**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| TERENCE ISAKOV, for himself and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ERNST & YOUNG, LTD. (BERMUDA); ERNST & YOUNG, LTD. (BAHAMAS); and ERNST & YOUNG, LLP,<br><br>Defendants. | Civil Action No. _____________<br><br>**JURY TRIAL DEMANDED**<br><br>September 24, 2010 |

## CLASS ACTION COMPLAINT

Plaintiff, Terence Isakov, M.D. ("Plaintiff"), on his own behalf and on behalf of all other investors in the Stewardship Credit Arbitrage Fund, L.L.C. ("Stewardship Fund" or the Fund") between March 15, 2006 and October 22, 2008 (the "Class Period"), alleges the following upon knowledge as to himself and his acts and, as to all other matters, upon information and belief, based upon, *inter alia*, the investigation made by and through his attorneys:

## OVERVIEW

1. From at least 2003 continuing to 2008, Defendants, Ernst & Young, Ltd. (Bermuda) ("E&Y Bermuda") and Ernst & Young, Ltd. (Bahamas) ("E&Y Bahamas"), together with, upon information and belief, the active assistance, involvement and/or oversight of Defendant, Ernst & Young, LLP ("E&Y") (collectively, with E&Y Bermuda and E&Y Bahamas, the "E&Y Defendants"), acted as the auditor of Stewardship Credit Arbitrage Fund, L.L.C. ("Stewardship Fund" or the "Fund") and, in furtherance of that engagement, provided Plaintiff and other investors in the Stewardship Fund with annual "Reports[s] of the Independent

Auditors." Without exception, each "Report of the Independent Auditors" claimed, *inter alia*, that (I) the referenced audit of the Stewardship Fund had been conducted "in accordance with auditing standards generally accepted in the United States of America," (ii) the audit "provide[d] a reasonable basis for our opinion" and (iii) the Stewardship Fund's audited financial statements "present fairly, in all material respects, the financial position of [the Stewardship Fund]."

2. These statements of E&Y Bermuda and E&Y Bahamas were false and misleading when issued to Plaintiff and other Stewardship Fund investors because the audits performed, if any, were not in accordance with Generally Accepted Auditing Standards ("GAAS") and, contrary to the claims of E&Y Bermuda and E&Y Bahamas, the Stewardship Fund's financial statements were not in conformity with Generally Accepted Accounting Principles ("GAAP"). In fact, since at least late 2004 and perhaps earlier, the Stewardship Fund's financial statements (indeed, its very financial solvency) were built upon loans supported by non-existent collateral, the utter falsity of which even the most rudimentary inquiry would have revealed.

3. The Stewardship Fund was essentially a "feeder fund" for a massive "Ponzi" orchestrated by Thomas J. Petters ("Petters"), a now-sentenced Minnesota businessman. Pursuant to this scheme, involving losses in excess of $3 billion, Petters, through corporate entities wholly subject to his control and direction, solicited investments from hedge funds, such as the Stewardship Fund, and other investors, to finance purported short-term loans for the purchase of high-end consumer electronics equipment, such as flat screen televisions, at a discount from foreign manufacturers which would then be re-sold, at a profit, to "Big Box" merchants such as BJ's Wholesale Club, Sam's Club and Costco. As confirmed by a unanimous December 2, 2009 jury verdict following trial in the United States District Court for the District

of Minnesota, which found Petters guilty of fraud and other related counts, the transactions which the loans were supposed to finance were completely fictitious; there were never any purchases or sales of any merchandise.

4. As revealed by the federal investigation, the Petters' fraud was perpetuated through the use of phony purchase orders and related transactional documents, created by one of Petters' co-conspirators. According to evidence submitted in connection with the Petters' prosecution, the conspirators themselves realized the flimsiness of their scheme, and were recorded acknowledging that "if investors send auditors out to visit warehouses where the merchandise is [supposedly] located, [] the scheme would implode." Indeed, federal investigators established the falsity of the purchase orders by presenting them to one of the intended retailers, who quickly confirmed that they were phony.

5. Because of the nature of the Stewardship Fund's investments, whereby a vast majority consisted of collateral loans to Petters and related entities, the E&Y Defendants were obligated to examine or test the existence of the collateral as part of their audits. That was never done, and the purportedly audited financial statements disseminated by the E&Y Defendants to Plaintiff and others similarly situated were false and misleading. As a result, investors such as Plaintiff and other members of the proposed Class were induced to invest, or to continue to invest, in the Stewardship Fund and thereby sustained damage.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the subject matter of this action under the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, and 28 U.S.C. §1331. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C.

§§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), including Rule 10b-5, 17 CFR § 240.10b-5.

7. Venue is proper in this judicial district pursuant to the provisions of the Exchange Act and 28 U.S.C. § 1391(b). Many of the acts and transactions giving rise to the violations of law complained of herein, including the E&Y Defendants' interaction with the Fund and its representatives and the receipt of false and misleading information to members of the proposed Class, occurred in this judicial district.

**PARTIES**

8. Plaintiff, as indicated by the attached Certification, made an additional capital contribution to the Fund, through his Individual Retirement Account, on September 1, 2006. Plaintiff, on behalf of his family's investment vehicle, previously had made a capital contribution to the Fund in January, 2005, and his spouse had invested in the Fund in 2003. As a "Member" of the Fund since at least 2005, Plaintiff received the E&Y Defendants' audit reports and the Fund's annual audited financial statements, on which he relied in making his Class Period investment. Plaintiff has sustained damages as a result.

9. E&Y Bermuda maintains its principal offices at 3 Reid Street, Hamilton, Bermuda. As more fully described below, E&Y Bermuda issued "clean" audit opinions of the Stewardship Fund on or about March 31, 2003, March 5, 2004, March 7, 2005, March 15, 2006, and March 27, 2007.

10. E&Y Bahamas maintains its principal offices at One Montague Place, East Bay Street, Nassau, Bahamas. As more fully described below, E&Y Bahamas issued a "clean" audit opinion of the Stewardship Fund on or about March 31, 2008.

11. E&Y is a partnership organized under the laws of the State of Delaware and maintains its principal place of business at 5 Times Square, New York, New York. At all times relevant hereto, the Ernst & Young Financial Services Office, which directs and supervises accounting and auditing professionals in E&Y Bermuda and E&Y Bahamas in the provision of services to hedge funds, was controlled and operated from E&Y's New York office.

12. According to their promotional materials, the E&Y Defendants are the leading auditors for the hedge fund industry, with the largest alternative investment practice among the "Big Four" auditors, touting that their personnel are "located in key hedge fund centers throughout the world to serve clients wherever they need assistance," who would "benefit from the collective skills and know-how of this interconnected, worldwide network." As the E&Y Defendants recently claimed:

> Our longstanding experience in the [hedge fund] industry provides us with uncommon insights into the spectrum of potential risks and the necessary internal controls. Valuation has increasingly become one of the most challenging areas that funds and their boards of directors face. ... Our audit teams leverage the knowledge and skills of our entire assets management practice, including those of internal valuation professionals in the areas of derivatives, structured products and private company valuations.

Moreover, the E&Y Defendants are all member firms of Ernst & Young Global, which is the principal governing entity of the global Ernst & Young organization, and are bound by, *inter alia*, a "Global Code of Conduct," which emphasizes "guiding principles" such as "professional integrity" and "maintaining [] objectivity and independence."

## BACKGROUND

**The Stewardship Fund**

13. The Stewardship Fund, created in 2001, is organized as a limited liability company under the laws of Delaware, with its principal offices located in Greenwich, Connecticut. During the proposed Class Period, according to monthly statements and other information provided to Plaintiff and other members of the proposed Class, the total assets under management by the Fund fluctuated between approximately $120 million and $160 million.

14. The Stewardship Fund is controlled by the Managing Member, Stewardship Investment Advisors LLC ("Advisors"), which is also structured as a Delaware limited liability company, and which share the same principal office location as the Fund. Advisors' sole member is Marlon Quan ("Quan"). Under Quan's control and direction, Advisors is vested with the authority to make all investment and trading decisions on behalf of the Stewardship Fund.

15. As a "hedge fund," the Stewardship Fund is an investment vehicle by which its members' "capital contributions" (*i.e.*, minimum initial investments of $1 million) are pooled to be collectively invested using a specific strategy. Although its May 1, 2006 Private Placement Memorandum (the "PPM") identified other types of investments, the Stewardship Fund's primary investing strategy was asset-based lending ("ABL"). In general, ABL seeks to, *inter alia*, invest in privately originated loans to companies or other entities, which are secured by a specific asset or pool of assets. More specifically, the Stewardship Fund's investment strategy was to purchase short-term notes, or loans, that were used to finance the purchase of non-perishable consumer merchandise inventory. Such a strategy is attractive to sophisticated investors because it is based on loans of relatively short duration (*i.e.*, from when the consumer

merchandise is acquired by the intermediary or broker and when the merchandise is purchased by the retailer – and the loan is repaid), and typically creates a steady cash flow, as the cash received from repayment of one loan is rolled over into new loans of similar maturity.

16. As described in the PPM, the Stewardship Fund would "seek a high level of current income and capital appreciation while minimizing risk by (1) purchasing a broad range of secured high-yield short-term notes from, or issued by, Acorn Capital Group, LLC ("Acorn"), a financing company ... engaged in providing commercial financing generally on a transaction-by-transaction basis ..." Acorn, also organized as a Delaware limited liability company, was created in 2001 and Quan is its sole member and President. Its principal offices have the same address as the Fund and Advisors and, upon information and belief, the Fund, Advisors and Acorn are staffed by the same employees. As the PPM acknowledged, Quan "effectively controls both Acorn and the [Stewardship Fund] through ownership interests in [Advisors] and Acorn." The PPM made clear that, although it was possible that the notes of "other financing companies" could be purchased by the Stewardship Fund, "all or substantially all of the Short-Term Notes that the [Fund] will purchase will be sold to it by Acorn ..."

17. The PPM also made clear that, not only did all investment and decision-making authority reside with Quan, through his control of Advisors, but all interaction between the Fund and its Members (*i.e.*, investors) would be through him. For example, the PPM directed that all requests for additional information should be directed to Quan. Further, the PPM flatly stated that "[m]embers do not take part in the management or control of the [Fund]" and although the Fund would "make all required state and federal filings with respect to the sale of Interest ... [m]embers will not receive copies of these filings."

18. Acorn, as an asset-based lender, claims to "fill the gap between traditional lenders and high-cost niche financing." This is consistent with the presentation materials used in or around September, 2004 to solicit new "members" to the Stewardship Fund in connection with an earlier Private Placement Memorandum, in which Acorn is portrayed as lending "to intermediaries typically involved in service businesses, product brokerage and distributors [which] often have high quality assets but lack strong balance sheets [and] typically have a need to match their short-term liabilities against longer-term receivables." Financing companies such as Acorn "can bridge that gap."

19. In both the presentation materials and the PPM, the Stewardship Fund emphasized its ability to manage risk. As stated in the former, "[t]o ensure principal protection, securities are over collateralized" and the Fund would employ "many safeguards to lower the risk profile" of its investments, including "[o]nly short term note exposure – under 180 days," "[s]trong capital reserves and collateral" and "'A' rated receivable exposure or better." The presentation materials identified a diverse collection of nine different "types of asset based trades." In a slide titled "Collateral Risk Management," the Stewardship Fund stressed that:

– types of collateral considered are cash (or cash equivalent), inventory and accounts receivable;

– only notes with 180 day tenor or less are considered;

– all deals include the filing of a UCC-1 assigning the collateral; and

– additional cash collateral is held in a segregated account.

In a slide captioned "Borrower Risk Management," the Stewardship Fund stated that, notwithstanding that "[s]ecuritized transactions have little exposure to the borrower, [] several

precautions have been taken," such as Acorn's demand for "additional collateral against the loan to compensate for less or poor quality collateral, such as corporate guarantees, personal guarantees [and] other tangible assets." In addition, "[a]ll deals with same borrowers are cross collateralized" and a "major accounting firm has been retained to examine the books of intermediaries [*i.e.*, the companies to which Acorn would make the loans]." Moreover, the Stewardship Fund's investors were promised that, since they would "rely on Acorn to manage debt servicing, investors receive audits from both the [Fund] and Acorn."

20. The PPM specified that Acorn's notes would be primarily issued "by companies that provide assets for collateral including, without limitation, companies such as: merchandise distributors ('distribution companies') who are engaged in the business of buying excess high-quality, consumer merchandise inventory arising, for example, from manufacturing overruns, wholesale inventory overages and retail bankruptcies, at distressed prices and selling the merchandise to retailers at a profit" and that such collateral "may include, without limitation, high-quality consumer merchandise and other inventory, work in the process of manufacture, ... general accounts receivables and purchase order receivables." The PPM further provided that Acorn would, "with respect to each Distribution Company and related transactions:"

– enter into a Credit Agreement, Security Agreement(s) and Lock-Box Agreement (and certain ancillary agreements);

– receive a Secured Promissory Note;

– be designated as a co-beneficiary on policies of insurance with respect to various defaults or other risks of loss on the Short-Term Notes;

– confirm that the underlying assets fall into an acceptable category;

– confirm that the accounts receivable counterparty has an "A" or higher credit

rating prior to acquisition, inclusive of any credit insurance coverage;

– obtain a security interest in the underlying assets and accounts receivable proceeds;

– require payment of the accounts receivable into a lock-box account; and

– perform ongoing quantitative and qualitative analysis or similar protracted procedure to determine the fair market value of underlying assets of the short-term commercial credit market and the financial conditions of the borrower and its customers.

21. The PPM provided that investors would receive "an annual report with respect to the prior Fiscal Year," although the earlier version of the Private Placement Memorandum specified that each member would "be furnished with monthly updates and annual reports containing audited financial statements with respect to the prior year." In the PPM and in prior versions, E&Y Bermuda was identified as the Fund's auditors. Pursuant to that commitment, in March of each year, from 2003 to 2007, E&Y Bermuda (or E&Y Bahamas with respect to 2008) issued a "Report of Independent Auditors," accompanied by the Fund's audited "consolidated statement of financial condition," addressed to "the Members of [the Stewardship Fund]."

**Professional Standards Governing Auditors**

22. The E&Y Defendants, through E&Y Bermuda, served as the Stewardship Fund's auditor from at least 2003 through October 22, 2008, when Quan issued a notice to Plaintiff and other members of the proposed Class that the E&Y Defendants had notified him that "their audit opinions and financial statements produced for the year ended December 31, 2007 and issued on March 31, 2008 for [the Fund] and [Acorn] can no longer be relied upon." During this time frame, including the Class Period, the E&Y Defendants were obligated to, and claimed that they

did, audit the Fund's financial statements in accordance with GAAS.[1] In reckless disregard of the Fund's true financial condition, including the condition of collateral that secured the overwhelming majority of the Fund's investments (the existence of which were never even determined), the E&Y Defendants certified materially false and misleading financial statements and issued unqualified auditing reports, as described below, which were equally false and misleading. Without these materially false and misleading unqualified audit opinions, the Petters fraud would have been discovered earlier, or would not have continued, and the injury suffered by Plaintiff and other members of the proposed Class would not have occurred, or its extent would have been considerably diminished.

23. There are ten GAAS provisions, which are divided into three types of standards: (1) general standards, which provide guidelines for auditor training and maintaining independence from the client; (2) standards of fieldwork, which provide guidelines for audit planning, collecting evidential verification for audit findings, and the proper evaluation of internal controls; and (3) standards of reporting, which are primarily concerned with ensuring that financial statements are presented in accordance with GAAP. As explained in detail below, the E&Y Defendants violated some of these provisions while acting as the Stewardship Fund's purportedly independent auditor.

24. Initially, GAAS requires that "[i]n all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors." AU § 150.02.

---

[1]GAAS, as approved and adopted by the American Institute of Certified Public Accountants ("AICPA"), relates to the conduct of the individual audit engagements. Statements on Auditing Standards (codified and referred to as AU § __) are recognized by the AICPA as the interpretation of GAAS.

This requirement is necessary because of the importance in having the public maintain confidence in the independence of auditors. AU § 220.03. Indeed, this overarching concept of auditor objectivity and independence is one of the five "guiding principles" in Ernst & Young's Global Code of Conduct.

25. GAAS Standard of Fieldwork No. 1 requires audits to be "adequately planned," and provides that particular attention should be paid to matters that, if inaccurately reported in a financial statement, could materially alter a company's financial situation. Thus, "[d]ue professional care is to be exercised in the planning and performance of the audit and the preparation of the report." AU § 230.01. Among other things, due professional care requires that an auditor exercise professional skepticism, defined as "an attitude that includes a questioning mind and a critical assessment of audit evidence." AU § 230.07. "Gathering and objectively evaluating audit evidence requires the auditor to consider the competency and sufficiency of the evidence." AU § 230.08. "In exercising professional skepticism, the auditor should not be satisfied with less than persuasive evidence because of a belief that management is honest." AU § 230.09. Furthermore, a GAAS-compliant audit operates as a "a cumulative process; as the auditor performs planning auditing procedures, the evidence obtained may cause him or her to modify the nature, timing, and extent of other planned procedures." AU § 312.33.

26. AU § 319 and GAAS Standards of Fieldwork No. 2 instruct auditors to obtain a sufficient understanding of a company and its internal control structure to plan an effective audit that will allow the auditor to assess the audit risk associated with inadequate internal controls. Given the E&Y Defendants' claimed expertise in hedge fund audits, the critical importance of collateral to ABL investing strategies must have been appreciated.

27. GAAS also required the E&Y Defendants, as part of the audit planning process, to identify "fraud risk factors," or circumstances that could lend themselves to fraudulent and/or illegal activities. AU § 316, Consideration of Fraud in a Financial Statement Audit, serves as a roadmap for uncovering accounting fraud by providing examples of "events or conditions that indicate incentives/pressures to perpetrate fraud, opportunities to carry out the fraud, or attitudes/rationalizations to justify a fraudulent action," and requires that independent auditors utilize professional skepticism. The E&Y Defendants either ignored or failed to identify several red flags in connection with the Stewardship Fund that AU § 316 identifies as "fraud risk factors," including:

- Among "Incentives/Pressures" to perpetrate financial reporting fraud are "[r]apid growth or unusual profitability." Here, pursuant to monthly reports distributed to Plaintiff and other members of the proposed Class, the Fund consistently reported double-digit monthly returns; for example, in October, 2005, the Fund reported an average monthly return of 0.83% and an annualized return of 10.37% and by April, 2008, those percentages were virtually unchanged – the Fund reported an average monthly return of 0.82% and an annualized return of 10.31%. The Fund stated that it never had an unprofitable month since its inception in 2001. This supposedly stellar growth provided an identifiable incentive and pressure to commit fraud.

- Among "Opportunities" to perpetrate financial reporting fraud are "[f]ormal or informal restrictions on the auditor that inappropriately limit his or her access to people or information;" "[a]ssets, liabilities, revenues, or expenses based on significant estimates that involve subjective judgments or uncertainties that are difficult to corroborate;" "[d]omination of management by a single person or small group ... without compensating controls," and "[i]neffective board of directors or audit committee oversight over the financial reporting process and internal control." As indicated in the PPM, the Fund had no board of directors, and if there was an audit committee, its members were never identified to Plaintiff or any other investors. Quan dominated the Fund, through his control of both Advisors and Acorn. Investors were emphatically told they had no role in management or control of the Fund, would not receive copies of regulatory filings and that all requests for information had to be funneled through Quan. In addition, it is clear that the E&Y Defendants never inspected any of the collateral

> which secured the loans purchased by the Fund from Acorn, because if they had, its non-existence would have been discovered. If the E&Y Defendants had sought to conduct such an examination and were refused (as, upon information and belief, other parties contracting with Acorn had sought to do), this too would have been a prominent red flag. Thus, there were ample opportunities for fraud to be perpetrated.

28. GAAS Standard of Fieldwork No. 3 states that "[s]ufficient competent evidential matter is to be obtained through inspection, observation, inquiries and confirmations to afford a reasonable basis for forming an opinion regarding the financial statements under audit." AU § 326, Evidential Matter, explains that the evidential matter collected and evaluated by auditors is central to a proper audit and serves as the foundation for the auditor's opinion report. Thus, the E&Y Defendants were required to investigate and obtain supporting evidential documentation for the assertions made by the Stewardship Fund in its financial statements, including the value of collateral that secured a majority of its investments, and could not merely take the word of Quan or other employees of the Fund (or Acorn) about the accuracy of the financial statements or the quality of the collateral.

29. Furthermore, consistent with the professional skepticism that must accompany any audit, the auditor should "recognize the possibility that the financial statements may not be fairly presented in conformity with [GAAP] ..." and should "consider relevant evidential matter regardless of whether it appears to corroborate or contradict the assertions in the financial statements." AU § 326.25. Management representations "are part of the evidential matter the independent auditor obtains, but they are not a substitute for the application of those auditing procedures necessary to afford a reasonable basis for an opinion regarding the financial statements under audit." AU § 333.02.

30. AU § 342, Auditing Accounting Estimates, explains that an "auditor's objective when evaluating accounting estimates is to obtain sufficient competent evidential matter to provide reasonable assurance that ... [a]ll accounting estimates that could be material to the financial statements have been developed." AU § 342.07. Among other things, the E&Y Defendants had to obtain competent evidential matter to provide reasonable assurance of the reasonableness of any estimates, provided by either the Fund or Acorn, of the collateral securing the loans purchased by the Fund from Acorn. Given the nonexistence of this collateral, at least with respect to loans made by Acorn to entities controlled by Petters, the E&Y Defendants could not have obtained "competent evidential matter" upon which reasonable assurances could be based.

31. Had the E&Y Defendants adequately planned and conducted their audits in accordance with GAAS, they would have discovered that the collateral securing loans made by Acorn to the Petters entities, which were sold to the Fund, were fabricated, which would have eliminated or at least lessened the damages suffered by Plaintiff and other members of the proposed Class.

32. GAAS Standard of Reporting No. 1 states: "The [audit] report shall state whether the financial statements are presented in accordance with [GAAP]." GAAS Standard of Reporting No. 4 and AU § 508, Reports on Audited Financial Statements, provide that an auditor can only give an unqualified audit report if the company's "financial statements present fairly, in all material aspects, an entity's financial position, results of operations, and cash flows in conformity with [GAAP]," and the audit was conducted in accordance with GAAS. Section 508 further provides that if an auditor cannot give an unqualified audit report, the circumstances may

require the auditor to give the company an adverse opinion or to include explanatory language in the audit opinion report to explain non-conformities with GAAP. The E&Y Defendants issued unqualified audit reports for six consecutive years stating that the Stewardship Fund's financial statements were presented fairly and in accordance with GAAP. In reality, this was untrue.

**The Petters Fraud**

33. In early September, 2008, a federal task force assembled in the District of Minnesota began investigating allegations of a massive fraud being committed by Petters, a well-known Minnesota entrepreneur who controlled an empire of companies, including Polaroid Corporation and Sun Country Airlines, and who had operated a company issuing short-term trade finance notes, Petters Co., Inc., since the mid-1990s.

34. As described in multiple sources, including, *inter alia*, the Second Amended Complaint for Permanent Injunction and other Equitable Relief, filed on October 6, 2008, in *U.S. v. Petters, et al.*, No. 08-CV-5348 (ADM) (D. Minn.) (the "Injunction Complaint") and the Complaint, filed on July 8, 2009, in *S.E.C. v. Petters, et al.*, No. 09-cv-1750 (ADM) (D. Minn.) (the "SEC Complaint"), as well as various newspaper articles and other media reports concerning the ongoing investigation and subsequent trials and convictions of Petters and his co-conspirators, the scheme orchestrated by Petters and his co-conspirators was stunningly simple. Through Petters Co., Inc., PAC Funding, LLC and related companies (collectively, the "Petters Companies"), Petters offered and sold promissory notes issued by the Petters Companies to hedge funds and other investors representing that the proceeds from the sale of the notes would be used to finance "purchase order inventory financing."

35. Purchase order inventory financing consisted of transactions in which the Petters

Companies arranged for the sale and delivery of end runs or overstock merchandise, primarily high-end consumer electronics such as flat screen televisions, from foreign-based manufacturers to “Big Box” retailers and consumer wholesale clubs, such as Wal-Mart and Costco (the “Retailer(s)”). Petters represented that these transactions usually took up to 180 days to complete and that the manufacturers demanded payment up-front while the Retailers did not pay until the merchandise was delivered. The financing represented by the Petters Companies’ notes was needed to finance the 180-day period between the Retailers’ orders of merchandise and the Retailers’ payment for the goods.

36. Petters represented that the promissory notes would be accompanied by a high rate of return, beginning at an annualized 11%, and they entailed minimal risk – in addition to being short term, each promissory note was secured by the underlying merchandise being financed by the note. In addition to a funding request from the Petters Companies, potential note purchasers would be presented with a series of documents relating to the transaction, including an executed note document reflecting the investment and the guaranteed rate of return within 180 days, purchase orders from a Retailer, bills of sale from manufacturers to intermediaries (companies who handled the actual acceptance and delivery of the merchandise), and an assignment of a security interest in the underlying merchandise to the note purchasers.

37. However, as Petters later would be recorded admitting, it was all “one big [expletive deleted] fraud.” No merchandise was ever ordered, let alone purchased, and there were no sales to Retailers. The two intermediaries used by the Petters Companies were shell companies, with no assets or operations, the principals of which were co-conspirators with Petters. The purchase orders and bills of sale were completely false, created by one of Petters’

co-conspirator's "cutting and pasting" from other documents. The supposed assignments of security interests were worthless, as there was no merchandise to be secured, and the promissory notes themselves were likewise without any value. According to the SEC Complaint, as of September, 2008, the combined balance sheet for the Petters Companies reflected total current liabilities, including outstanding notes to approximately twenty entities and individuals, of $3.5 billion.

38. As indicated in the October 2, 2008 Affidavit of Eileen Rice, a F.B.I. Special Agent, which was filed with the Injunction Complaint, the fraud was easy to detect if someone had bothered to look. As one of the co-conspirators was recorded as observing, since there was no merchandise (nor, in some instances, even a warehouse), the scheme would "implode" if note purchasers' auditors ever attempted to "visit warehouses." Federal investigators were able to establish the falsity of the "hard copy" purchase orders and bills of sale by simply showing them to one of the Retailers, who confirmed that the Petters Companies' vendor numbers, as well as the Retailer's purchase order numbers, were fictitious. Moreover, at least one of the Retailers required that entities from which it purchases goods utilize an electronic data exchange system, whereby all purchase orders, invoices and transactional documents were exchanged electronically, thus eliminating the need for paper documents. In addition, this Retailer's suppliers were required to use "Retail Link," an internet-based application used to ensure that suppliers met specifications.

39. As even Petters and his co-conspirators realized, even a minimal investigation by auditors would have disclosed that there was no merchandise securing millions of dollars' worth of promissory notes sold by the Petters Companies. The fact that the Petters fraud lasted as long

as it did provides inconvertible evidence that, although Acorn purchased hundreds of millions of dollars' worth of promissory notes from the Petters Companies, which were then sold to the Fund, such an examination was never conducted by the E&Y Defendants.

## THE E&Y DEFENDANTS' FALSE AND MISLEADING STATEMENTS

### Pre-Class Period Statements

40. On or about March 31, 2003, the E&Y Defendants issued their first audit opinion regarding the Stewardship Fund (the "2003 Report"), which was signed by E&Y Bermuda, to "the Members of [the Fund]." This opinion confirmed, *inter alia*, that "[a]n audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements." Based on their audit, the E&Y Defendants represented that "the financial statements referred to above present fairly, in all material respects, the financial position of [the Stewardship Fund] at December 31, 2002 and the results of its operations ... for the year then ended, in conformity with accounting principles generally accepted in the United States of America."

41. On or about March 5, 2004, in a report issued to "Members of [the Fund]" by E&Y Bermuda (the "2004 Report"), the E&Y Defendants issued an opinion, virtually identical to the 2003 Report, representing that, based upon their audit, "the financial statements referred to above present fairly, in all material respects, the financial position of [the Stewardship Fund] at December 31, 2003 and the results of its operations ... for the year then ended, in conformity with accounting principles generally accepted in the United States of America."

42. On or about March 7, 2005, in a report issued to "Members of [the Fund]" by E&Y Bermuda (the "2005 Report"), the E&Y Defendants issued an opinion, virtually identical to the 2003 Report and the 2004 Report, representing that, based upon their audit, "the financial

statements referred to above present fairly, in all material respects, the financial position of [the Stewardship Fund] as of December 31, 2004 and the results of its operations ... for the year then ended, in conformity with accounting principles generally accepted in the United States of America." The only difference between the 2005 Report and the earlier Reports was the E&Y Defendants' disclaimer that they had not been "engaged to perform an audit of the [Fund's] internal control over financial reporting" and the 2005 Report would "express no such opinion." Nonetheless, presumably in recognition of AU § 319 and their GAAS obligations, the E&Y Defendants acknowledged that their "audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances ..."

**Class Period Statements**

43. On or about March 15, 2006, in a report issued to "Members of [the Fund]" by E&Y Bermuda (the "2006 Report") and received by Plaintiff, the E&Y Defendants issued an opinion, virtually identical to the 2005 Report, representing that, based upon their audit, purportedly conducted in accordance with GAAS, "the financial statements referred to above present fairly, in all material respects, the financial position of [the Stewardship Fund] as of December 31, 2005 and the results of its operations ... for the year then ended, in conformity with accounting principles generally accepted in the United States of America."

44. The Statement of Financial Condition (the "2006 Financial Statement") that accompanied the 2006 Report acknowledged, *inter alia*, consistent with the PPM and other information, that the Fund "seeks a high level of current income and capital appreciation while minimizing risk by purchasing high-yield short-term notes from [Acorn, which was] engaged in

providing commercial financing generally on a transaction basis." The 2006 Financial Statement further recognized that the Fund only purchased promissory notes from Acorn, and that the Fund's "investments in promissory notes are secured by collateral and in some instances, by a limited guarantee granted by the majority shareholder of the issuer of the promissory notes" and that "[s]uch collateral has been assigned to the [Fund] by Acorn in respect of promissory notes purchased from Acorn." The 2006 Financial Statement reflected that the Fund had purchased over $86 million worth of promissory notes from Acorn, comprising over 75% of the Fund's total investments, although there was no indication as to the identity of the underlying borrower.

45. Therefore, as of the date of the 2006 Report, the E&Y Defendants knew that the vast majority of the Fund's investments were in promissory notes purchased by Acorn, which were secured by collateral assigned to the Fund (and perhaps a personal guarantee of the underlying promisor). The E&Y Defendants also knew that they had never inspected or examined the collateral, and indeed were unaware whether it even existed. To the extent a personal guarantee accompanied any promissory note, the E&Y Defendants knew nothing about the credit-worthiness of the guarantor. As a result, the audit was not conducted in accordance with GAAS and the 2006 Financial Statement was not in conformity with GAAP. Notwithstanding this, the E&Y Defendants issued the 2006 Report, which was false and misleading for the reasons stated.

46. On or about March 27, 2007, in a report issued to "Members of [the Fund]" by E&Y Bermuda (the "2007 Report") and received by Plaintiff, the E&Y Defendants issued an opinion, virtually identical to the 2006 Report, representing that, based upon their audit, purportedly conducted in accordance with GAAS, "the financial statements referred to above

present fairly, in all material respects, the financial position of [the Stewardship Fund] as at December 31, 2006 and the results of its operations ... for the year then ended, in conformity with accounting principles generally accepted in the United States of America."

47. For the reasons set forth above, as of the date of the 2007 Report, the E&Y Defendants knew that the vast majority of the Fund's investments were in promissory notes purchased by Acorn, which were secured by collateral assigned to the Fund (and perhaps personal guarantees of the underlying promisor). The E&Y Defendants also knew that they had never inspected or examined the collateral, and indeed were unaware whether it even existed. As a result, the audit was not conducted in accordance with GAAS and the financial statement accompanying the 2007 Report was not in conformity with GAAP. Notwithstanding this, the E&Y Defendants issued the 2007 Report, which was false and misleading for the reasons stated.

48. On or about March 31, 2008, in a report issued to "Members of [the Fund]" by E&Y Bahamas (the "2008 Report") and received by Plaintiff, the E&Y Defendants issued an opinion, substantially similar to the 2006 Report and 2007 Report, representing that, based upon their audit, purportedly conducted in accordance with GAAS, "the consolidated financial statements referred to above present fairly, in all material respects, the financial position of [the Stewardship Fund] as at December 31, 2007, and the results of its operations ... for the year then ended in conformity with accounting principles generally accepted in the United States of America."

49. The 2008 Report was accompanied by the Consolidated Statement of Financial Condition – with Consolidating Details (the "2008 Financial Statement"). As explained by the 2008 Report, "[t]he consolidating details are presented for purposes of additional analysis" and

had been "subjected to the auditing procedures applied in our audit of the [2008 Financial Statement]." The 2008 Financial Statement disclosed that, as of November, 2007, the Fund had created two wholly-owned subsidiaries, Putnam Green LLC and Livingston Acres (the "Subsidiaries"), "to facilitate a leverage facility with AG Deutsche Zentral-Genossenschaftsbank Frankfurt Am Main ('DZ Bank')." Thus, the financial position of the Fund reflected in the 2008 Report was consolidated with that of the Subsidiaries, although "[a]ll intercompany transactions have been eliminated on consolidation." The 2008 Financial Statement reflected that the Fund had purchased over $108 million worth of promissory notes from Acorn, comprising over 90% of the Fund's total investments. Although there still was no indication as to the identity of the underlying borrower, in a section of the 2008 Financial Statement discussing credit risk, it was revealed that the Fund "has credit exposure of $77,172,318 for investments in promissory notes from a group of issuers related through common ownership."

50. Therefore, as of the date of the 2008 Report, the E&Y Defendants knew that the overwhelming majority of the Fund's investments, either directly or through the Subsidiaries, were in promissory notes purchased by Acorn, and of these, the vast majority were issued by inter-related companies. As with the 2006 Report and the 2007 Report, the E&Y Defendants knew that these promissory notes were secured by collateral assigned to the Fund (and perhaps a personal guarantee of the underlying promisor), but they also knew that they had never inspected or examined the collateral, did not know whether it even existed and, to the extent a personal guarantee accompanied a promissory note, the E&Y Defendants knew nothing about the credit-worthiness of the guarantor. As a result, the audit was not conducted in accordance with GAAS and the 2008 Financial Statement was not in conformity with GAAP. Notwithstanding this, the

E&Y Defendants issued the 2008 Report, which was false and misleading for the reasons stated.

**Events Leading Up To The Uncovering Of The Petters Fraud**

51. On August 14, 2008, Acorn commenced an action against Petters individually, *Acorn Capital Group, LLC v. Thomas J. Petters*, No. 08 Civ. 7236 (S.D.N.Y.). The complaint (the "Acorn Complaint") alleged that Acorn, beginning in November, 2004, had made a series of loans to PAC Funding, LLC, one of the Petters Companies, the collective amount of which exceeded $273 million, exclusive of interest, all of which were past due and outstanding. Acorn further alleged that "certain" of the promissory notes pursuant to which the loans had been made to the Petters Companies had been assigned by Acorn to six other funds (upon information and belief, all related or ultimately controlled by Quan), including the Stewardship Fund and its Subsidiaries. The Acorn Complaint specifies that, as a result of Acorn's assignment, the Stewardship Fund was owed over $9 million by the Petters Companies, and the Subsidiaries were owed over $50 million. The Acorn Complaint alleges that, because the Petters Companies were in default to Acorn, Petters had breached his personal guaranty ($50 million) for repayment of the promissory notes. The Acorn Complaint further alleges that Petters individually breached certain related representations and warranties because, in an August 4, 2008 telephone call with Quan, Petters had admitted that the collateral underlying the promissory notes was worth less than the contractual limit and that some of the collateral consisted of inventory, rather than accounts receivable. Upon information and belief, Plaintiff and other members of the proposed Class were first informed of the existence of Acorn's action against Petters in an October 17, 2008 memorandum from Quan to the Fund's "Members."

52. On September 25, 2008, the *Minneapolis Star Tribune* reported that federal agents

had executed a wide-ranging search warrant on the offices of one of the Petters Companies. A spokesperson of the Petters Companies was quoted as saying that "[t]he investigation pertains to one financial entity that Petters is involved with." The next day, the *Minneapolis Star Tribune* reported that, according to an affidavit submitted by the federal government in support of its search warrant application, just unsealed that afternoon, it was alleged that Petters and the Petters Companies had engaged in a massive fraud, involving phony purchase and sales orders used to document that funds loaned to the Petters Companies were "secured by property, principally retail goods, that were purchased at wholesale from vendors ... and sold to retailers such as Wal-Mart and Sam's Club for a profit." By October 1, 2008, *Bloomberg.com* was reporting that Acorn was "among at least 20 investors the F.B.I. said may have been victimized by [Petters'] fraudulent lending scheme that could exceed $2 billion." In a May 26, 2010 Final Proposed Restitution Order filed by the federal government in the *Petters*' criminal action, it was estimated that Acorn sustained losses of almost $140 million as a result of the Petters' fraud.

53. By a memorandum dated October 17, 2008, Quan notified Plaintiff and other members of the proposed Class that "[t]he Federal Government is conducting an investigation into allegations of fraud allegedly perpetrated by [] Petters and others associated with [the Petters Companies.]" The memorandum claimed that approximately sixty percent of the Fund's investments (including that of the Subsidiaries), totaling more than $80 million, were loans to the Petters Companies, and that representatives of Acorn and Advisors had met with the court-appointed receiver of the Petters Companies to discuss, *inter alia*, "the collateral securing the applicable loan notes owned by the [Fund]."

54. By a memorandum dated October 22, 2008, Quan notified Plaintiff and other

members of the proposed Class that "[b]ecause of the unprecedented set of facts and circumstances being presented by the Petters situation, which were unknown at the time, we have been requested by Ernst & Young LLP to notify you that their audit opinions and financial statements produced for the year ended December 31, 2007 and issued on March 31, 2008 for [the Fund] and [Acorn] can no longer be relied upon."

## CLASS ACTION ALLEGATIONS

55. Plaintiff brings this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of himself and all other persons who invested or otherwise contributed to the Stewardship Fund during the Class Period (*i.e.*, between March 15, 2006 and October 22, 2008). Excluded from the Class are the E&Y Defendants, their subsidiaries and affiliates, any entities in which they have a controlling interest, the legal representatives, heirs, successors, predecessors in interest, affiliates or assigns of any of the Defendants, and the Judge(s) to whom this case is assigned.

56. This action may properly be maintained as a class action as a result of the following facts:

a. During the Class Period, at least sixty entities or individuals, located in many parts of the United States, were Members of the Fund, and are so numerous that joinder of all members of the Class is impracticable;

b. Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff and all members of the Class sustained damages as a result of the E&Y Defendants' wrongful conduct complained of herein;

c. Plaintiff is a representative party who will fairly and adequately protect the

interests of the other members of the Class, has retained counsel competent and experienced in class action securities litigation and has no interests antagonistic to, or in conflict with, the Class he seeks to represent;

d. A class action is superior to all other available methods for the fair and efficient adjudication of the claims asserted herein, because joinder of all members is impracticable. Furthermore, even though the damages suffered by the individual Class members may be significant, the expense and burden of individual litigation may make it difficult for the Class members to separately redress the wrongs done to them. Although some individual actions have been commenced by Class members, upon information and belief, none have asserted claims under the federal securities laws against the E&Y Defendants;

e. Plaintiff anticipates no unusual difficulties in the management of this action as a class action; and

f. The questions of law and fact common to the members of the Class predominate over any questions affecting any individual members of the Class.

57. The questions of law and fact which are common to the Class include, among others:

a. Whether the federal securities laws were violated by the acts of the E&Y Defendants as alleged in this Complaint;

b. Whether the audit reports disseminated to members of the Class by the E&Y Defendants during the Class Period omitted or misrepresented material facts about the E&Y Defendants' audits, as well as the financial condition, business prospects, and internal controls of the Stewardship Fund;

c. Whether the E&Y Defendants failed to correct previously issued audit reports that they knew to be false or they recklessly disregarded the truth or falsity of such audit reports;

d. Whether the E&Y Defendants failed to disclose material, adverse information at a time when they were in possession of such information;

e. Whether the E&Y Defendants acted with knowledge or reckless disregard for the truth in misrepresenting and omitting material facts from the audit reports; and

f. Whether the members of the Class have sustained damages and, if so, what is the proper measure thereof.

## COUNT I

## VIOLATION OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT AND RULE 10b-5 THEREUNDER (Against all Defendants)

58. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if set forth herein at length.

59. Throughout the Class Period, E&Y Bermuda, E&Y Bahamas and E&Y, singly and in concert, directly or indirectly, issued audit opinions that constituted the presentation of false and misleading information as to the assets of the Stewardship Fund. Instead of millions of dollars, as represented, virtually no assets existed. These statements were made recklessly, and constitute deceptive and untrue statements of material facts and omissions of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. These statements induced Plaintiff and other members of the Class to make investments or contributions in the Stewardship Fund.

60. The E&Y Defendants issued audit opinions with respect to the Fund's financial statements in which they (I) stated that they conducted the audits in accordance with GAAS and (ii) expressed their unqualified opinion that the Fund's financial statements "present[ed] fairly, in all material respects, the financial position of [the Stewardship Fund] ..." Those statements were false. In truth, the E&Y Defendants did not confirm the existence of the Fund's assets nor the collateral underlying the promissory notes sold to the Fund by Acorn. While purporting to conduct an audit, the E&Y Defendants did not take the most fundamental and obvious step of confirming the existence of the Fund's assets or the collateral, and did not do so despite the requirements of GAAS.

61. The E&Y Defendants acted recklessly in making the false statements and their conduct in performing the audits was highly unreasonable and represented an extreme departure from the standards of ordinary care. Moreover, when they made their false statements and committed their omissions, the E&Y Defendants knew facts or had access to information suggesting that their public statements were not accurate or failed to check information they had a duty to monitor and which have demonstrated the falsity of their statements.

62. To issue clean audit opinions that the Stewardship Fund had millions of dollars of assets, secured by collateral worth at least that much or more, without any independent confirmation that any of the assets or collateral existed, is a textbook definition of an audit so reckless as to essentially constitute no audit at all. Issuing clean audit opinions in the circumstances here, with the red flags set forth above, is even more reckless. The failure of the E&Y Defendants to acquire evidential matter from, *inter alia*, independent third parties such as the consumer electronic equipment manufacturers or the Retailers, or to acquire direct personal

knowledge of the existence of the collateral, such as by inspections and physical examination, not only was a blatant violation of auditing standards, but violated the most fundamental and obvious purpose of an audit – to confirm that reported assets (and here, the collateral) in fact exist.

63. The facts alleged herein compel a strong inference that the E&Y Defendants made material false and misleading statements in the audit reports to Plaintiff and other members of the Class with scienter, in that the E&Y Defendants knew that the audit reports were materially false and misleading; knew or recklessly disregarded that such audit reports would be issued or disseminated to Plaintiff and other members of the Class; and/or knowingly and substantially participated or acquiesced in the issuance or dissemination of such audit reports as primary violators of the federal securities laws.

64. As a result of the foregoing, the value of interests in the Stewardship Fund were artificially inflated during the Class Period. In ignorance of the falsity of the audit reports and the statements and representations made therein, and the deceptive and manipulative devices and contrivances employed by the E&Y Defendants, Plaintiff and the other members of the Class reasonably relied, to their detriment, on the audit reports and statements described above in investing or otherwise continuing to contribute to the Stewardship Fund, the value of which was artificially inflated as a result of the E&Y Defendants' false and misleading statements.

65. Had Plaintiff and the other members of the Class known of the material adverse information which the E&Y Defendants failed to disclose and/or misrepresented, they would not have invested or otherwise continue to invest in the Stewardship Fund, if at all, in the amounts that they did.

66. The E&Y Defendants' dissemination of this false and misleading material

information, and their failure to disclose material information that rendered their other statements false and misleading, served only to harm Plaintiff and the other members of the Class who invested or otherwise contributed to the Stewardship Fund, in ignorance of the financial risk to them as a result of such false and misleading information.

67. As a direct and proximate result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

68. By reason of the foregoing, the E&Y Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and the other members of the Class for the substantial damages which they suffered in connection with their investment or contribution in the Stewardship Fund during the Class Period.

**COUNT II**

**VIOLATION OF SECTION 20(a)**
**OF THE SECURITIES EXCHANGE ACT**
**(Against E&Y)**

69. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if set forth herein at length.

70. During the Class Period, E&Y, by virtue of its control and operation of the Ernst & Young Financial Services Office, was a controlling person of E&Y Bermuda and E&Y Bahamas within the meaning of Section 20(a) of the Exchange Act.

71. E&Y controlled, participated in and/or was aware of the operations of E&Y Bermuda and E&Y Bahamas, and/or had intimate knowledge of the audit work and resulting audit reports and opinions E&Y Bermuda and E&Y Bahamas issued regarding the Stewardship Fund, and had the power to influence and control and did influence and control, directly or

indirectly, the decision-making of E&Y Bermuda and E&Y Bahamas, including the content and dissemination of the audit reports that were false and misleading.

72. E&Y had direct and supervisory involvement and control in the day-to-day operations of E&Y Bermuda and E&Y Bahamas and, therefore, is presumed to have had the power to control or influence the audit reports giving rise to the securities violations as alleged herein, and exercised the same.

73. By virtue of the conduct described above, E&Y is liable to Plaintiff and the other members of the Class for the substantial damages that they have suffered in connection with their investment or contribution to the Stewardship Fund during the Class Period.

WHEREFORE, Plaintiff, on behalf of himself and the other members of the Class, demands judgment against the E&Y Defendants as follows:

a. Determining that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b. Certifying Plaintiff as the Class Representative and his counsel as Class Counsel;

c. Declaring and determining that the E&Y Defendants violated the federal securities laws by reason of their conduct as alleged herein;

d. Awarding monetary damages against the E&Y Defendants;

e. Awarding Plaintiff the costs, expenses, and disbursements incurred in prosecuting this action, including reasonable attorneys' fees and other recoverable expenses of litigation; and

f. Awarding Plaintiff and the other members of the Class such other and

further relief as the Court may deem appropriate and just under all of the circumstances.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action for all claims so triable against the E&Y Defendants.

Respectfully submitted,

TERENCE ISAKOV, M.D.

/s/ Patrick A. Klingman

James E. Miller (ct21560)
Patrick A. Klingman (ct17813)
Karen Leser-Grenon (ct23587)
SHEPHERD, FINKELMAN, MILLER & SHAH, LLP
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (860) 526-1120
Email: jmiller@sfmslaw.com
pklingman@sfmslaw.com
kleser@sfmslaw.com

Scott R. Shepherd
Lawrence D. Berger
SHEPHERD, FINKELMAN, MILLER & SHAH, LLP
35 E. State Street
Media, PA 19063
Telephone: (610) 891-9880
Facsimile: (610) 891-9883
Email: sshepherd@sfmslaw.com
lberger@sfmslaw.com

His Counsel