**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| TERENCE ISAKOV, for himself and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ERNST & YOUNG, LTD. (BERMUDA); and ERNST & YOUNG, LTD. (BAHAMAS),<br><br>Defendants. | ) | Civil Action No. 3:10-cv-01517 (MRK)<br><br>Jury Trial Demanded<br><br>March 18, 2011 |

**SECOND AMENDED CLASS ACTION COMPLAINT**

Lead Plaintiff, Terence Isakov, M.D. ("Plaintiff"), on his own behalf and on behalf of all others who invested in the Stewardship Credit Arbitrage Fund, LLC ("Stewardship Fund" or the "Fund") between March 15, 2006 and September 25, 2008 (the "Class Period"), for his claims against Defendants, Ernst & Young, Ltd. (Bermuda) ("E&Y Bermuda") and Ernst & Young, Ltd. (Bahamas) ("E&Y Bahamas") (collectively and individually, the "E&Y Auditors" or the "E&Y Defendants"), alleges the following upon knowledge as to himself and his own acts and, as to all other matters, based upon the investigation made by and through his counsel, which included the following:

(1) an examination and review of correspondence and promotional materials provided by the Stewardship Fund and related entities, as well as public filings of Stewardship Investment Advisors, LLC and other entities with the United States Securities and Exchange Commission ("SEC");

(2) the review and analysis of pleadings and/or other submissions in the following

actions: *United States v. Thomas J. Petters, et al.*, No. 08-cr-00364 (RHK/AJB) (D. Minn.) ("*Petters* criminal action"); *United States v. Thomas J. Petters, et al.*, No. 08-cv-05348 (ADM/JSM) (D. Minn.) ("*Petters* civil injunction action"); *SEC v. Thomas J. Petters, et al.*, No. 09-cv-01750 (ADM) (D. Minn.) ("*Petters* SEC action"); *Stoebner, etc. v. Acorn Capital Group, LLC, etc.*, ADV. No. 09-4031 (GFK) (Bankr. D. Minn.) ("*Polaroid-Acorn* adversary proceeding"), brought in connection with *In re Polaroid Corp., et al.*, No. 08-46617 (GFK) (Bankr. D. Minn.); *Kelley, etc. v. Acorn Capital Group, LLC, et al.*, No. 10-04441 (GFK) (Bankr. D. Minn.) ("*Petters-Acorn* adversary proceeding"), brought in connection with *In re Petters Company, Inc., et al.*, No. 08-45257 (GFK) (Bankr. D. Minn.); *Acorn Capital Group LLC v. Wedbush Morgan Securities, et al.*, No. C 06-01674-JSW (N.D. Cal.) ("*Wedbush* action"); *SSR Capital Partners, LP, et al. v. ArrowHead Capital Partners II, LP, et al.*, No. DC-09-08239 (H-160th Jud. Dist., Dallas Cty. (TX)) ("*ArrowHead* (TX) action"); *Sovereign Bank v. ACG II, LLC, et al.*, No. 3:08-cv-1600 (WWE) (D. Conn.) ("*Sovereign Bank* (CT) action"); *BNY AIS Nominees Limited, et al. v. Quan, et al.*, No. 3:08-cv-00796 (AWT) (D. Conn.) ("*Gottex* (CT) action"); and *BNY AIS Nominees Limited, et al. v. Stewardship Credit Arbitrage Fund, Ltd.*, 2008: No. 266 (Comm. Ct. – Bermuda S.Ct.) ("*Gottex* (Bermuda) action"); and

(3) interviews with a number of former employees (identified herein as confidential witnesses) of the Stewardship Fund, Stewardship Investment Advisors, LLC and/or Acorn Capital Group, LLC, as well as the review of certain published reports, news articles and other materials relating to, *inter alia*, Thomas J. Petters.

Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. OVERVIEW

1. This action presents a textbook example of an auditor that knowingly participated in a fraudulent scheme by its client, or buried its "heads in the sand" and refused to discover obvious fraud that was staring it in the face. As discussed below, any fair reading of the facts establishes that, at best, the E&Y Defendants engaged in no audit at all with respect to the Stewardship Fund.

2. The facts of record establish that the E&Y Defendants disregarded established auditing standards and, in essence, engaged in no audit of the Stewardship Fund at all while, at the same time, falsely and, in exceptionally reckless manner, issuing unqualified audit opinions with respect to the Stewardship Fund even though the E&Y Defendants had no good faith basis to do so.

3. The totality of the Stewardship Fund's assets consisted of promissory notes purchased from an affiliate, Acorn Capital Group, LLC ("Acorn"), and almost 70% of those promissory notes represented loans made by Acorn to a single borrower – PAC Funding, LLC ("PAC Funding") – and were completely fraudulent. Yet, despite the fact that they comprised the majority of the Fund's "portfolio," the E&Y Auditors never examined, inspected or took any steps to verify the condition, quality or even the existence of the collateral that supposedly secured these promissory notes from PAC Funding (a fraudulent enterprise operated by Thomas J. Petters, a convicted felon). Specifically, even though each of these promissory notes, purchased by the Fund from Acorn, was supposedly secured by high-end consumer electronics equipment (such as flat-screen or high-definition televisions), the E&Y Auditors never examined, inspected or determined the quality of this supposed collateral (which, in fact, was

fictitious because PAC Funding was simply another arm of the Petters Ponzi scheme). In failing to inspect the underlying collateral, the E&Y Auditors violated basic and established auditing standards, as explained below. In addition, although the agreement between Acorn and PAC Funding (pursuant to which Acorn loaned over $1.9 billion beginning in 2004) was supposedly itself secured by a $50 million personal guarantee from Thomas J. Petters, the guarantor was a convicted felon who had not filed personal income taxes for a number of years. Yet, the E&Y Auditors took no steps to determine whether the guarantor was worth the amount of his guarantee -- and either never looked to see if the documentation required by the personal guaranty (including tax returns and audited financial statements) had been supplied pursuant to the terms of the guaranty or, worse yet, looked and ignored the fact that the documents were never supplied (which, in any event, could not have been available for inspection because Acorn personnel have admitted in sworn testimony that such documentation was never supplied to them). Moreover, while loans to PAC Funding represented the majority of the Fund's portfolio, much of the remainder was comprised of loans secured by vastly overvalued jewelry – barely worth 1% of the appraised value – the appraisals for which were fraudulently prepared by affiliates or friends of the borrower. In addition to the foregoing, the E&Y Auditors ignored that (i) the same individual controlled not only the Stewardship Fund and its investment advisor, but also Acorn, the loan originator, from which the Fund was required to purchase every loan that made up its portfolio, and which also was supposedly servicing the loans going forward; (ii) the E&Y Auditors had no basis to value the Fund's investments (*i.e.*, to opine that the value provided for the promissory notes, singularly or combined, was supported and justifiable), even though the E&Y Defendants' marketing materials emphasize their ability to master this "challenging area;" and (iii) the E&Y

Auditors had ***no*** written documentary evidence that, *inter alia*, merchandise was actually being purchased from PAC Funding, reflected the manner in which the merchandise was supposedly shipped or otherwise transported from the manufacturers or where the merchandise was stored or warehoused at any point along the way, or reflected PAC Funding's financial condition, such as audited financial statements. All of these acts and omissions by the E&Y Defendants, in addition to the conduct described below, amounted to such extreme departures from the most basic of auditing standards that only one logical conclusion can be gleaned from these facts -- the E&Y Defendants either knew about the fraud at issue or were highly suspicious of the same and decided that they should "bury their heads in the sand" rather than discover the obvious. Simply put, this is not a case of mere negligence (although the E&Y Defendants most assuredly were also negligent and thereby breached their legal duties to the proposed Class, as explained below), but, rather, this is a case where the actions of the auditor defendants, at a minimum, were so severely reckless that they amount to intentional conduct and fraud.

4. As the detailed facts alleged below establish, at the very minimum, the E&Y Defendants engaged in the reckless failure to investigate the doubtful and a concomitant refusal to see the obvious. As will be shown, this is not a situation in which evidence of the Stewardship Fund's true financial condition was hidden from the E&Y Auditors, but rather concerns information that the E&Y Auditors unquestionably knew they needed, but never sought to possess, which they were required to do in order to perform an audit according to the most basic of standards, according to investors' expectations and according to their public duty. The records of the Stewardship Fund were unquestionably lacking critical and necessary information to complete any competent audit -- and the E&Y Auditors knew that they did not possess this

information. As explained below, the E&Y Auditors confronted and senselessly ignored numerous and obvious "red flags" that virtually all of the investments held in the Stewardship Fund were fraudulent in nature.

5. This also is not a situation in which an auditor failed to discover improprieties but, instead, is a case where the facts lead to only two possible plausible inferences: (a) the auditors knew about the fraud; or (b) the auditors knew that there were serious discrepancies in the books and records of the Stewardship Fund and deliberately decided to look no further for fear of what would be discovered.

6. The E&Y Defendants will undoubtedly contend that their audit responsibility was limited to the Fund itself, but such a myopic and self-serving approach ignores the realities about which the E&Y Defendants were undoubtedly aware. The reason Acorn was the sole source of all of the Stewardship Fund's investments was because it too was controlled by Marlon Quan ("Quan"). Quan also dominated the Fund's Managing Member, Stewardship Investment Advisors, LLC ("Advisors"), and all of these entities shared the same office and personnel. In other words, the same individual was on both sides of every loan purchase transaction the Fund made and, at all times during the Class Period, the Fund, under the control of Advisors, was the passive recipient of multiple promissory notes purchased from Acorn, the majority of which originated from the same borrower. Under these circumstances, conducting an audit with such "blinders on" to the reality of the business enterprise being audited would be contrary to decades-old audit guidance and instruction, and equally fraudulent or reckless. Moreover, since Acorn, Advisors and the Stewardship Fund all shared the same offices and personnel, the E&Y Defendants can scarcely claim that they were unaware of this relationship or did not have access

to the materials that the most basic and fundamental of audits would have required.

7. Although Gustav Escher, III ("Escher") was nominally the Fund's "Independent Manager" with responsibility to independently evaluate any transaction between Acorn and the Fund, in fact he was a friend and former colleague of Quan's. Escher also was conflicted because he was a director of one or more related entities, including the Off-Shore Fund (defined below) and Livingston Acres, LLC., a subsidiary of the Fund. Because Escher's role was tantamount to an officer of the Fund, and he was paid by the Fund, Escher was unquestionably within the scope of the Fund's audit. Yet the E&Y Auditors never reviewed any indicators of Escher's supposed "independent" evaluation -- another violation of basic auditing principles and standards.

8. At the end of the Class Period, it was discovered that the borrower, PAC Funding, was one of several funding vehicles for companies owned and controlled by Thomas J. Petters ("Petters"), Minneapolis' version of Bernie Madoff, who had orchestrated a massive Ponzi scheme since the mid-1990s. Upon the Ponzi scheme's ultimate collapse in or around early September, 2008, the vast majority of the Fund's assets were discovered to be illusory and utterly worthless.

9. Unbeknownst to Plaintiff and other members of the proposed Class, the Stewardship Fund, a hedge fund controlled and dominated by Quan, was essentially a "feeder" for the Petters Ponzi scheme, which cumulatively involved over $40 billion and resulted in losses in excess of $3 billion. If the E&Y Defendants had followed basic auditing principles while engaging in even an incompetent or merely negligent audit, they would have discovered the existence of the Petters Ponzi scheme quickly and easily. Instead, because the E&Y Defendants

either knew about the true nature of Stewardship Fund's investments or decided to turn a blind eye to the fraud while engaging in no audit at all, Plaintiff and the Class have suffered tens of millions of dollars of losses.

10. Acorn, purportedly a finance company and loan originator, was among the top ten investors (and consequently, one of the biggest single losers) in the Petters' fraud. As subsequent criminal and bankruptcy investigations would reveal, the underlying transactions that the promissory notes were intended to finance were notable not only for their utter falsity, but also for the absence of supporting documentation – in addition to never actually seeing the collateral that supposedly secured these loans, the E&Y Auditors never saw, for example, any shipping documentation from the parties which were purportedly buying the consumer electronics, or even any audited financial statements of PAC Funding or any related Petters entity.

11. As discussed below, this was not the only fraudulent scheme in which the Stewardship Fund was invested -- which could have been discovered easily if any true audit at all had been conducted. The Stewardship Fund's other major investment was in essentially worthless jewelry, the value of which was unsupported by any independent appraisal or examination, and which the E&Y Defendants would and should have easily discovered if they were acting as auditors, as opposed to business partners, of the Stewardship Fund, Acorn, Advisors and Quan.

12. The facts of record establish that the E&Y Auditors engaged in essentially no audit at all of the Stewardship Fund and never demanded audited reports of the assets of the Fund, Acorn or any other affiliated entity, nor performed testing and review of such assets, as required by applicable auditing standards. Any such demand, review or testing would have

revealed the fraudulent nature of the investments comprising the vast majority of the Stewardship Fund's investments.

13. The role of E&Y Bermuda (and later E&Y Bahamas)(discussed more fully below) as the Stewardship Fund's auditor was vitally important to existing and prospective Fund "members." As one of the "Big Four" global auditing/accounting firms, the Ernst & Young brand was well-known and gave the Fund considerable legitimacy. Even more important, given Quan's control and domination of the Fund, Advisors and Acorn, E&Y Bermuda was the only disinterested, wholly independent observer of the Fund's financial condition and its transactions with the related entities. Thus, it was expected and understood that existing investors, such as Plaintiff, as well as potential investors, would rely on the opinions of the E&Y Auditors in making their investment decisions.

14. Since at least 2004, E&Y Bermuda was prominently identified in the Stewardship Fund's promotional literature and the various iterations of the Fund's Private Placement Memoranda as the Fund's auditor. E&Y Bermuda's unqualified audit reports were addressed and provided to Plaintiff and other members of the proposed Class, which is limited in size and whose identities were known to the E&Y Auditors. Thus, the E&Y Auditors had a duty to, or a relationship akin to privity with, Plaintiff and other members of the proposed Class. Unfortunately for Plaintiff and the proposed Class, the audit reports were knowingly or recklessly false and misleading when issued, which resulted in the harm suffered by Plaintiff and the proposed Class.

15. In justifiable reliance on the misrepresentations of the E&Y Defendants alleged herein, Plaintiff and members of the proposed Class invested, continued to invest or were

dissuaded from withdrawing their investments in the Stewardship Fund. Had the E&Y Defendants not fraudulently and/or severely recklessly conducted their audits of the Fund and thereafter disseminated the false and misleading statements, Plaintiff and other members of the proposed Class would have known the true financial condition of the Stewardship Fund and would have withdrawn their investments or at least stopped all further investments and thereby limited the extent of the damages they ultimately sustained.

## II. JURISDICTION AND VENUE

16. This Court has jurisdiction over the subject matter of this action under the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, and 28 U.S.C. §1331. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder by the SEC, including Rule 10b-5, 17 CFR § 240.10b-5. The Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over all remaining state law-based claims asserted herein.

17. The interests in the Stewardship Fund purchased or acquired by Plaintiff during the Class Period constitute investment contracts and are "securities" pursuant to Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10), in that they constitute investments in a common enterprise from which the interest owners were to receive profits solely from the efforts of the Fund's Managing Member. The interests in the Fund are not "covered securities" as defined by 15 U.S.C. § 77r(b).

18. Venue is proper in this judicial district pursuant to the provisions of the Exchange Act and 28 U.S.C. § 1391(b). Many of the acts and transactions giving rise to the violations of law complained of herein, including the E&Y Defendants' interaction with the Fund and its

representatives and the dissemination and/or receipt of false and misleading information to members of the proposed Class, occurred in this judicial district.

19. In connection with the acts, conduct and violations of law detailed herein, the E&Y Defendants, at all relevant times, directly and indirectly, utilized the means and instrumentalities of interstate commerce, including the mails and telephone communications.

## III. PARTIES

20. Plaintiff is an individual residing in Ohio. In 2003, Plaintiff's spouse invested in the Fund. Thereafter, as manager of the Isakov Family LLC, his family's investment vehicle, Plaintiff invested in the Stewardship Fund in January, 2005. On September 1, 2006, pursuant to a Confidential Private Placement Memorandum, Plaintiff made an additional capital contribution to the Fund, through his Individual Retirement Account. As a "Member" of the Fund since at least 2005, Plaintiff received the E&Y Defendants' audit reports and the Fund's annual audited financial statements, on which he relied in making his Class Period investment. Plaintiff has sustained damages as a result of the E&Y Defendants' violations of applicable law. Plaintiff's Certification was submitted in connection with the September 24, 2010 Complaint commencing this action, and is incorporated herein by reference.

21. E&Y Bermuda maintains its principal offices at 3 Reid Street, Hamilton, Bermuda. As more fully described below, E&Y Bermuda issued "clean" audit opinions of the Stewardship Fund on or about March 31, 2003, March 5, 2004, March 7, 2005, March 15, 2006, and March 27, 2007.

22. E&Y Bahamas maintains its principal offices at One Montague Place, East Bay Street, Nassau, Bahamas. As more fully described below, E&Y Bahamas issued a "clean" audit

opinion of the Stewardship Fund on or about March 31, 2008.

23. The E&Y Defendants are both member firms of Ernst & Young Global, which is the principal governing entity of the global Ernst & Young organization. According to their promotional materials, the E&Y Defendants are the leading auditors for the hedge fund industry, with the largest alternative investment practice among the "Big Four" auditors, boasting that their personnel are "located in key hedge fund centers throughout the world to serve clients wherever they need assistance," who would "benefit from the collective skills and know-how of this [*i.e.*, E&Y's] interconnected, worldwide network." As the E&Y Defendants recently claimed:

> Our longstanding experience in the [hedge fund] industry provides us with uncommon insights into the spectrum of potential risks and the necessary internal controls. Valuation has increasingly become one of the most challenging areas that funds and their boards of directors face. ... Our audit teams leverage the knowledge and skills of our entire assets management practice, including those of internal valuation professionals in the areas of derivatives, structured products and private company valuations.

## IV. BACKGROUND

### A. INVESTING IN THE STEWARDSHIP FUND

24. As described in the May 1, 2006 Confidential Private Placement Memorandum (the "PPM") provided to Plaintiff, as an "Existing Investor," by Advisors (which was virtually identical to every other version of the Fund's Private Placement Memoranda issued during the Class Period), the Stewardship Fund sought "a high level of current income and capital appreciation while minimizing risk by (1) purchasing a broad range of secured high-yield short-term notes from, or issued by, Acorn ..., a financing company ... engaged in providing commercial financing generally on a transaction-by-transaction basis ...." As the PPM made clear, "all or substantially all of the Short-Term Notes that the [Fund] will purchase will be sold

to it by Acorn ...."[1] Elsewhere in the PPM, Acorn was described as "the only or primary seller of Short-Term Notes to the [Fund] for the foreseeable future."

25. Acorn's symbiotic role with the Fund was stressed in presentation materials used in or around September, 2004 and, upon information and belief, continuously thereafter, to solicit new "members" to the Stewardship Fund. Therein, Acorn is portrayed as lending "to intermediaries typically involved in service businesses, product brokerage and distributors [which] often have high quality assets but lack strong balance sheets [and] typically have a need to match their short-term liabilities against longer-term receivables." Financing companies such as Acorn are represented as having the capability to "bridge that gap." By the same token, after the Stewardship Fund purchased the promissory notes from Acorn, Acorn would continue, for a fee, to service the notes.

26. Quan is the sole member of Advisors, and under Quan's control and direction, Advisors made all investment and trading decisions on behalf of the Stewardship Fund. Quan was also the sole member and/or Managing Member of Acorn and, at all times relevant hereto, represented that he was Acorn's President and "owner." According to the PPM, "Quan effectively controls both Acorn and the [Stewardship Fund] through his ownership interests in [Advisors] and Acorn." The PPM and other promotional materials emphasized Quan's

---

[1]The Stewardship Fund was affiliated with Stewardship Credit Arbitrage Fund, Ltd. (the "Off-Shore Fund"), which was organized as a mutual fund company under the laws of Bermuda in May, 2001. Like the Stewardship Fund, Advisors acted as the Off-Shore Fund's investment advisor, the Off-Shore Fund was engaged in virtually the same investment strategy and it also relied exclusively on Acorn. The *Gottex* (CT) action complaint alleged that Acorn "is the financing company that sources and originates the loans that are sold to the [Off-shore] Fund." Pursuant to an Order of the Bermuda Supreme Court, since late December, 2008, the Off-Shore Fund has been under the direction and control of court-appointed provisional liquidators.

"significant knowledge of credit, legal and accounting standards" gained through his public accounting and investment banking career (which included Donaldson, Lufkin & Jenrette, Artemis Capital Group, Inc. and Dain Rauscher, Inc.), all of which was supposedly directed toward advancing the financial success of the Fund – "[d]rawing from his understanding of credit concerns, risk mitigation and the need for structuring efficiencies, Mr. Quan has helped to reduce the overall costs of financing to borrowers and maximize returns to the investors." Indeed, although prospective investors were warned that the Fund had "a limited prior operating history," they were assured that Quan had "extensive prior experience related to the [Fund's] principal investment strategy."

27. Notwithstanding its intention to lend to entities lacking "strong balance sheets," both the presentation materials and all versions of the PPM emphasized the ability of the Fund, through Acorn, to manage the risk. As stated in the presentation materials, "[t]o ensure principal protection, securities are over collateralized" and the Fund would employ "many safeguards to lower the risk profile" of its investments, including "[o]nly short term note exposure – under 180 days," "[s]trong capital reserves and collateral" and "'A' rated receivable exposure or better." The presentation materials identified a diverse collection of nine different "types of asset based trades." In a slide titled "Collateral Risk Management," the Stewardship Fund stressed that:

– types of collateral considered are cash (or cash equivalent), inventory and accounts receivable;

– only notes with 180 day tenor or less are considered;

– all deals include the filing of a UCC-1 assigning the collateral; and

– additional cash collateral is held in a segregated account.

28. In a slide captioned "Borrower Risk Management," the Stewardship Fund stated that, notwithstanding that "[s]ecuritized transactions have little exposure to the borrower, [] several precautions have been taken," such as Acorn's demand for "additional collateral against the loan to compensate for less or poor quality collateral, such as corporate guarantees, personal guarantees [and] other tangible assets." In addition, "[a]ll deals with same borrowers are cross collateralized."

29. The role of the E&Y Defendants as auditors figured prominently in this pitch to prospective investors, who were assured of the steps that would be taken to manage and control the risk. According to the "Borrower Risk Management" slide, a "major accounting firm has been retained to examine the books of intermediaries [*i.e.*, the companies to which Acorn would make the loans]." The Stewardship Fund's investors were promised that, since they would "rely on Acorn to manage debt servicing, investors [would] receive audits from both the [Fund] and Acorn." Although both these representations turned out to be false, as Plaintiff and other members of the proposed Class never received audited financials of any "intermediaries" or Acorn, it was expected that investors would rely on these audits, as well as those of the Fund itself, in making their investment decisions.

30. The PPM specified that each member would "be furnished with monthly updates and annual reports containing audited financial statements with respect to the prior year." Among other things, the PPM identified "Ernst & Young, Hamilton, Bermuda" as the Fund's auditor.

31. The PPM specified that Acorn's notes would be primarily issued by the following entities:

> companies that provide assets for collateral including, without limitation, companies such as: merchandise distributors ("distribution companies") who are engaged in the business of buying excess high-quality, consumer merchandise inventory arising, for example, from manufacturing overruns, wholesale inventory overages and retail bankruptcies, at distressed prices and selling the merchandise to retailers at a profit....

The PPM also stated that such collateral "may include, without limitation, high-quality consumer merchandise and other inventory, work in the process of manufacture, ... general accounts receivables and purchase order receivables." The PPM further provided that Acorn would, "with respect to each Distribution Company and related transactions:"

- enter into a Credit Agreement, Security Agreement(s) and Lock-Box Agreement (and certain ancillary agreements);
- receive a Secured Promissory Note;
- be designated as a co-beneficiary on policies of insurance with respect to various defaults or other risks of loss on the Short-Term Notes;
- confirm that the underlying assets fall into an acceptable category;
- confirm that the accounts receivable counterparty has an "A" or higher credit rating prior to acquisition, inclusive of any credit insurance coverage;
- obtain a security interest in the underlying assets and accounts receivable proceeds;
- require payment of the accounts receivable into a lock-box account; and
- perform ongoing quantitative and qualitative analysis or similar protracted procedure to determine the fair market value of underlying assets of the short-term commercial credit market and the financial conditions of the borrower and its customers.

32. The PPM provided that "[m]embers do not take part in the management or control of the [Fund]" and although the Fund would "make all required state and federal filings with respect to the sale of Interest ... [m]embers will not receive copies of these filings." Prospective

"members" of the Fund were advised that "[a]ll decisions with respect to the investment activities of the [Stewardship Fund] are made exclusively by the Managing Member [*i.e.*, Advisors]," that "[m]embers will not have the opportunity to evaluate fully for themselves the relevant economic, financial, and other information regarding the [Fund's] investments" and that "[n]o person should purchase Interests unless he is willing to entrust all aspects of the [Fund's] investment activities to the Managing Member."

33. The PPM thereby made clear that Quan was at the apex of the Fund, as well as the head of Advisors and Acorn. The PPM stated that Quan, as its sole member, controlled Acorn. Furthermore, not only did all investment and decision-making authority reside with Quan, through his control of Advisors, but all interaction between the Fund and its investors likewise would be through him. For example, the PPM directed that all requests for additional information should be directed to Quan, and potential members of the Fund had to deliver original copies of all subscription (*i.e.*, investment) documents to Quan's attention. In addition, every engagement letter entered into between Advisors, on behalf of the Stewardship Fund, and E&Y Bermuda (as well as E&Y Bahamas) was addressed to, and executed by, Quan.

34. Former employees of the Fund, Advisors and/or Acorn likewise confirm that the dominance, control and presence of Quan was ubiquitous. For example, Confidential Witness No. 1 ("CW 1"), who worked at Acorn for approximately a year, including an early portion of the Class Period, and who was involved in Acorn's efforts to locate new lending opportunities, described Quan as "very hands on" and a "micromanager" who presided over weekly meetings. Confidential Witness No. 2 ("CW 2"), whose Class Period responsibilities at Acorn included monitoring collateral underlying Acorn's loans, such as verifying accounts receivables (but who,

amazingly, was never given any Petters' related loans to monitor), confirmed Quan's attendance at these weekly "portfolio" meetings. Other former employees, such as Confidential Witness No. 3 ("CW 3"), who was involved with marketing and underwriting for potential loans at Acorn for approximately one year during the Class Period, and Confidential Witness No. 4 ("CW 4"), who, likewise, had a marketing and business development role at Acorn for a majority of the Class Period, confirm that all potential lending deals had to be approved by Quan. CW 4 described Quan as the ultimate decision maker at Acorn regarding all deals, said that Quan himself originated most of the deals that were ultimately approved at Acorn, and noted that these were almost always loans to Petters entities.

35. From all accounts, the Fund, Advisors and Acorn were all operated as a single integrated enterprise, all housed in the same offices in Greenwich, Connecticut, and with one identity and purpose. Several former employees recalled that the three operations – combined – never employed more than twenty persons. Moreover, it appears that no differentiation was made between the business of the Fund, Advisors or Acorn. CW 2 observed that duties and titles were fluid between the Fund, Advisors and Acorn, and another former employee, Dominick Miele, testified at his deposition taken in connection with the *Polaroid-Acorn* adversary proceeding, that while he was initially hired (by Quan) to perform certain Fund-related duties, such as handling subscription and redemption requests, he was then (apparently seamlessly) transitioned into a loan monitoring role for Acorn. Another individual apparently simultaneously acted as general counsel to both Advisors and Acorn during a portion of the Class Period.

## B. THE PETTERS' PONZI SCHEME – COMPRISING ALMOST 70% OF THE FUND'S "INVESTMENTS"

36. In early September, 2008, an inter-agency federal task force assembled in the District of Minnesota began investigating allegations of a massive fraud being committed by Petters, a well-known Minnesota entrepreneur and (less well-known at the time) convicted felon who, through his ownership of Petters Group Worldwide LLC ("PGW"), controlled an empire of companies, including Polaroid Corporation ("Polaroid") and Sun Country Airlines,[2] and who operated a company issuing short-term trade finance notes to facilitate "diverting" transactions, Petters Co., Inc. ("PCI"), since the mid-1990s. The investigation quickly uncovered that, throughout this time frame, Petters had been operating a massive Ponzi scheme, involving over $40 billion and resulting in losses of more than $3 billion. By December, 2008, Petters and five other individuals (collectively, the "Accomplices") – Deanna Coleman (PCI's Vice President of Operations), Robert White (PCI's Chief Financial Officer), Jim Wehmhoff (PCI's Executive Vice President - Tax), Larry Reynolds (owner of Los Angeles-based Nationwide International Resources, Inc. ("NIR"), a supposed liquidator of consumer merchandise), and Michael Catain (owner of Excelsior, MN-based Enchanted Family Buying Company ("Enchanted"), the other supposed liquidator) – had been arrested and charged for their respective roles in the fraud.

---

[2]Petters founded PGW in 2001, and he made himself the sole owner, Chairman and Chief Executive Officer. Although PGW was the umbrella company under which Fingerhut Direct Marketing (acquired in 2002), uBid (acquired in 2003), Polaroid (acquired in 2005) and Sun Country Airlines (acquired in 2006) were managed, PCI was at the core, and it was PCI's fraudulently obtained investor funds that supported PGW's daily and long-term operations from its inception. According to filings in connection with the *Polaroid-Acorn* adversary proceeding, PGW had no independent financial resources and was never capitalized to operate apart from PCI. As an example, PCI paid all annual bonuses for Petters-entity employees, including those at PGW and Polaroid.

37. According to information gathered from the federal investigation, media reports and subsequent related bankruptcy proceedings, Petters formed PCI in 1994 and appointed himself Chairman of the Board, Chief Executive Officer and President, positions he retained up to shortly after his arrest. Petters portrayed PCI as a "diverter" or "middleman" that purchased high-end consumer electronics, such as flat-screen televisions, from brokers or liquidators (NIR and Enchanted) and resold the merchandise to large "big box" retailers such as Costco, Sam's Club (owned by Wal-Mart) and BJ's Wholesale Club (collectively, the "Retailers"). In exchange for funds contributed to finance the supposed acquisition of the consumer goods, Petters, through PCI, provided investors with promissory notes. Investors would also be provided with a security interest in the consumer goods by PCI, which, after "delivery" of the merchandise, would become a security interest in the (non-existent) accounts receivable.

38. Petters referred to this investment "strategy" as "purchase order inventory financing." Because of end runs, over-production or liquidations, excess consumer electronic equipment allegedly would be available for purchase from foreign-based manufacturers, and the Retailers would be willing recipients of such overstock merchandise. NIR or Enchanted, in conjunction with PCI, would act as the "middleman." According to Petters, these transactions usually took between 90 and 180 days to complete, but the manufacturers demanded payment up-front while the Retailers did not pay until the merchandise was delivered. Thus, the financing represented by the PCI promissory notes was needed for the 90 to 180-day period between the purchase of the merchandise and its delivery to the Retailers.

39. Petters represented that the promissory notes would be accompanied by a high rate of return, beginning at an annualized 11%, and would entail minimal risk – besides being short

term, each promissory note was secured by the underlying merchandise being financed by the note. In addition to a funding request from the Petters companies, potential note purchasers would be presented with a series of documents relating to the transaction, including an executed note document reflecting the investment and the guaranteed rate of return within 180 days, purchase orders from a Retailer, bills of sale from manufacturers to the liquidators, and an assignment of a security interest in the underlying merchandise to the note purchasers.

40. However, all these documents were phony; investors in PCI were actually financing the purchase of non-existent merchandise secured by fabricated purchase orders. According to the October 2, 2008 affidavit of F.B.I. Special Agent Eileen Rice, filed in connection with the *Petters* civil injunction action (the “Rice Aff.”), Deanna Coleman (“Coleman”), who had joined with Petters early on, created false purchase orders and invoices related to the purchase of merchandise from NIR and Enchanted. Robert White (“White”), who joined PCI in or around 1999, was responsible for creating the false purchase orders related to the fictitious sale of the merchandise to the “big box” Retailers. Neither NIR nor Enchanted ever purchased or sold any merchandise on behalf of PCI, but instead were merely conduits for wired funds from investors which were then transferred to PCI.

41. Consistent with a “classic” Ponzi scheme, PCI investors received payments – not from the earnings or proceeds of the fabricated transactions for which the financing was obtained (because there were no such earnings) – but from funds obtained from later investors. The payments would often consist of repayment of the principal amount invested, as well as an amount comprising the purported “profit.” Petters’ clear intention was that sizeable payments back to earlier investors would spur repeated, greater and more widespread investment in the PCI

diverter transactions and thereby extend the life of the Ponzi scheme.

42. As Petters later would be recorded admitting, it was all "one big [expletive deleted] fraud." No merchandise was ever ordered, let alone purchased, and there were no sales to the Retailers. NIR and Enchanted were essentially shell companies, with no assets or operations, the principals of which were co-conspirators with Petters. Coleman and White created the purchase orders, bills of sale and other documentation by "cutting and pasting" from once-legitimate documents. The supposed assignments of security interests were worthless, as there was no merchandise to be secured, and the promissory notes themselves were likewise without any value. According to the SEC Complaint, as of September, 2008, the combined balance sheet of PCI and its related entities reflected total current liabilities, including outstanding notes to approximately 20 entities and individuals, of $3.5 billion.

43. As indicated in the Rice Aff. and as alleged herein, the fraud would have been easy to detect if someone had bothered to look. As one of Petters' co-conspirators was recorded as observing, since there was no merchandise (nor, in some instances, even a warehouse), the scheme would "implode" if note purchasers' auditors ever attempted to "visit warehouses." Federal investigators were able to establish the falsity of the "hard copy" purchase orders and bills of sale by simply showing them to one of the Retailers, who confirmed that the PCI vendor numbers, as well as the Retailer's purchase order numbers, were fictitious. Moreover, at least one of the Retailers requires that all vendors use an internet-based system, thus eliminating the need for traditional "paper" documents.[3]

[3]In other words, even though Petters' accomplices, Coleman and White, were manually creating paper documents purporting to be Sam's Club purchase orders, during this same time frame, Sam's Club actually required that such information be entered electronically. According

44. It is a general truth that no Ponzi scheme can survive without a constant influx of fresh capital. Through their investment in the Stewardship Fund, Plaintiff and other members of the proposed Class unwittingly added to the stream of cash. However, but for the E&Y Defendants' knowing participation in the scheme perpetrated by the Stewardship Fund, or their reckless failure to properly and competently audit the Stewardship Fund and their dissemination of the false and misleading audit reports during the Class Period, Plaintiff and other members of the proposed Class would have realized the true condition of their investment and could have taken steps to lessen or eliminate their financial harm.

45. As alleged in the complaint filed in the *Petters-Acorn* adversary proceeding (brought by the court-appointed Chapter 11 Trustee of PCI), RedtagBiz, Inc. ("Redtag") was formed in 2000 by Petters and thereafter controlled by him, and ultimately merged into PGW in 2006. Acorn first transacted with Redtag in May, 2001, whereby Acorn made funds available to Redtag to finance account receivables resulting from the purchase and sale of electronic goods by PCI. Acorn received a promissory note, secured by interest in "any or all Receivables arising from the Purchase Orders" and "any and all Merchandise." According to this pleading, between

---

to an affidavit of a F.B.I. agent submitted in support of the October 2, 2008 complaint in the *Petters* criminal action, all of Sam's Club vendors use EDI ("electronic data interchange") to exchange purchase orders, invoices and all other transactional documents electronically. Another requirement imposed by Sam's Club was that suppliers use "Retail Link," an internet-based application, to submit information to the Retailer. In the complaint filed in another "clawback" proceeding arising from *In re Petters Company, Inc., et al.*, No. 08-45257 (GFK) (Bankr. D. Minn.), the Trustee cites the testimony of Coleman, Petters' accomplice, regarding one hedge fund, Opportunity Finance, LLC, which confronted Petters with the Sam's Club notification that, as of November 6, 2003, it would accept only PDF files, submitted electronically. This complaint alleges that Opportunity Finance, LLC was effectively "bought-out" in exchange for its silence, as it demanded and received, over $165 million from PCI at an accelerated rate over a short period of time.

2001 and 2003, Acorn entered into approximately 33 separate note transactions with Redtag, worth over $88 million. Upon information and belief, some or all of the promissory notes resulting from these transactions would have been sold by Acorn to the Fund.

46. In November, 2002, Acorn entered into a separate transaction directly with PCI. The *Petters-Acorn* adversary proceeding complaint alleges that Acorn made funds available to PCI to finance account receivables resulting from the purchase and sale of electronic goods, and Acorn was granted a security interest in the PCI-financed assets, including "any or all Receivables arising from the Purchase" and "any and all Merchandise." This complaint further alleges that Acorn and PCI entered into approximately 149 separate note transactions worth over $585 million. Upon information and belief, some or all of the promissory notes resulting from these transactions would have been sold by Acorn to the Fund.

47. In November, 2004, following formation of PAC Funding, a special purpose entity wholly owned by PCI (and completely under Petters' control), Acorn entered into the first of a series of transactions with this entity.[4] Initially, Acorn agreed to make loans of up to a total of $200 million, in which each loan to PAC Funding would be separate and distinct, and limited to the lesser of $6 million or the total purchase price of all purchase orders allegedly associated with the loan (the "Initial Credit Agreement"). Although the purchase orders and corresponding accounts receivable would act as the primary security for these loans, Acorn and PAC Funding also entered into a security agreement (contemporaneous with the Initial Credit Agreement),

[4]According to the October 7, 2010 affidavit of Theodore F. Martens ("Martens Aff."), a forensic accountant with PriceWaterhouseCoopers LLP, which was submitted in connection with the *Polaroid-Acorn* adversary proceeding, Petters formed eight different special purpose entities ("SPEs") to serve as pass-through entities for the financing activities of Petters' principal investors. PAC Funding was specifically created and assigned for Acorn.

whereby (1) Acorn was granted a security interest in certain of PAC Funding's assets, (2) the parties agreed that the loans would be further secured by a lockbox agreement, which would receive payments directly from Retailers, as well as a block account in which PAC Funding would deposit 10% prior to requesting each loan, and (3) Petters granted Acorn his personal guaranty of up to $50 million.

48. Thereafter, as alleged in the *Petters-Acorn* adversary proceeding complaint, Acorn and PAC Funding entered into a number of amendments to the Initial Credit Agreement: in December, 2005, the parties renewed the outstanding loans and extended the commitment period by an additional year; in September, 2006, the parties renewed the outstanding loans and increased the total commitment amount from $200 million to $217 million; in November, 2006, by letter agreement, the parties further extended the commitment period to January 31, 2008 and increased the total commitment amount to $250 million; in December, 2006, again by letter agreement, the parties renewed the outstanding loans and further extended the commitment period to July 31, 2008; in January, 2007, the parties again renewed the outstanding loans and again extended the commitment period; and in October, 2007, the parties renewed the outstanding loans, extended the commitment period to July 31, 2009, and increased the commitment amount to $300 million.

49. The *Petters-Acorn* adversary proceeding complaint alleges that, as of May 14, 2008, the outstanding PAC Funding loans owed to Acorn were $289 million, which represented approximately 60-70% of Acorn's entire portfolio of loans. From the first transaction in late 2004, PAC Funding engaged in approximately 491 separate note transactions with Acorn, for a principal sum in excess of $1.9 billion. As more fully alleged herein, some or all of the

promissory notes resulting from these transactions were sold by Acorn to the Fund.

50. In addition to the transactions with PAC Funding, the *Petters-Acorn* adversary proceeding complaint also alleges that Acorn entered into two separate loan transactions, on July 18, 2007 and August 20, 2007, with Petters Aircraft Leasing, LLC ("PAL"), in the aggregate principal amount of $21,500,000. In connection with these transactions, PCI, PAC Funding and Petters Aviation, LLC ("Petters Aviation") entered into an unlimited guaranty, which provided for the continuing, absolute and unconditional guaranty of payment of the borrower, PAL. PAL engaged in two separate note transactions with Acorn in the principal sum of $21,500,000. Upon information and belief, one or both of the promissory notes resulting from these transactions were sold by Acorn to the Fund.

51. The complaint filed in the *Petters-Acorn* adversary proceeding further alleges that, on March 30, 2007, Acorn entered into a credit agreement with Petters Aviation, whereby Acorn provided an initial $10 million line of credit. On April 17, 2007 and January 17, 2008, the agreement was amended and the commitment amount was increased to $12,810,590. Pursuant to this agreement, Acorn received several promissory notes from Petters Aviation in the aggregate principal amount of $13,486,450. On the same date as the credit agreement (and similar to the transaction with PAL), PCI and PAC Funding entered into an unlimited guaranty, which provided the continuing, absolute and unconditional guaranty of payment of the obligations owed by Petters Aviation to Acorn. Petters Aviation engaged in three separate note transactions with Acorn in the principal sum of no less than $13,486,450. Upon information and belief, one or more of the promissory notes resulting from these transactions were sold by Acorn to the Fund.

52. As the foregoing reflects, from 2001 through 2007, Acorn entered into over 670

separate loan transactions with companies owned or otherwise controlled by Petters, at an aggregate value of over $2.6 billion. As suggested in the Trustee's summary judgment motion filed in the *Polaroid-Acorn* adversary proceeding, but for the worsening economy and tightening credit in 2007, "***[t]his mutually beneficial relationship – with Acorn asking no questions and funneling money to Petters, and Petters using the money and then funneling it back to Acorn***," likely would have continued for some time absent the discovery of Petters' Ponzi scheme. (Emphasis added.)

53. According to a post-Class Period memorandum sent by Quan (therein identified as "Investment Manager") to Stewardship Fund members on or about October 17, 2008, the gross amount owed to the Fund by PAC Funding and the other Petters entities as of April 30, 2008 was over $85 million, or almost 70% of the Fund's combined portfolio of approximately $127 million.

54. From late 2007 and continuing to early 2008, PAC Funding was falling behind in payments; indeed, within months of the October, 2007 amendment, PAC Funding was in default on the Initial Credit Agreement, as amended. According to the *Petters-Acorn* adversary proceeding complaint, by February, 2008, PAC Funding had borrowed approximately $275 million against its line of credit with Acorn, and more than $100 million of that was in default.

55. Over the next two and one-half months, Petters, PAC Funding and Acorn (through Quan) attempted to "restructure" the loans – first, on or about February 29, 2008, Petters, PAC Funding and Acorn entered into a Forbearance Agreement, whereby, in exchange for Acorn's agreement to refrain for 120 days from filing an action, or foreclosing on the supposed collateral secured by the November, 2004 security agreement (which would effectively end the Ponzi

scheme), Petters agreed to exchange the (bogus) purchase orders that were collateralizing Acorn's loans for a security interest in Polaroid's inventory and accounts – even though Polaroid had not previously been a party to any transactions between PAC Funding and Acorn.[5] In addition, for the first time, PAC Funding and Petters agreed to provide Acorn with proof that PAC Funding was the legal owner of at least $112 million worth of accounts receivables from various retailers. This confirms, *inter alia*, that the E&Y Auditors previously never had any evidence of PAC Funding's ownership interests before this date.

56. That same day – February 29, 2008 – PAC Funding agreed to make loans to Polaroid, and Polaroid issued a note in favor of PAC Funding in the amount of $15 million in return (the "Polaroid Note"). In addition, on the same day, Acorn, PAC Funding and PCI entered into a Subordination Agreement, whereby PCI, among other parties with liens in Polaroid assets, purportedly subordinated the right to repayment of its $20 million promissory note until the Polaroid Note between Polaroid and PAC Funding was fully repaid.

57. In late April, 2008, PAC Funding and Acorn restructured the credit facility of the Initial Credit Agreement from a revolving credit facility to a term facility, in which, *inter alia*,

---

[5]As alleged in the Trustee's summary judgment motion, filed in the *Polaroid-Acorn* adversary proceeding, Petters purchased Polaroid in 2005 for $425 million, all of which came from PCI's fraudulently obtained investor funds. Among other things, Polaroid was purchased to "bury the debt" created by the Ponzi scheme, to give Petters increased credibility to investors and to induce potential investors to make loans to further his Ponzi scheme. Following the acquisition, Petters appointed himself chairman and sole board member of Polaroid, positions he retained during all relevant time periods. Upon information and belief, Petters also installed Mary Jeffries ("Jeffries"), formerly an executive at PCI and PGW, as Chief Executive Officer of Polaroid. Given his ownership and control of Polaroid, the Trustee's summary judgment motion charged that Petters "used Polaroid, as he used the other Petters' entities, as a personal piggy bank, taking cash from Polaroid to pay other hedge fund loans to PCI, to meet short term cash needs of other Petters entities, and to continue his lavish personal lifestyle."

PAC Funding would receive a 30-day moratorium on all payment obligations and Acorn would receive a minimum monthly payment of $10 million. Thereafter, commencing on August 1, 2008, PAC Funding was required to make monthly payments of $10 million to Acorn.

58. After further defaults, on or about May 14, 2008, Acorn and PAC Funding further amended the Initial Credit Agreement, which imposed onerous obligations on Polaroid, as well as requiring that Acorn be provided with an additional security interest in Polaroid's valuable intellectual property, all of which was intended to further secure PAC Funding's obligations to Acorn. In other words, pursuant to the Initial Credit Agreement and the November, 2004 credit agreement, all of Acorn's loans to PAC Funding were primarily secured by (phony) purchase orders, (fake) account receivables and Petters' Limited Personal Guaranty of $50 million (which was worthless). As alleged, even though Polaroid had never before been a party to any transactions with Acorn or otherwise involved with the loans provided to PAC Funding pursuant to the Initial Credit Agreement, as amended, the May 2008 "restructuring" was intended to retire and replace the PAC Funding promissory notes, totaling $289 million (principal and capitalized interest) and collateralized by purchase orders supposedly issued by the Retailers, with Polaroid inventory, account receivables and Polaroid's North American trademarks.

59. The Trustee's summary judgment motion, filed in the *Polaroid-Acorn* adversary proceeding, describes Polaroid's reaction to the use of its resources by Petters to essentially "buy time" from Acorn for Petters' sole benefit. For example, although the only consideration Polaroid received as a result of the May, 2008 "restructuring" were two loans from PAC Funding for $15 million and $10 million, respectively (the $15 million was repaid by Polaroid within 45 days), it nevertheless had to pledge to Acorn, at Petters' direction, an interest in inventory,

accounts receivable and its North American trademarks in order to secure all of the outstanding investment from Acorn to PAC Funding (approximately $280 million). According to the summary judgment motion, Jeffries, Polaroid's Chief Executive Officer, testified that she opposed the use of Polaroid's assets as collateral for the $280 million in PAC Funding obligations if Polaroid would only receive $15 million, but Quan assuaged her concerns by promising that Acorn would re-send the $15 million immediately after Polaroid paid the $15 million note, and that Acorn would then provide a $50 million asset-based line of credit to Polaroid.

## C. <u>THE ESCALATING LIABILITIES OF THE OFF-SHORE FUND</u>

60. As reflected in the May, 2008 complaint and other items filed in the *Gottex* (CT) action, as well as the December, 2008 ruling issued in the *Gottex* (Bermuda) action, between October, 2005 and March, 2007, the Gottex Funds (consisting of Gottex ABL (Cayman) Ltd., Gottex Matrix Asset Focused Master Fund Ltd., Gottex/Nomura Market Neutral Fund (USD) Ltd., Gottex ABI Master Fund Ltd., and Hudson ABL Fund Ltd.), either directly or indirectly, invested more than $100 million in the Off-Shore Fund.[6] However, in mid-2006, the Gottex Funds' representative met with Quan to express dissatisfaction with the Off-Shore Fund's relatively low returns and its high management fees, with the result that an alleged agreement was reached between the parties, whereby Advisors would lower its management fee if the

---

[6]According to the June 26, 2008 Declaration of J.P. Bailey (the "Bailey Dec."), an investment manager of the Gottex Funds with extensive experience in hedge funds, which was filed in support of the Gottex Funds' emergency motion for expedited discovery and temporary preliminary injunction, the Gottex Funds are "funds of funds" (*i.e.*, funds that invest in hedge funds). Among the Gottex Funds' investing strategies is "asset-based lending," like that employed by the Stewardship Fund and the Off-Shore Fund.

Gottex Funds' returns fell below a certain level.

61. By February, 2007, the agreement had never been reduced to writing and Quan allegedly refused to honor its terms. Thereafter, on or about May 31, 2007 and July 31, 2007, the Gottex Funds provided notice of redemption of all shares in the Off-Shore Fund as of August 31, 2007 and October 31, 2007, respectively. However, according to the complaint filed in the *Gottex* (CT) action, Quan induced the Gottex Funds to postpone the dates of redemption until March 31, 2008. In early April, 2008, Quan notified the Gottex Funds that, contrary to the standard in the hedge fund industry, the planned redemption would not be in cash, but rather "in kind" in the form of "participation notes."[7]

62. Concerned over the liquidity of the Off-Shore Fund's proposed "in kind" redemption, in May, 2008, the Gottex Funds simultaneously commenced actions in the District of Connecticut and in the Commercial Court division of Bermuda's Supreme Court. The former (the *Gottex* (CT) action), in which the Gottex Funds asserted claims against Quan and Advisors for, *inter alia*, fraud, misrepresentation and breach of contract, was dismissed for improper venue by order dated April 22, 2009. However, the *Gottex* (Bermuda) action, in which the Gottex

---

[7]The *Gottex* (CT) action complaint, as well as the Bailey Dec., emphasize how unusual it was for a hedge fund, particularly one such as the Off-Shore Fund that purported to hold short-term, highly-liquid assets, not to redeem an investor in cash. Because a large proportion of the Off-Shore Fund's holdings consisted of 90-day receivables, which create a steady cash flow, there should have been little or no need for the Off-Shore Fund to liquidate any assets in order to satisfy the Gottex Funds' redemption requests. In other words, as the short-term notes came due, the proceeds could have been simply set aside and not reinvested. The Bailey Dec. reiterates this point by contrasting the experience with Arrowhead Capital Finance Ltd. ("Arrowhead"), in which the Gottex Funds also invested and which also held a substantial majority of its assets in loans made to entities controlled by Petters – in response to the Gottex Funds' December, 2006 redemption requests, Arrowhead paid 90% of the value of the redemptions in cash within 90 days.

Funds initially asserted that the attempted "in kind" redemption breached the terms of their investment in the Off-Shore Fund, resulted in the June, 2008 issuance of a "worldwide *Mareva* injunction" (essentially an asset freeze recognized by Commonwealth jurisdictions) and ultimately the court-ordered appointment of provisional liquidators in connection with the "winding up" of the Off-Shore Fund because of insolvency.

63. The December, 2008 Ruling in the *Gottex* (Bermuda) action (the "Bermuda Ruling") contains, among other things, Quan's admission that the Off-Shore Fund had "liquidity problems" in late 2007 (which is approximately the same time that PAC Funding began to fall behind in its payments), and a chronology of increasingly strident communications and meetings between Quan, Advisors and representatives of the Gottex Funds from late April to mid-May, 2008 regarding the scope and value of the "in kind" redemption (which is contemporaneous with the "restructuring" negotiations by Quan and Acorn over the PAC Funding credit agreement and the attempt to access Polaroid's inventory and intellectual property). The Bermuda Ruling also determined that, as of November 12, 2008, the Off-Shore Fund was "cash flow insolvent."[8] In addition, the Bermuda Ruling quotes from minutes of the Off-Shore Fund's June 9, 2008 board of directors meeting, which stated that the Off-Shore Fund had received approximately $50 million in redemption requests against the Off-Shore Fund's total value of $125 million, and

[8]The Bermuda Ruling notes that Quan attempted to dispute this finding, arguing that, because the Off-Shore Fund had additional collateral in the form of security in Polaroid's assets, it was not insolvent on a balance sheet basis. The Bermuda court discounted the significance of the Polaroid assets, noting that the supposed value was based upon a dated valuation by Duff & Phelps, the use of which was specifically limited by Duff & Phelps to another transaction. In addition, Quan's estimate that recovery of the Polaroid assets would translate into between 28% and 50% of $456 million was similarly discounted because the year-old Duff & Phelps valuation estimated the Polaroid collateral was worth between $310 and $380 million.

which approved Quan's recommendation that determination of the Off-Shore Fund's NAV ("net asset value") be suspended indefinitely and that no redemptions would be accepted or paid out during the period of suspension.

64. With respect to Quan, the Bermuda Ruling concluded that he was "very much the key player, and companies controlled by him such as [Advisors] and Acorn also perform key roles in relation to the business of the [Off-Shore Fund]," whose acts were "for the most part affected through Mr. Quan ...." The Bermuda Ruling continues by reviewing "a number of instances where it cannot be said that the [Off-Shore Fund] has acted as one might expect a Company in its position to act," including the failure of Quan and Advisors to notify the Gottex Funds when PAC Funding defaulted in or before February, 2008.

65. The Off-Shore Fund was affiliated with the Stewardship Fund through common ownership, and Quan admitted that the Off-Shore Fund had "liquidity problems" as of late 2007. As alleged in the *Gottex* (CT) action complaint, it was also a recipient of promissory notes originated by Acorn. According to the Bermuda Ruling, a majority of these notes were with Petters entities. Despite these commonalities and connections with the Stewardship Fund, the E&Y Auditors omitted any reference to the Off-Shore Fund or its condition from their Class Period audit reports.

## D. THE STEWARDSHIP FUND'S OTHER INVESTMENTS WERE ALSO BASED ON FRAUDULENT REPRESENTATIONS

66. The claims asserted in *Stewardship Credit Arbitrage Fund LLC, et al. v. Charles Zucker Cultured Pearl Corp., et al.*, No. 600634/2010 (Sup. Ct. N.Y. County) (the "*Zucker* action"), arise from Acorn's receipt of, and reliance on, fraudulent appraisals of jewelry and other

antiquities from Benjamin Zucker ("Zucker") that were to serve as collateral for loans made by Acorn to a "noted jewelry and antiquity magnate," Ralph Esmerian ("Esmerian") and his partner, Mitchell May. As more specifically alleged in the plaintiffs' Amended Complaint[9] filed on or about June 14, 2010:

> In December 2006, Acorn Capital Group LLC ("Acorn") agreed to loan approximately $40 million to R. Esmerian, Inc. ("REI") – an entity owned and controlled by Ralph Esmerian – to be used as working capital for REI's operations (the "REI Loan"). As a condition to funding, Acorn required that REI pledge, as security for the loan, collateral with an aggregate appraised value of at least three times the outstanding principal amount of the loan (the "REI Collateral").
>
> Approximately a year later, in December 2007, Acorn agreed to loan $13.5 million dollars to Vassal Jewels LLC ("Vassal"), which represented that the funds would be used, *inter alia*, to purchase REI stock (the "Vassal Loan"). Like the REI Loan, Acorn required that Vassal pledge, as security, collateral with an aggregate appraised value that met or exceeded specified benchmarks based on the outstanding principal amount of the loan (the "Vassal Collateral").
>
> In order to satisfy these appraisal requirements, Acorn, REI, and Vassal agreed that two different appraisers – one of whom was Benjamin Zucker of Precious Stones – would appraise the REI and Vassal Collateral. These appraisal requirements were a material condition of the underlying loan agreements. Because of the unique nature of the REI and Vassal Collateral, which included collections of art, antiquities, jewels, and jewelry, Acorn did not have the expertise to determine the market value of the REI and Vassal Collateral on its own and, therefore, needed to obtain appraisals from qualified and reputable appraisals [sic] in order to conduct its due diligence on the potential loans.

67. Through the plaintiffs in the *Zucker* action, as its assignees, Acorn alleged that its due diligence was more than adequate and that it had no "reason to suspect Zucker's qualifications, ability, or intentions to perform the appraisals at issue in a good faith and accurate manner ... nor suspect he would perform the appraisals fraudulently or in a grossly negligent

[9] Also named as plaintiffs in the *Zucker* action are the Off-Shore Fund, Northflight Fund LP and PrideCo Secured Loan Fund LP, all of whom received a portion of the underlying loans upon transfer and assignment from Acorn.

manner." However, elsewhere in the Amended Complaint, it is alleged Esmerian was Zucker's "long-time friend."

68. The Amended Complaint further alleges that Zucker "provided Acorn with a number of appraisal reports that valued the Collateral well in excess of the various loan agreements' requirements," on which Acorn reasonably relied in proceeding with the loans to REI and Vassal. However, at an unspecified time in 2008, after both REI and Vassal defaulted under the terms of their respective loan agreements, it is alleged that Acorn:

> discovered that [Zucker] had significantly and systematically overstated the value of the REI and Vassal Collateral. For example, Defendants represented that the Vassal Collateral had a market value of $42.5 million in late 2007. After taking possession of the Vassal Collateral, Plaintiffs' expert appraiser has determined that the Vassal Collateral's market value was actually between $191,000 and $293,000 in late 2007 – less than one percent of Defendants' appraised values. Similarly, after taking possession of the REI Collateral, Plaintiffs' expert determined that the REI Collateral was worth only a small fraction of the values set forth in the Appraisal Reports as of the time of those appraisals.

69. The Fund and the other assignees of Acorn assert claims for, *inter alia*, fraud, negligent misrepresentation, and professional negligence. In July, 2010, Zucker moved to dismiss the Amended Complaint.

## E. PROFESSIONAL STANDARDS GOVERNING AUDITORS

70. E&Y Bermuda and E&Y Bahamas served as the Stewardship Fund's auditors from at least 2003 until October 22, 2008, when Plaintiff and other members of the proposed Class were notified, in a memorandum from Advisors, that it had been:

> requested by Ernst & Young, LLP to notify you that their audit opinions and financial statements produced for the year ended December 31, 2007 and issued on March 31, 2008 for Stewardship Credit Arbitrage Fund, LLC, and Acorn Capital Group, LLC can no longer be relied upon.

71. During this time frame (which includes the Class Period), E&Y Bermuda (and later, E&Y Bahamas) had full access to the financial books and records of Stewardship Fund and its affiliated companies, including Acorn (and enjoyed such access since at least 2003), and was responsible for and, in fact, assert that they did review the financial statements of the Fund. More specifically, the E&Y Auditors were obligated to, and claimed that they did, audit the Fund's financial statements in accordance with Generally Accepted Auditing Standards ("GAAS").[10] To the extent the E&Y Auditors were not able to review all the information they determined was necessary in order to competently perform the audits, or if they were doubtful regarding the veracity or accuracy of any such information or documents that were otherwise material to their testing, the E&Y Auditors were obligated to qualify their audit opinions or to refuse to issue an audit opinion at all. As alleged herein, the E&Y Auditors did neither.

72. At all pertinent times, the E&Y Auditors fully appreciated that audits and the resulting audit reports are used by businesses to establish the financial credibility of their enterprises in the eyes of outside persons, such as existing and prospective investors, financial institutions, and others who extend credit to an enterprise or make risk-oriented decisions based on its economic viability. As California's Supreme Court has observed, "[t]he unqualified audit report of a CPA firm, particularly one of the 'Big Six,' [sic] is often an admission ticket to venture capital markets – a necessary condition precedent to attracting the kind and level of

---

[10]GAAS, as approved and adopted by the American Institute of Certified Public Accountants ("AICPA"), relates to the conduct of an auditor in evaluating the material conformity of a subject entity's financial statement such that it may issue a report and opinion thereupon. Statements on Auditing Standards (codified and referred to as AU § __) are recognized by the AICPA as interpretations of GAAS, are commonly used and recognized, and have, therefore, been cited and referred to hereinafter by the applicable AU §.

outside funds essential to the client's financial growth and survival." Similarly, Generally Accepted Accounting Principles ("GAAP") recognize that financial audit reporting is "a principal means of communicating accounting information to those outside an enterprise." (Statement of Financial Accounting Concepts of the Financial Accounting Standards Board of the AICPA No. 1, ¶ 6, p. 7.) The AICPA itself likewise observed that "[t]he independent audit, through the process of examining evidence underlying the financial statements, adds credibility to management's representations in the statements. In turn, the audit provides investors, bankers, creditors, and others with reasonable assurance that the financial statements are free of material misstatement." More broadly, in *United States v Arthur Young & Co.*, 465 U.S. 805 (1984), the U.S. Supreme Court recognized that, in certifying a corporation's financial status, an "independent auditor assumes a *public* responsibility transcending any employment relationship with the client" and that an accountant's "interpretations of the client's financial statements" are significant for "the accountant's role as a disinterested analyst charged with public obligations."

73. The planning and execution of an audit requires a high degree of professional skill and judgment. Initially, as noted more fully below, the accountant plans the audit by surveying her client's business operations and accounting systems and making preliminary decisions as to the scope of the audit and what methods and procedures will be used. The client's internal financial control systems are then evaluated and compliance tests are performed to determine whether they are functioning properly. Transactions and data should be sampled, vouched for, and traced. Throughout the audit process, results are examined and procedures are reevaluated and modified to reflect discoveries made by the auditors (*i.e.*, weaknesses in the internal control system should cause the auditor to plan for additional audit procedures to satisfy herself that the

internal control weaknesses have not caused any material misrepresentations in the financial statements).

74. The E&Y Auditors were required to, *inter alia*, design, implement and perform an audit that would detect material misstatements of the Fund's financial statements. "Financial statements are materially misstated when they contain misstatements whose effect, individually or in the aggregate, is important enough to cause them not to be presented fairly, in all material respects, in conformity with generally accepted accounting principles." AU § 312.04. Of course, as detailed below, the financial statements of the Stewardship Fund were materially false in virtually all respects throughout the entire Class Period.

75. There are ten GAAS provisions, which are divided into three types of standards, all of which describe and/or delineate – individually and as a whole – the auditor's obligations with respect to issuing an opinion upon financial statements under audit, including the auditor's responsibility to provide reasonable assurance, when issuing an unqualified opinion, that the subject financial statements have been presented in conformity with GAAP in all material respects. Those standards are organized into three primary categories: (1) general standards, which provide guidelines for auditor competency and supervision, as well as the requirement to maintain independence from the client; (2) standards of fieldwork, which provide guidelines for audit planning, collecting evidential matter as part of audit findings in order to provide reasonable assurance regarding the measures and amounts presented in the financial statements under audit, and the proper evaluation of internal controls; and (3) standards of reporting, which are primarily concerned with the manner in which the auditor's conclusions about her findings are expressed in a written report. As explained in detail below, the E&Y Auditors violated

various elements of all of these provisions while acting as the Stewardship Fund's purportedly independent auditor.

76. Initially, GAAS requires that "[i]n all matters relating to the assignment, an independence in mental attitude is to be maintained by the auditor or auditors." AU § 150.02. This requirement is necessary because of the importance in having the public maintain confidence in the independence of auditors. AU § 220.03. Indeed, this overarching concept of auditor objectivity and independence is supposedly one of the five "guiding principles" in Ernst & Young's Global Code of Conduct.

77. GAAS Standard of Fieldwork No. 1 requires audits to be "adequately planned," and provides that particular attention should be paid to matters that, if inaccurately reported in a financial statement, could materially alter a company's financial situation. Thus, "[d]ue professional care is to be exercised in the planning and performance of the audit and the preparation of the report." AU § 230.01. Among other things, due professional care requires that an auditor exercise professional skepticism. AU § 230 states that professional skepticism is defined by "an attitude that includes a questioning mind and a critical assessment of audit evidence," and requires that "the auditor use[] the knowledge, skill, and ability called for by the profession of public accounting to diligently perform, in good faith and with integrity, the gathering and objective evaluation of evidence." AU § 230.07. "Gathering and objectively evaluating audit evidence requires the auditor to consider the competency and sufficiency of the evidence." AU § 230.08. Similarly, the standard states: "[i]n exercising professional skepticism, the auditor should not be satisfied with less than persuasive evidence because of a belief that management is honest." AU § 230.09.

78. The AICPA also provides pertinent guidance on the need for an audit to be adequately planned and appropriately supervised. In this regard, AU § 311 provides as follows:

> Audit planning involves developing an overall strategy for the expected conduct and scope of the audit. The nature, extent, and timing of planning vary with the size and complexity of the entity, experience with the entity, and knowledge of the entity's business. In planning the audit, the auditor should consider, among other matters:
>
> a. Matters relating to the entity's business and the industry in which it operates …
>
> b. The entity's accounting policies and procedures.
>
> c. The methods used by the entity to process significant accounting information ... including the use of service organizations, such as outside service centers.
>
> d. Planned assessed level of control risk.
>
> e. Preliminary judgment about materiality levels for audit purposes.
>
> f. Financial statement items likely to require adjustment.
>
> g. Conditions that may require extension or modification of audit tests, such as the risk of material error or fraud or the existence of related party transactions.
>
> h. The nature of reports expected to be rendered (for example, a report on consolidated or consolidating financial statements, reports on financial statements filed with the SEC, or special reports such as those on compliance with contractual provisions).

AU § 311.03.

79. GAAS specifically requires an audit team to be knowledgeable about its client's business and operations, and this knowledge should be considered in the planning phase of an audit. AU § 311.06 provides, in pertinent part, as follows:

> The auditor should obtain a level of knowledge of the entity's business that will

> enable him to plan and perform his audit in accordance with generally accepted auditing standards. That level of knowledge should enable him to obtain an understanding of the events, transactions, and practices that, in his judgment, may have a significant effect on the financial statements.

80. The AICPA's Accounting and Auditing Guide for Depository and Lending Institutions (the "AAG") provides that "in planning the audit, the independent accountant should consider the factors influencing inherent risk ... as they relate to financial statement assertions about investments." AAG-DEP 7.107. The AAG also states that the "level of inherent risk for securities varies widely from institution to institution depending on, among other things, the nature and complexity of the securities and the extent and the effectiveness of the institution's accounting and operational policies and procedures." AAG-DEP 7.108. Certain particular examples of factors that may indicate higher inherent risk include ***significant concentrations of credit risk with one counterparty and/or declines in the values of collateral underlying securities*** (including, presumably, the requirement to understand the true fair market value of such collateral), among other things. AAG-DEP 7.108 (emphasis added).

81. Chapter 8 of the AAG expands upon the factors that may contribute to inherent risk (specifically as to loans) and delineates the following items that were applicable to the audits of the Stewardship Fund (particularly because the majority of assets in the Fund's portfolio were loans that had been originated by Acorn, a related party):

- High rate of growth in the loan portfolio
- Concentration of lending authority in one individual
- Significant nontraditional lending activities that involve a higher degree of risk ...
- Significant concentrations of loans in a particular industry or

geographic area

- The potential for insider abuse because of significant loans to the institution's officers, directors, shareholders, or other related parties that do not meet normal underwriting standards, such as nominee loans, loans with questionable collateral, and multiple transactions with a single related party or group of affiliated parties.

AAG-DEP 8.133.

82. Furthermore, a GAAS-compliant audit operates as a "a cumulative process; as the auditor performs planning auditing procedures, the evidence obtained may cause him or her to modify the nature, timing, and extent of other planned procedures." AU § 312.33. That same standard provides that "[a]udit risk and materiality, among other matters, need to be considered together in designing the nature, timing, and extent of audit procedures and in evaluating the results of those procedures." AU § 312.01. The ability and willingness of the auditor to accept and employ this premise is one of the most critical elements of a GAAS-compliant audit. It highlights the reality that audit procedures can, and must, adapt to the particular client and the financial statements under audit, and that such procedures must be modified to ensure that reasonable assurance about the material conformity of the financial statements with GAAP can be offered by the independent accountant. The auditor can reduce the risk of material misstatement by modifying the nature, timing, and extent of planned auditing procedures on a continuous basis in performing the audit. AU § 312.39. Notwithstanding the foregoing, "if the auditor believes that such risk is unacceptably high, he or she should perform additional auditing procedures or satisfy himself or herself that the entity has adjusted the financial statements to reduce the risk of material misstatement to an acceptable level." AU § 312.39.

83. AU § 319 and GAAS Standards of Fieldwork No. 2 instructs auditors to obtain a sufficient understanding of a company and its internal control structure to plan an effective audit that will allow the auditor to assess the audit risk associated with inadequate internal controls.

84. AU § 319 also provides, in relevant part, with respect to obtaining an understanding of internal control, that "[i]n making a judgment about the understanding of internal control necessary to plan the audit, the auditor considers the knowledge obtained from other sources about the types of misstatement that could occur, the risk that such misstatements may occur, and the factors that influence the design of tests of controls, when applicable, and substantive tests." AU § 319.29.

85. Similarly, the AAG highlights that strong internal control over the financial reporting of securities would involve the following:

- The Board of Directors – generally through an investment committee – oversees management's securities activities.

- Accounting entries supporting securities transactions are periodically reviewed by supervisory personnel to ensure that classification of securities was made and documented at acquisition ... and is in accordance with the institution's investment policy and management's intent.

- Recorded securities are periodically reviewed and compared to safe-keeping ledgers and custodial confirmations, on a timely basis, including immediate and thorough investigation and resolution of differences and appropriate supervisory review and approval of completed reconciliations.

- There is appropriate segregation of duties among those who (a) execute securities transactions, (b) approve securities transactions, (c) have access to securities transactions, and (d) post or reconcile related accounting records.

AAG-DEP 7.112.

86. Similarly, the AAG recommends that the auditor obtain knowledge – as required

by AU § 319 – about the internal controls that management has established to provide reasonable assurance that specific financial reporting objectives will be achieved. AAG-DEP 8.139. As to the Fund (and Acorn, since it was the source of all of the loans in the Fund's portfolio), such an assessment would include consideration of whether, *inter alia*, the following "typical controls relating to loans" were in existence and effective:

- An inventory of required loan documents, including evidence of collateral and the recording of liens, is monitored to ensure the timely receipt of required documents.

- There is segregation of duties among those who (a) approve loans, (b) controls notes and collateral, (c) receive payments, (d) post subsidiary ledgers, and (e) reconcile subsidiary and general ledgers.

- Notes and collateral on hand are kept in secure, locked, fireproof compartments. Negotiable collateral is kept under dual access control. Physical inventory and other processes are in place to identify losses or impairment of collateral.

AAG-DEP 8.140.

87. Credit risk can also contribute to the potential for financial statement misstatements, especially for those entities with balance sheets that are comprised of receivables from third parties. Particular elements of credit risk that should be considered by the reporting entity – and which are thereby relevant to the auditor – include collateral risk (including the valuation thereof) and concentration risk, which stems from the inadequate diversification of the loan portfolio in terms of different industries, geographic regions, loan products, terms of loan products, or the number of borrowers. AAG-DEP 8.07. As the AAG recognizes, all of the foregoing may cause losses in the portfolio and to the entity.

88. In that regard, GAAS also required the E&Y Defendants, as part of the audit planning process, to identify "fraud risk factors," or circumstances that could lend themselves to

fraudulent and/or illegal activities. AU § 316, *Consideration of Fraud in a Financial Statement Audit*, serves as a roadmap for uncovering accounting fraud by providing examples of "events or conditions that indicate incentives/pressures to perpetrate fraud, opportunities to carry out the fraud, or attitudes/rationalizations to justify a fraudulent action," and requires that independent auditors utilize professional skepticism. The E&Y Defendants ignored a number of significant red flags in connection with the Stewardship Fund that AU § 316 identifies as "fraud risk factors," including the following:

- Among "Incentives/Pressures" to perpetrate financial reporting fraud are "[r]apid growth or unusual profitability."
- Among "Opportunities" to perpetrate financial reporting fraud are "[f]ormal or informal restrictions on the auditor that inappropriately limit his or her access to people or information;" "[a]ssets, liabilities, revenues, or expenses based on significant estimates that involve subjective judgments or uncertainties that are difficult to corroborate;" "[d]omination of management by a single person or small group ... without compensating controls," and "[i]neffective board of directors or audit committee oversight over the financial reporting process and internal control."[11]

89. GAAS Standard of Fieldwork No. 3 states that "[s]ufficient competent evidential matter is to be obtained through inspection, observation, inquiries and confirmations to afford a reasonable basis for forming an opinion regarding the financial statements under audit." AU § 150.02. AU § 326, *Evidential Matter*, explains that the evidential matter collected and evaluated by auditors is central to a proper audit and serves as the foundation for the auditor's opinion

[11] In this regard, monthly newsletters distributed by Advisors and Quan to Plaintiff and other Fund investors claimed, *inter alia*, that there were never any unprofitable months over the life of the Fund and that the Fund never had a consecutive loss. Moreover, as alleged herein, Quan completely dominated all aspects of the Fund, as well as Acorn – the source of all of the Fund's assets – and there was no board of directors or other "compensating controls." As alleged herein, these factors were only a few of many that were readily apparent to the E&Y Auditors and which presented "fraud risk factors."

report. Thus, the E&Y Defendants were required to investigate and obtain supporting evidential documentation for the assertions made by the Stewardship Fund in its financial statements, including the value of collateral that secured a majority of its investments and the personal guaranties securing the loan portfolios at issue, and could not merely take the word of Quan or other employees of the Fund (or Acorn) about the accuracy of the financial statements, including, specifically, the existence or quality of the collateral. As explained above, the E&Y Defendants could not have engaged in these most basic of auditing functions because, if they had, they would have discovered that the investments (*i.e.,* in loans from Acorn) were worthless and that there was no personal guaranty of any value underlying these loans (since the documentation required by the personal guaranty other than the paper guaranty itself was all missing and non-existent).

90. Furthermore, consistent with the professional skepticism that must accompany any audit, the auditor should "recognize the possibility that the financial statements may not be fairly presented in conformity with [GAAP] ..." and should "consider relevant evidential matter regardless of whether it appears to corroborate or contradict the assertions in the financial statements." AU § 326.25. Given the nonexistence of the collateral underlying Acorn's loans to the Petters entities, the E&Y Defendants could not have obtained "competent evidential matter" upon which reasonable assurances could have been based in connection with any of the unqualified audit opinions disseminated during the Class Period. At a minimum, all of the foregoing guidance from the AICPA would have escalated the importance of professional skepticism on the part of the E&Y Defendants and escalated the importance of ensuring that the promissory notes within the Fund's portfolio of assets had been valued correctly and supported by adequate, and adequately-valued, collateral.

91. Beyond this, the AAG highlights the importance to an auditor of inspecting loan documents and files when attempting to provide assurance on the material conformity of financial statements comprised of loan products. Given the proportion of the Fund's total portfolio that was comprised of promissory notes, such procedures would have been relevant to the E&Y Defendants. Specifically, the AAG states:

> When inspecting loan documents, the independent accountant should consider testing the physical existence and reading any evidence of assignment to the institution of the collateral that supports the collateralized loans. For certain loans, the independent accountant should consider inspecting collateral in the custody of the borrower ... [t]he independent accountant should also consider examining or requesting confirmation of collateral not on hand. An inspection of loan documentation should include tests of the adequacy of both the current value of the collateral in relation to the outstanding loan balance and, if needed, insurance coverage on the loan collateral.

AAG-DEP 8.160. As alleged herein, the E&Y Defendants never even inspected the collateral underlying the loan documentation at issue or the personal guaranty files to determine if the most basic of information required by those guaranties even existed (which it did not because Petters had not filed tax returns in years and never supplied Acorn with audited financial statements - an obvious and compelling red flag to any minimally competent auditor).

92. Although management representations "are part of the evidential matter the independent auditor obtains, [ ] they are not a substitute for the application of those auditing procedures necessary to afford a reasonable basis for an opinion regarding the financial statements under audit." AU § 333.02.

93. The two primary statements assertions that must be satisfied through the audit of financial statements of a mutual or hedge fund are existence and valuation. As stated in the AAG:

> [T]he primary objectives of audit procedures in [the area of investments] are to obtain reasonable assurance that securities … exist at the balance sheet date … and are owned by the institution [and] have been properly classified, described, and disclosed in the financial statements at appropriate amounts (including consideration of any other-than-temporary declines in value).

AAG-DEP 7.105.

94. The "existence" assertion represents the need for the entity to demonstrate, for purposes of a review or audit, that assets reflected in the balance sheet of the financial statements are both physically in existence and the subject of valid and sufficient ownership and title on the part of the entity. It is the auditor's obligation, therefore, to validate the existence assertion for material and significant assets when performing procedures and issuing an opinion. Of course, the E&Y Defendants violated this basic audit principle in its entirety as well.

95. Valuation calls for the entity and auditor to ensure that, notwithstanding the existence and/or validity of the title of assets in question, the value at which such assets are being presented and carried on the balance sheet is supported and justifiable. There are many ways for an entity to determine the carrying value of assets, especially those characterized as investments. Although estimates may play a role in determining carrying value, GAAP provides a breadth of guidance aimed at reducing the uncertainty associated with asset values, and GAAS, correspondingly, highlights varying risks that relate to the carrying value of assets and substantial guidance to the auditor about how he or she may achieve reasonable assurance that an entity's assets are being presented in manners that are supportable and consistent with GAAP. The E&Y Defendants could not have followed any GAAP principles regarding the valuation of assets because they never even bothered to determine if any assets underlying the loans at issue existed (which they did not - since the transactions underlying the loans were non-existent and fictitious

and there were no physical assets of any value underlying such purported loans).

96. In addition to the foregoing standards and guidelines, upon information and belief and at all times relevant hereto, the E&Y Defendants were bound to comply with the Ernst & Young Client Acceptance and Continuance policy (the "Acceptance & Continuation Policy"), which Ernst & Young entities view as an important risk management tool and which sets out principles to determine whether Ernst & Young, in any location or practice area, should accept a new client or a new engagement, or continue a relationship with an existing client. If, pursuant to these guidelines, the proposed or existing client or an engagement presents risks that are incompatible with Ernst & Young's desired risk profile, these concerns must be resolved or the scope of the audit designed in such a way that these risks are adequately addressed. If the E&Y partner and client cannot agree, either the client or the engagement is not accepted. According to Ernst & Young's own materials, this on-going process of review and resolution of any concerns is essential for the firm to manage risk, protect their personnel, maintain quality and meet regulatory requirements.

97. Among other things, the Acceptance & Continuation Policy requires Ernst & Young partners to "document" the directors or founders of the firms or funds that they are to audit, as well as their business inter-relationships. Here, application of the Acceptance & Continuation Policy would have required identification and review of the inter-relationship of the Stewardship Fund, the Off-Shore Fund and any other hedge fund or investment vehicle under Quan's control, as well as Acorn and Advisors, all related party transactions, and the full extent of Quan's control and involvement in the operation of the Fund and the related entities. Particularly given their predominance among the Fund's assets, the same identification and

review necessarily would have been performed with respect to PAC Funding, Petters and all the other counter-parties to each Acorn promissory note to be purchased by the Fund in light of the enormous concentration of risk on the part of the Stewardship Fund in these loans.[12] Again, none of these activities were undertaken by the E&Y Defendants because, if they had been undertaken, the E&Y Defendants would have discovered that the vast majority of the Stewardship Fund's investments were in the hands of a convicted felon who had not filed tax returns for a number of years.

98. For the E&Y Auditors' audit engagement of the Fund, their audit workpapers document the initial (and thereafter annual) application of the Acceptance & Continuation Policy, including the identification of specific risks and the actions taken by the E&Y Auditors' professionals to address, *inter alia*, the following:

- The stated investment strategy of the Fund was to invest in high yield notes, sourced exclusively by Acorn, a related party entity, the vast majority of which originated with Petters-related entities. Moreover, Quan's role with respect to Advisors and Acorn, the provider of investment advice and the creator of the investments themselves, respectively, presented such a concentration of risk in one person and an inherent conflict of interest that would have raised audit risk concerns to the E&Y Auditors.

- Because of the sizeable and long-standing presence of Petters-related promissory notes in the Fund's portfolio, as well as Petters' subsequent role as guarantor, a full conflicts, matters and background check would have been done to assuage any fears that the Fund was investing in a risk entity, counting on a risk individual or, in a worst case scenario, placing all its investors' assets into a fraudulent scheme. Audited financial statements of PAC Funding and other Petters entities, and audited reports prepared by an auditing firm, would have been requested since those were the entities guaranteeing the collateral securing the loans, in addition to Petters' own tax returns and audited financial statements for Petters as he was a personal guarantor.

---

[12]Such review and investigation likewise would be performed with respect to the Fund's jewelry investments, which represented the next highest concentration of the Fund's assets.

- The PPM and any other marketing materials used by Quan, Advisors and/or Acorn to solicit investments for the Fund would be an essential part of the documentation necessarily identified and reviewed pursuant to the Acceptance & Continuation Policy, thereby clearly disclosing not only Quan's conflict of interest, but also Escher's oversight role and his function as limiting or at least tempering Quan's concentration of authority and control over the management of the Fund, the choice of investments and the relationship with the Fund's major source of assets. The E&Y Auditors would interview and/or investigate Escher himself for any conflicts, for his independence, and for any legal matters involving him that would affect his role as an important compliance and internal control function of the Fund.

- The nature of the Fund's assets – primarily promissory notes backed by retail transactions and collateral in presumably remote locations – presents a high fraud risk to the audit engagement. Ernst & Young's audit methodology requires the E&Y Auditors to use internal or external experts to support the audit when it presents technical or logistical issues not able to be addressed adequately by the core audit team. The issue of valuation of complex instruments or thinly traded instruments requires consultation with valuation experts, presumably within the Ernst & Young Financial Services Office administered by E&Y, as well as the technical accounting resources to guide or instruct on the proper treatment of these assets under GAAP – in particular their impairment if that becomes necessary. The high risk of fraud inherent in the Petter/PAC Funding business model translates into additional testing – identified during the initial application of the Acceptance & Continuation Policy – for the existence of the collateral securing the promissory notes. This is another area where internal or external expertise or reliance on outside experts for the audit of physical inventories, shipping documents, purchase orders, security interests and other documents critical to verifying the existence of the assets would be vital.

## V. <u>THE E&Y DEFENDANTS' FALSE AND MISLEADING STATEMENTS</u>

### A. PRE-CLASS PERIOD STATEMENTS

99. On or about March 31, 2003, E&Y Bermuda issued its first audit opinion regarding the Stewardship Fund (the "2002 Report") to "the Members of [the Fund]." This opinion confirmed, *inter alia*, that "[a]n audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements." Based on its audit, E&Y Bermuda represented that "the financial statements referred to above present fairly, in all material

respects, the financial position of [the Stewardship Fund] at December 31, 2002 and the results of its operations ... for the year then ended, in conformity with accounting principles generally accepted in the United States of America."

100. On or about March 5, 2004, in a report issued to "Members of [the Fund]" by E&Y Bermuda (the "2003 Report"), E&Y Bermuda issued an opinion, virtually identical to the 2002 Report, representing that, based upon its audit, "the financial statements referred to above present fairly, in all material respects, the financial position of [the Stewardship Fund] at December 31, 2003 and the results of its operations ... for the year then ended, in conformity with accounting principles generally accepted in the United States of America."

101. On or about March 7, 2005, in a report issued to "Members of [the Fund]" by E&Y Bermuda (the "2004 Report"), E&Y Bermuda issued an opinion, virtually identical to the 2002 Report and the 2003 Report, representing that, based upon its audit, "the financial statements referred to above present fairly, in all material respects, the financial position of [the Stewardship Fund] as of December 31, 2004 and the results of its operations ... for the year then ended, in conformity with accounting principles generally accepted in the United States of America." The only difference between the 2004 Report and the earlier Reports was E&Y Bermuda's disclaimer that it had not been "engaged to perform an audit of the [Fund's] internal control over financial reporting" and, consequently, the 2004 Report would "express no such opinion." Nonetheless, presumably in recognition of AU § 319 and its GAAS obligations, E&Y Bermuda acknowledged that its "audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances...."

102. Among other things, the 2004 Report was accompanied by the Statement of

Financial Condition, which listed, of the Fund's assets, "promissory notes, at fair value" worth $81,917,068, but which had cost the Fund $84,276,067.[13] As alleged more fully below, this information was false. The 2004 Report individually listed, by due date, interest, par value, fair value and percentage of net assets, 36 promissory notes, which together amounted to 83.99% of the Fund's portfolio.[14]

## B. CLASS PERIOD STATEMENTS

103. On or about March 15, 2006, in a report issued to "Members of [the Fund]" by E&Y Bermuda (the "2005 Report") and received by Plaintiff, E&Y Bermuda issued an opinion, virtually identical to the 2004 Report, representing that, based upon its audit, purportedly conducted in accordance with GAAS, "the financial statements referred to above present fairly, in all material respects, the financial position of [the Stewardship Fund] as of December 31, 2005 and the results of its operations ... for the year then ended, in conformity with accounting principles generally accepted in the United States of America."

---

[13]These figures were subject to Notes 4 and 5. Note 4 provided, *inter alia*, that Advisors, as Managing Member, was entitled to a monthly management fee, which was $836,676 for 2004. In addition, Advisors was also entitled to a quarterly performance allocation, which was over $1.5 million for 2004. Note 4 also described the Fund's revolver loan agreement with Acorn, whereby "Acorn may at any time, and from to time, borrow, prepay and re-borrow principal sums" up to a maximum of $40 million, as well as Acorn's serving fees chargeable to the Fund, which totaled $694,682 for 2004. Note 5 disclosed, *inter alia*, that, for 2004, the Fund had "purchased or financed promissory notes from only one entity, Acorn" and that these promissory notes were "secured by collateral and in some instances, by a limited guarantee granted by the majority shareholder of the issuer of the promissory notes" and the collateral "has been assigned to the [Fund] by Acorn in respect of promissory notes purchased from Acorn."

[14]The 2004 Report also identified almost 6% of the Fund's portfolio as being invested in "Stanfield Credit Opportunities L.P.," to which E&Y Bermuda allocated a fair value of $5.6 million, even though it conceded that "[d]etailed information regarding the investment portfolios of Stanfield is not available at December 31, 2004."

104. The Statement of Financial Condition (the "2005 Financial Statement") that accompanied the 2005 Report acknowledged, *inter alia*, consistent with the PPM and other information, that the Fund "seeks a high level of current income and capital appreciation while minimizing risk by purchasing high-yield short-term notes from [Acorn, which was] engaged in providing commercial financing generally on a transaction basis." The 2005 Financial Statement further recognized that the Fund only purchased promissory notes from Acorn, and that the Fund's "investments in promissory notes are secured by collateral and in some instances, by a limited guarantee granted by the majority shareholder of the issuer of the promissory notes" and that "[s]uch collateral has been assigned to the [Fund] by Acorn in respect of promissory notes purchased from Acorn."

105. Among other things, the 2005 Report listed, of the Fund's assets, "promissory notes, at fair value" worth $86,960,990, with a corresponding "amortized cost" of $86,960,990.[15] There was no indication why the cost of the promissory notes was now amortized, which was not done in the 2004 Report. Moreover, as alleged more fully below, this information was false. The 2005 Financial Statement individually listed, by due date, interest, par value, fair value and

---

[15]These figures were subject to Notes 3 and 4. Note 3 provided, *inter alia*, that Advisors, as Managing Member, was entitled to a monthly management fee, which was $1,122,629 for 2005. In addition, Advisors was also entitled to a quarterly performance allocation, which was over $2.3 million for 2005. Note 4 also described the Fund's revolver loan agreement with Acorn, whereby "Acorn may at any time, and from to time, borrow, prepay and re-borrow principal sums" up to a maximum of $40 million (the 2005 Report also listed Acorn's promissory note to the Fund for the $29 million outstanding on the revolver loan agreement as an asset). Note 3 also specified Acorn's serving fees chargeable to the Fund, which totaled $874,107 for 2005. Note 4 disclosed, *inter alia*, that, for 2005, the Fund had "purchased or financed promissory notes from only one entity, Acorn" and that these promissory notes were "secured by collateral and in some instances, by a limited guarantee granted by the majority shareholder of the issuer of the promissory notes" and the collateral "has been assigned to the [Fund] by Acorn in respect of promissory notes purchased from Acorn."

percentage of net assets, 33 promissory notes, which together amounted to 76.05% of the Fund's portfolio. There was, however, no indication as to the identity of the underlying borrower to which Acorn had loaned the funds.

106. As of the date of the 2005 Report, E&Y Bermuda knew that the vast majority of the Fund's investments were in promissory notes purchased by Acorn, which were secured by collateral assigned to the Fund (and perhaps a personal guarantee of the underlying promisor). As alleged below, E&Y Bermuda also knew that they had never, *inter alia*, inspected or examined the collateral and, indeed, was unaware whether it even existed. To the extent a personal guarantee accompanied any promissory note, E&Y Bermuda knew nothing about the credit-worthiness of the guarantor and, as explained above, any audit at all would have uncovered the fact that Petters never had supplied Acorn with required audited financial statements and federal income tax returns (which did not exist and never had been filed by Petters). As a result, and for all of the reasons explained above, the audit was not conducted in accordance with GAAS and the 2005 Financial Statement was not in conformity with GAAP. Notwithstanding this fact, E&Y Bermuda issued the 2005 Report, which was materially false and misleading for the reasons stated.

107. On or about March 27, 2007, in a report issued to "Members of [the Fund]" by E&Y Bermuda (the "2006 Report") and received by Plaintiff, E&Y Bermuda issued an opinion, virtually identical to the 2005 Report, representing that, based upon its audit, purportedly conducted in accordance with GAAS, "the financial statements referred to above present fairly, in all material respects, the financial position of [the Stewardship Fund] as at December 31, 2006 and the results of its operations ... for the year then ended, in conformity with accounting

principles generally accepted in the United States of America."

108. The Statement of Financial Condition (the "2006 Financial Statement") that accompanied the 2006 Report acknowledged, *inter alia*, consistent with the PPM and other information, that the Fund "seeks a high level of current income and capital appreciation while minimizing risk by purchasing high-yield short-term notes from [Acorn, which was] engaged in providing commercial financing generally on a transaction basis." The 2006 Financial Statement further recognized that the Fund only purchased promissory notes from Acorn, and that the Fund's "investments in promissory notes are secured by collateral and in some instances, by a limited guarantee granted by the majority shareholder of the issuer of the promissory notes" and that "[s]uch collateral has been assigned to the [Fund] by Acorn in respect of promissory notes purchased from Acorn."

109. Among other things, the 2006 Report listed, of the Fund's assets, "promissory notes, at fair value" worth $87,982,212, with a corresponding "amortized cost" of $87,982,212.[16] As alleged more fully below, this information was false. The 2006 Financial Statement individually listed, by due date, interest, par value, fair value and percentage of net assets, 24

[16]These figures were subject to Notes 3 and 4. Note 3 provided, *inter alia*, that Advisors, as Managing Member, was entitled to a monthly management fee, which was $1,184,491 for 2006. In addition, Advisors was also entitled to a quarterly performance allocation, which was over $2.6 million for 2006. Note 4 also described the Fund's revolver loan agreement with Acorn, whereby "Acorn may at any time, and from to time, borrow, prepay and re-borrow principal sums" up to a maximum of $40 million (the 2006 Report also listed Acorn's promissory note to the Fund for the $28 million outstanding on the revolver loan agreement as an asset). Note 3 also specified Acorn's serving fees chargeable to the Fund, which totaled $935,713 for 2006. Note 4 disclosed, *inter alia*, that, for 2006, the Fund had "purchased or financed promissory notes from only one entity, Acorn" and that these promissory notes were "secured by collateral and in some instances, by a limited guarantee granted by the majority shareholder of the issuer of the promissory notes" and the collateral "has been assigned to the [Fund] by Acorn in respect of promissory notes purchased from Acorn."

promissory notes, which together amounted to 79.98% of the Fund's portfolio. There was, however, no indication as to the identity of the underlying borrower to which Acorn had loaned the funds.

110. As of the date of the 2006 Report, E&Y Bermuda knew that the vast majority of the Fund's investments were in promissory notes purchased by Acorn, which were secured by collateral assigned to the Fund (and perhaps a personal guarantee of the underlying promisor). As alleged below, E&Y Bermuda also knew that they had never, *inter alia*, inspected or examined the collateral and, indeed, was unaware whether it even existed. To the extent a personal guarantee accompanied any promissory note, E&Y Bermuda again knew nothing about the credit-worthiness of the guarantor. As a result, and for all of the reasons explained above, the audit was not conducted in accordance with GAAS and the 2006 Financial Statement was not in conformity with GAAP. Notwithstanding this, E&Y Bermuda issued the 2006 Report, which was materially false and misleading for the reasons stated.

111. On or about March 31, 2008, in a report issued to "Members of [the Fund]" by E&Y Bahamas (the "2007 Report") and received by Plaintiff, E&Y Bahamas issued an opinion, substantially similar to the 2006 Report and 2007 Report, representing that, based upon its audit, purportedly conducted in accordance with GAAS, "the consolidated financial statements referred to above present fairly, in all material respects, the financial position of [the Stewardship Fund] as at December 31, 2007, and the results of its operations ... for the year then ended in conformity with accounting principles generally accepted in the United States of America." There was no notice or explanation provided to Plaintiff or other members of the proposed Class for the change in the Fund's auditor from E&Y Bermuda to E&Y Bahamas.

112. The 2007 Report was accompanied by the Consolidated Statement of Financial Condition – with Consolidating Details (the "2007 Financial Statement"). As explained by the 2007 Report, "[t]he consolidating details are presented for purposes of additional analysis" and had been "subjected to the auditing procedures applied in our audit of the [2007 Financial Statement]." The 2007 Financial Statement disclosed that, as of November, 2007, the Fund had created two wholly-owned subsidiaries, Putnam Green LLC and Livingston Acres (the "Subsidiaries"), "to facilitate a leverage facility with AG Deutsche Zentral-Genossenschaftsbank Frankfurt Am Main ('DZ Bank')."[17] Thus, the financial position of the Fund reflected in the 2007 Report was consolidated with that of the Subsidiaries, although "[a]ll intercompany transactions have been eliminated on consolidation."

113. The Statement of Financial Condition (the "2007 Financial Statement") that accompanied the 2007 Report acknowledged, *inter alia*, consistent with the PPM and other information, that the Fund "seeks a high level of current income and capital appreciation while minimizing risk by purchasing high-yield short-term notes from [Acorn, which was] engaged in providing commercial financing generally on a transaction basis." The 2007 Financial Statement further recognized that the Fund only purchased promissory notes from Acorn, and that the Fund's "investments in promissory notes are secured by collateral and in some instances, by a limited guarantee granted by the majority shareholder of the issuer of the promissory notes" and that "[s]uch collateral has been assigned to the [Fund] by Acorn in respect of promissory notes purchased from Acorn."

114. Among other things, the 2007 Report listed, of the Fund's assets, "promissory

[17]Quan was President of the Subsidiaries.

notes, at fair value" worth $108,404,687, with a corresponding "amortized cost" of $108,404,687.[18] As alleged more fully below, this information was false. The 2007 Financial Statement individually listed, by due date, interest, par value, fair value and percentage of net assets, 33 promissory notes, which together amounted to 90.58% of the Fund's portfolio. Although there still was no indication as to the identity of the underlying borrower, in a section of the 2007 Financial Statement discussing credit risk, it was revealed that the Fund "has credit exposure of $77,172,318 for investments in promissory notes from a group of issuers related through common ownership."

115. Therefore, as of the date of the 2007 Report, E&Y Bahamas knew that the vast majority of the Fund's investments were in promissory notes purchased by Acorn, which were secured by collateral assigned to the Fund (and perhaps a personal guarantee of the underlying promisor). As alleged below, E&Y Bahamas also knew that it had never, *inter alia*, inspected or examined the collateral and, indeed, was unaware whether it even existed. To the extent a personal guarantee accompanied any promissory note, E&Y Bahamas knew nothing about the

[18]Unlike the 2005 and 2006 Reports, these figures were not subject to any specific notes in the 2007 Report. Nonetheless, Note 3 in the 2007 Report provided, *inter alia*, that Advisors, as Managing Member, was entitled to a monthly management fee, which was $1,207,612 for 2007. In addition, Advisors was also entitled to a quarterly performance allocation, which was over $2.4 million for 2007. Note 3 also described the Fund's revolver loan agreement with Acorn, whereby "Acorn may at any time, and from to time, borrow, prepay and re-borrow principal sums," which had been increased to a maximum of $55 million (the 2007 Report also listed Acorn's promissory note to the Fund for the $21 million outstanding on the revolver loan agreement as an asset). Note 3 also specified Acorn's serving fees chargeable to the Fund, which totaled $604,418 for 2007. Note 6 disclosed, *inter alia*, that, for 2007, the Fund had "purchased or financed promissory notes from only one entity, Acorn" and that these promissory notes were "secured by collateral and in some instances, by a limited guarantee granted by the majority shareholder of the issuer of the promissory notes" and the collateral "has been assigned to the [Fund] by Acorn in respect of promissory notes purchased from Acorn."

credit-worthiness of the guarantor. As a result, the audit was not conducted in accordance with GAAS and the 2007 Financial Statement was not in conformity with GAAP. Notwithstanding this, E&Y Bahamas issued the 2007 Report, which was materially false and misleading for the reasons stated.

116. In addition, because Escher, as the Fund's "Independent Manager," was employed by the Fund to independently evaluate any transaction between Acorn and the Fund, he was within the scope of the E&Y Auditors' audits. The PPM specified that Escher was "neither affiliated with, nor has a direct or indirect material interest in any transaction of the [Fund], Acorn, Mr. Quan or any affiliate or service provider of the foregoing ...," but despite this false assertion, Escher was not only a friend and former colleague of Quan, he was also a director of one or more related entities, including the Off-Shore Fund and Livingston Acres, LLC., one of the Fund's subsidiaries. At a minimum, to the extent Escher was compensated as director of the Off-Shore, which – like the Stewardship Fund – purchased promissory notes originated by Acorn, he had a "direct material interest" in Acorn's transactions. For the same reason, as well as his role as director of one of the Fund's subsidiaries, Escher had at least an indirect material interest in the Fund's transactions with Acorn. The PPM further represented that Escher would, *inter alia*, "approve the terms of any and all transactions between Acorn and the [Fund], including, without limitation, with respect to Short-Term Notes and any equity investment, guarantee or liquidity facility." The E&Y Auditors, at a minimum, would have needed to review evidence of Escher's supposed independent and approval of every PAC Funding promissory note sold by Acorn to the Fund. Without independence, Escher's approval would have be illusory and clearly apparent as such to the E&Y Auditors. The E&Y Auditors either discovered Escher's

lack of independence and that he was disregarding the duties that he had supposedly undertaken or, at a minimum, utterly failed to investigate his independence or whether he was engaging in any of his purported duties, all in violation of the most basic principles of GAAS detailed above.

## C. THE CLASS PERIOD FALSE STATEMENTS WERE ISSUED KNOWINGLY OR WITH EXTREME RECKLESSNESS

117. The E&Y Auditors' knowledge that was necessary for them to opine as to the "fair presentation in all material aspects" of the Fund's financial information had to be obtained independently from that of the Fund and/or its affiliated entities. The E&Y Auditors had an affirmative obligation and duty to assess – on their own – the relation of Advisors, Acorn or Quan to PAC Funding, Petters, other Petters entities and the underlying transactions that the promissory notes were supposedly funding, and how each of these parties affected the finances of the Fund. The E&Y Auditors' assessment, culminating in their official opinions, must be based on substantive tests (analytical procedures such as looking at trends, changes in balances, industry data, mathematical relationships between balances and tests of detail such as inspecting documents), which are necessary to support an opinion on completeness, validity and/or accuracy of account balances and underlying classes of transactions. The E&Y Auditors must demonstrate professional skepticism. In practice, that means the E&Y Auditors had to go beyond what Quan or other members of the Fund's management said or the information those individuals provided them, exercise their requisite professional skepticism and look at the evidence themselves and validate it via the other party to the note or guarantee, or with a third-party such as the Retailers. Based on the facts alleged herein, the E&Y Auditors did none of this. Moreover, because Advisors, Acorn and Quan knew virtually nothing about PAC Funding and the underlying

transactions, took no steps to gain such knowledge and had no documents to support the existence or legitimacy of the transactions at issue, this information shortfall provided a woefully insufficient basis for a reasonably competent auditor to issue an opinion as to the Stewardship Fund's financial condition.

118. Prior to entering into the Initial Credit Agreement, neither Advisors, Acorn nor Quan performed any due diligence regarding Petters or PAC Funding, Acorn's specially-created SPE. Rather, the only point of reference, on which they exclusively relied, were the previous lending relationships with Redtagbiz and other Petters' companies. As Quan equivocated during his July 2, 2010 deposition taken in connection with the *Polaroid-Acorn* adversary proceeding: "We had an established track record with the Petters companies through the prior financings, so we had done due diligence on an ongoing basis. ... [T]here was no specific due diligence related specifically to this transaction." Likewise, CW 4 recalled that he was told by Quan that, with respect to loans to PAC Funding and Petters entities, due diligence was unnecessary. CW 3 said that during his tenure at Acorn (2007 to 2008), Petters was never vetted.

119. Quan did testify that, on one occasion in 2004, he made a single telephone call to Larry Reynolds, the supposed principal of NIR (and Petters' accomplice), who Acorn understood was facilitating PAC Funding's merchandise purchases. Even though Reynolds merely "confirmed" that NIR was selling merchandise to one of Petters' entities, and told Quan that he could not provide any other information because of non-disclosure agreements and "confidentiality concerns," neither Quan nor Acorn did anything more to verify the underlying PAC Funding transactions.

120. The absence of due diligence is further confirmed by the October 27, 2004 PAC

Funding LLC Approval Memorandum (the "10/27/04 memo"). Among other things, the 10/27/04 memo, which was approved by Quan, Paul Seidenwar (Acorn's then-Chief Credit Officer), Robert Bucci (Acorn's Chief Financial Officer) and Mary Ammon (underwriter), states as follows:

> PAC Funding was bourne [sic] out of previous historical fundings by sister companies of the same owner, Redtagbiz and Petters Company, LLC for purchase order financings ("PO financings"). ... We have had over a four year history with these related parties with no defaults or late payments. Further, we have had several other transactions, unrelated to PO financings: $40 million for inventory financing, $13 million A/R financings Petters Consumer Brands, and $50 million for FingerHut, Inc. as bridge financing.
>
> As stated in the termsheet of the proposed transaction, documentation is required for each funding, not to exceed $6 million. The requirement of both a deposit reserve (blocked account) and a Lock Box account for collections adds to the comfort level of the transaction. ...

Thus, the 10/27/04 memo recommends approval of the Initial Credit Agreement because of, *inter alia*, "the relationships with the borrower throughout a ten year period." But, importantly, it also requires the existence of documentation and safeguards (including the Lock Box account) which plainly did not exist and which any audit at all would have easily uncovered.

121. The E&Y Auditors were required, through their exercise of professional skepticism and otherwise, to go beyond what information the Fund, Quan, Advisors and/or Acorn possessed. Nevertheless, when examining the internal records of the Fund or any of its affiliated entities, including Acorn, in connection with the audits issued during the Class Period, the E&Y Auditors could not have reviewed any information regarding due diligence conducted of Petters, PAC Funding or any related Petters entities because none existed (and, as explained above, the required documentation that the Fund, Quan, Advisors and Acorn were supposed to

possess was largely missing and non-existent). The only basis for the Initial Credit Agreement was Acorn's past lending business with other Petters entities, which were likewise fraudulent. Because the absence of this information, standing alone, would have required the E&Y Auditors, through their exercise of professional skepticism, to investigate further in order to perform a competent audit, the issuance of unqualified audit opinions based on the facts known to the E&Y Auditors was, at the very minimum, severely and exceptionally reckless to a degree such that the E&Y Auditors cannot seriously contend that they even conducted an audit at all of the Fund and its investments.

122. Another reason for approval of the transaction with PAC Funding noted by the 10/27/04 memo was the "personal guarantee of the Principal Owner [*i.e.*, Petters] ..." CW 3 was told by Quan that Petters' personal guarantee obviated the need for due diligence. However, such an explanation could not have satisfied the E&Y Auditors' responsibility to, *inter alia*, exercise independence, professional skepticism and refrain from relying solely on management representations (especially where, as here, the personal guaranty file was missing required and basic documentation - *i.e.,* tax returns and audited financial statements). Moreover, as alleged above, naked reliance on such an explanation violated the Acceptance and Continuation Policy.

123. There was no due diligence conducted regarding Petters' own personal worth, and his personal guarantee of $50 million was apparently accepted at face value by the E&Y Auditors. For example, Quan testified that he could not recall whether a request for Petters' tax returns was ever made, but it would have been impossible for Acorn to ever have received any of Petters' personal tax returns since he failed to file any after 2005 – a fact that any modicum of due diligence would have revealed. Quan testified that the only thing Acorn received regarding

Petters' own net worth was "personal financial statements ... internally generated" by Jim Wehmhoff, PCI's Executive Vice President - Tax, who was subsequently convicted for assisting Petters in falsifying corporate and personal tax returns. According to Quan, these "personal financial statements" showed that "most of [Petters'] financial strength was in the investments in his companies." There is no indication that the E&Y Auditors ever conducted any investigation into Petters' personal finances or required production of the audited financial statements or tax returns explicitly required by the terms of the personal guarantee. The former would have revealed Petters' criminal background and the latter could not have been produced because they did not exist. Thus, the E&Y Auditors' failure to engage in such an examination or investigation of Petters amounted to no audit at all.

124. At least in some instances, part of Acorn's pre-Class Period due diligence involved the use of Beau Dietl & Associates, a New York-based private investigator, to conduct background checks of the individuals involved in proposed lending transactions. For example, such a "personal background check" was conducted in June, 2005 in connection with Esmerian's colleague, Mitchell May, who sought a $5 million credit secured by "high quality jewelry." However, no such investigation was conducted regarding Petters because it would have revealed Petters' previous and serious criminal record. According to the complaint filed in the *Petters* SEC action, Petters had multiple felony convictions, including 1989 charges in Colorado for forgery, larceny and fraud, for which he served a prison sentence in May, 1990. That same year, Petters was charged in Minnesota with two counts of theft by check, to which he pled guilty to one count. Furthermore, as reported on October 26, 2008 in the *Minneapolis Star-Tribune*, similar disturbing information regarding Petters' background was relatively easy to find:

> New York hedge fund manager Richard Bookbinder of Bookbinder Capital Management passed on an investment after he learned that Petters had lied on a Dun & Bradstreet questionnaire about earning a degree from St. Cloud State University.
>
> "Things popped up and we didn't feel comfortable. When people gave money [to Petters] they didn't ask, 'Who's this guy? What's his background?'" he said. "The question is: This information was out there in 2002. We looked at it and we're a small firm; why didn't other people look at it?"
>
> Randy Shain, vice president of First Advantage Investigative Services, which did the due diligence for Bookbinder, said he investigated Petters and his Petters Company, Inc. (PCI) for four different clients. Each client looked at his findings and walked away.
>
> "The amount of litigation involving Petters was pretty startling," Shain said. "We don't tell clients what to do. We let the clients decide. But a background report tells you what has happened in the past, and human beings tend to do the same thing again, especially under stress."

125. Had the E&Y Auditors reviewed Acorn's files to determine the credit-worthiness of Petters, they would have discovered a glaring omission – contrary to information obtained regarding personal guarantees received from other borrowers for amounts far less than $50 million, there was no such background check or information as to Petters. Therefore, the E&Y Auditors knew that no due diligence was conducted with respect to the borrower whose loans comprised almost 70% of the investments held in the Fund's portfolio. It is clear that the E&Y Auditors conducted no due diligence of their own because, if they had done so, they would have discovered Petters' criminal background and would have been forced to question, *inter alia*, his true credit-worthiness and whether the loans that amounted to the vast majority of the Stewardship Fund's investments existed and were supported by any collateral.

126. Section 5.1 of the Initial Credit Agreement required PAC Funding to provide Acorn with audited financial statements. Despite this requirement, Quan testified at his

deposition in connection with the *Polaroid-Acorn* adversary proceeding that Acorn never received audited financial statements of PAC Funding. Although Acorn received unaudited monthly balance sheets, Dominic Miele ("Miele"), Acorn's analyst responsible for monitoring and servicing the loans it originated, testified at his deposition in connection with the *Polaroid-Acorn* adversary proceeding that nothing was ever done to verify this information. Thus, had the E&Y Auditors reviewed the Initial Credit Agreement and then Acorn's files to examine PAC Funding's audited financial statements, they would have seen that, contrary to the express terms of the Initial Credit Agreement, none were ever provided. Therefore, because such audited financial statements were never provided, the E&Y Auditors never reviewed them.

127. The 10/27/04 memo specifically identified the "Lock Box account" as adding to the "comfort level" for the Initial Credit Agreement with PAC Funding. Indeed, pursuant to the Initial Credit Agreement, PAC Funding was required "to direct payees on receivables constituting Collateral under the Security Agreement [*i.e.*, the high-end consumer electronics] to remit their payments to a lockbox ... established with [Crown Bank] for the benefit of [Acorn]." The November 1, 2004 Lockbox Account Agreement between PAC Funding, Acorn and Crown Bank (the "Lockbox Agreement"), entered into at the same time as the Initial Credit Agreement, provided Acorn with a security interest in, *inter alia*, the lockbox and specifically acknowledged that the lockbox account would be "under the sole dominion and control" of Acorn.

128. Miele testified at his deposition, taken in connection with the *Polaroid-Acorn* adversary proceeding, that part of his monitoring duties at Acorn was the daily review of anticipated payments to the Lockbox account, and his understanding of the Lockbox Agreement was that proceeds of the sales transactions would be wired from the Retailers to the Lockbox

account.[19] However, Miele also testified to "one incident" in 2006 where he discovered a late payment to the Lockbox account which, following verification with a Crown Bank employee, had not come directly from one of the Retailers, but rather had originated from PCI. Miele then informed Acorn's Chief Financial Officer, Robert Bucci, who, after consulting with Quan and Paul Seidenwar, told Miele that, because PAC Funding had the ability to prepay a note, "everything was okay with regards to them sending the money." Miele did not follow-up with Bucci or anyone else at Acorn about the fact that this particular payment had been late and, by definition, could not have been a prepayment. Miele testified that he had not previously monitored the source of payments to the Lockbox account, and that after this one incident, he ceased any attempts to verify the source of payments to the Lockbox account.

129. Given that there were never any sales to Retailers, the only source of funds deposited in the Lockbox account was PCI or another Petters entity. Had the E&Y Auditors reviewed the manner in which the Lockbox account was being utilized, they would have discovered that, contrary to the express terms of the Lockbox agreement, no payments had ever been made by Retailers. Therefore, because the Lockbox agreement was never adhered to and no Retailers ever made any deposits to this account, the E&Y Auditors reviewed neither the Lockbox agreement nor any activity in this account (or, worse yet, reviewed this highly suspicious information and simply ignored it). Indeed, it is apparent that the E&Y Auditors never spoke to Miele regarding the 2006 "incident," even though he was the employee

[19] Contrary to the terms of the Initial Credit Agreement and the understanding of other personnel at Acorn, Quan testified that Acorn never intended to enforce the Lockbox requirement, and that he understood from the beginning that purported payments from retailers would initially go through PCI's bank account and then to the Lockbox at Crown Bank, rather than coming directly from retailers.

responsible for monitoring the account during that time (and perhaps throughout the Class Period) (or, worse yet, reviewed this highly suspicious information and simply ignored it).[20]

130. Confidential Witness No. 5 ("CW 5"), hired to develop new loans for Acorn, reported that, even before the Class Period, Petters was making only one payment per month. Since the ABL loans were designed to be staggered, with payments that should have been received continually as between 90 to 180 days lapsed on each lending transaction, even Acorn's own management admitted that this payment arrangement was unusual and suspicious. Thus, had the E&Y Auditors reviewed Acorn's files or records to examine the manner in which the Petters' entities were making payments, they would have discovered this unusual pattern. Therefore, the E&Y Auditors neither reviewed the manner in which payments were received on loans that comprised a majority of the Fund's assets nor interviewed any employees of the Fund or its affiliates to understand the manner in which the loans were performing (or, worse yet, reviewed this highly suspicious information and simply ignored it).

131. Miele testified that, after 2003, he became increasingly focused on servicing Acorn's loans to PCI and PAC Funding. In this function, Miele reported directly to Mark Sullivan, Acorn's then-Operations Supervisor. Miele testified his monitoring duties of the PCI and PAC Funding notes consisted of creating and reviewing credit rating reports of the Retailers (*i.e.*, Costco or BJ's) via Dun & Bradstreet and making quarterly visits to PCI's offices in

[20] Although CW 2's job at Acorn involved keeping collateral and funding records current, and verifying the existence and amounts of accounts receivable, her duties did not extend to PAC Funding or Petters'-related loans. Presumably, if they were attempting to conduct an audit of any kind, the E&Y Auditors would have spoken with CW 2 and discovered that she was not responsible for monitoring loans that comprised almost 70% of the Fund's assets, and then the E&Y Auditors would have interviewed Miele.

Minnesota.

132. The purpose of Miele's site visits was to review recent purchase orders from the Retailers, the invoices from NIR, the liquidator, and the purchase orders from PAC Funding (or PCI depending on the time frame) to ensure that they all corresponded and that the SKU numbers for the merchandise were consistent throughout. Each visit was basically the same, and would last two to three hours as Miele reviewed approximately 10 to 20 sets of purchase documents. Miele did not know why, after the Initial Credit Agreement was entered into, Acorn was only permitted to review the documentation in PCI's offices or why he was instructed to surreptitiously photograph the purchase orders he was reviewing. There is no indication that the E&Y Auditors ever checked the legitimacy of any of these photographed purchase orders. Thus, at most, the only documentation the E&Y Auditors ever reviewed in connection with these transactions, the underlying loans of which comprised almost 70% of the Fund's assets, were Dun & Bradstreet printouts regarding credit ratings of the Retailers and photographs of purchase orders, but not, for instance, concomitant shipping documentation. The E&Y Auditors never interviewed Miele, the sole Advisors or Acorn employee responsible for monitoring the loans comprising the majority of the Fund's assets, or they would have discovered this unusual approach to loan servicing that reeked of fraud (or, worse yet, they reviewed this highly suspicious information and simply ignored it).

133. During an initial site visit to PCI's offices in March, 2005, Quan and Miele were told that the merchandise was picked up from the liquidator's warehouse by the Retailers and that copies of the shipping documents (*i.e.*, bills of lading) were maintained by the Retailers (but available by request through PCI). Acorn never requested such documentation - because, if it

had, it would have learned that the documentation did not exist. Accordingly, the E&Y Auditors never reviewed such documentation because it was not in Acorn's files (or, worse yet, requested this documentation, never received it and simply ignored the lack of receipt of these critical documents).

134. Stephen Foster ("Foster"), the principal of Foster Consulting, based in Walpole, MA, performs, *inter alia*, asset-based loan audits and other advisory services for banks and other lending institutions. In connection with the *Polaroid-Acorn* adversary proceeding, Foster testified regarding the September, 2008 field examination of ACG II, LLC ("ACG"), a special purpose vehicle created and wholly owned by Acorn, which Foster conducted on behalf of Sovereign Bank ("Sovereign").[21] Among other things, Foster testified that it is standard procedure for banks and other lenders in connection with receivable or purchase order transactions to verify in person or in writing that the underlying transaction for which the loan had been made had occurred on the date and in the amount indicated in the credit documentation. Indeed, Sullivan testified in connection with the *Polaroid-Acorn* adversary proceeding that it had been Acorn's "standard operational procedure" to make verification calls, but he had been told by Quan early on during his tenure at Acorn that a confidentiality agreement prohibited direct contact with the Retailers with which Petters transacted. Miele testified that he had been told by Quan that the Retailers could not be contacted because Petters was "paranoid."

135. Foster further testified that the Acorn records he examined indicated that major

---

[21] ACG was created by Acorn in 2007 to pool certain short-term purchase order loans that would serve as exclusive collateral for the $22.5 million line of credit provided by Sovereign to ACG. In or around September, 2008, ACG defaulted on the credit agreement with Sovereign and this default is the subject of the *Sovereign Bank* (CT) action.

retailers had used their own trucks and had not signed any shipping documents, which was contrary to Foster's experience and inconsistent with good auditing practices.[22] Foster also testified that there were ways in which verification could be performed without implicating confidentiality concerns.

136. Foster's October, 2008 Field Examination Report of ACG's collateral as of August 31, 2008 (the "ACG Collateral Report"), provided to Sovereign's Field Exam Group, was based primarily on the records of ACG and Acorn (although it was noted that "cooperation and access was limited"),[23] and discussions with Seidenwar, Sullivan and other Acorn personnel. Among the ACG Collateral Report's conclusions was that "due diligence conducted over the past year, at least, has been sorely lacking." More specifically, the ACG Collateral Report stated that:

> [ACG] does not perform verification on purchase orders or receivables that are in its collateral pool. Actual purchase orders were not reviewed for the last year, but instead a list of P.O.'s was received [from] PAC Funding. The ACG field exams did not confirm shipping documents for any receivables. [ACG] stated that shipping documents were not available when major retailers use their own trucks to pick-up merchandise, which is clearly erroneous and could indicate fraud. ... It is disconcerting that a portfolio that reached $300M would have such a low level of review. We were informed by President Paul Seidenwar that ACG had grown overly confident in its relationship with PCI and reduced its oversight over the last year due to its increasing familiarity and comfort and the relationship. We recommend that the Bank accompany ACG and perform a full audit on PCI collateral including purchase order, receivables and inventory testing. ACG did

---

[22]During the July 3, 2008 site visit to PCI (and as reported in his memo to Quan, Seidenwar and Sullivan regarding the trip), Miele asked Coleman for copies of any correspondence from the Retailers reflecting the causes of purported shipping delays. Coleman told him that because the Retailers "have their own logistics" and pick up the merchandise themselves, "there are no third party Bills of Lading or manifest exhibiting the shipments." This was contrary to what Miele was told in March, 2005.

[23]Specifically, the ACG Collateral Report notes that ACG "declined to provide some information and blacked out information on certain schedules, while other data was provided for eyes only with no copies allowed to be retained."

> not allow us to retain the prior examinations conducted internally, and we recommend that the Bank require full access from the loan guarantor.
>
> * * *
>
> ACG prides itself on the ABL background of its executives. Even so, it appears that [the] credit methodology used has been poor. When loans were made against purchase orders, actual purchase order documents were not required, at least for the past year. [ACG] received a list of purchase orders signed by PAC Funding with each funding request. The purchase orders were never verified, which is an essential due diligence requirement in purchase order financing. Our review of the field exams showed that the methods used to check the collateral were insufficient. We were not allowed to retain the field exams for further analysis. As discussed earlier, when A/R collateral was taken in May 2008, proper review of shipping documents was not conducted as [ACG] was told by PAC Funding that there were no signed documents due to the customer base (Sam's, Costco, Target, BJ's). The lack of extensive due diligence enabled the financing of apparently fraudulent purchase orders and receivables.
>
> * * *
>
> Verifications are not performed on this account. More troublesome is the fact that Acorn has not performed verifications on the purchase orders or receivables that are part of the borrowing base.

137. The ACG Collateral Report provides a snapshot of Acorn's loan servicing/ monitoring operation for the PAC Funding loans between at least August, 2007 through August, 2008. Among other things, it verifies the then current absence of any actual promissory notes from PAC Funding to Acorn, which were then sold to the Fund. In addition, it notes the significant restrictions placed on Foster's access to Acorn's internal records – if the E&Y Auditors faced similar obstacles, their requisite skepticism would have been heightened because, *inter alia*, AU § 316 specifically identifies "[f]ormal or informal restrictions on the auditor that inappropriately limit his or her access to people or information" as an "opportunity" for fraud. If the E&Y Auditors did not face similar obstacles to access to Acorn's internal records, they would

have uncovered the fraud.

138. Foster also noted the following deficiencies with respect to the notes that were supposedly specifically designated as securing the loan from Sovereign:

> In February 2008, ACG restructured its full portfolio of approximately $300MM of purchase order funding notes due from PAC Funding. Without the Bank's consent, ACG used $20MM in a cash collateral pool to payoff delinquent notes to other members of the note pool that have been unnamed. Sovereign did not receive any paydown of its notes and was impaired as the 10% cash collateral was replaced by additional purchase orders totaling $35MM that now appear to be worthless.
>
> On 5/12/08, again without the bank's consent, ACG retired $267.1M of notes, including all ACG II notes held by Sovereign, and replaced them with new notes of $273.9MM which included $6.8MM of capitalized interest. There was a moratorium on principal payments, and so the borrowing base showed that the facility was current, even though it had previously defaulted and was restructured. The Bank was not aware of this at the lime of the restructure. Although this new restructure provided ACG with additional collateral, including the Polaroid Trademark, inventory, A/R and new purchase orders, the collateral was never verified. ... The notes that were now held by Sovereign no longer were tied to specific purchase orders but a pool of collateral shared with other funding entities for which there is no intercreditor agreement.
>
> * * *
>
> We could not confirm who's notes were repaid, though they were not Sovereign notes. We would typically test the notes, but they were all uncertificated. We could not test the collateral that corresponded to the notes since the restructure turned the fallback into pooled collateral, and we were prevented from testing the assets based on a stand-still agreement with Fortress Capital.
>
> * * *
>
> ACG II reported $1.75MM of income for the 7-months ending 7/31/08 on note interest of $2,418M. It is apparent that the company has not reserved for the defaulted notes, while interest income is at least partially accrued but not paid. ... The company did not allow us to retain ACG FYE or interim financials.
>
> As of 8/22/08, the Pac Funding facility of $274,OMM dominates the overall $357.8MM under management. Pac Funding comprises $14.7MM of the

> $25.1MM of outstanding notes owned by ACG. ... The write-off of the Pac Funding notes could be devastating.
>
> * * *
>
> The uncertificated structure of the notes in the collateral pool allowed the company to restructure the facility without the Bank's consent. The Bank is not in control [of] cash proceeds and is unable thereby to monitor cash flow. The collateral is currently in a pool with other ACG funding agents. This structure was instituted to allow for quick movement of notes between funding pools or quick payoffs. ...
>
> * * *
>
> Recordkeeping rated unacceptable due to the historical practice of restructuring without bank consent, reporting facilities as current that were in default and lack of access to all ACG records during our visit.
>
> Accounts (Notes) receivable were rated unacceptable due to the inability to test the collateral, the evidence that due diligence has been insufficient, the poor performance of the notes and the indication of fraud.

139. There is every indication that the deficiencies noted in the ACG Collateral Report were systemic at Acorn. Not only is it highly unlikely that Acorn would have maintained a set of books and records for the Fund that were different from those for the Sovereign loan to ACG II, Inc., it is equally implausible that Acorn would have employed loan servicing functions that were distinct to the borrower. Moreover, the ACG Collateral Report is consistent with the testimony of Quan, Miele and others noted above. Therefore, the restrictions placed on review of internal documents, the absence of collateral verification or other due diligence, the insufficient amount of reserves and the commingling of cash collateral, among other things, existed at the time of the E&Y Auditors' examination and provided an insufficient basis on which to opine as to the Fund's financial condition. The E&Y Auditors were either aware of these severe deficiencies or, even worse, never even bothered to review these records and discover these deficiencies. In

either event, even if viewed in a light most favorable to the E&Y Auditors, they conducted no meaningful audit at all of the Stewardship Fund.

140. Remarkably, in February, 2008, at the same time that PAC Funding had begun to fall behind on its payments to Acorn, which ultimately resulted in the May, 2008 "restructuring," Coleman proposed to Quan that Acorn enter into "roundtrip" transactions, whereby PAC Funding's payments to Acorn would be conditioned on Acorn's agreement to immediately send the funds back to PAC Funding.

141. On February 25, 2008, Coleman sent an email to Petters stating:

> Had a nice call with Marlon and I believe we'll be able to bring him 90 to 100% current. I'm going to have to use his 22MM from the blocked account to do so but he promised me he'll turn the 22MM around into new deal right away. So Wednesday when I get the 22MM from him I would use that to pay off old notes and he would turn it around and do new notes.

According to the Martens Aff., which was filed in connection with the *Polaroid-Acorn* adversary proceeding, on March 6, 2008, PAC Funding wired a total of $22,499,956.41 to Acorn and, over the next four days, Acorn wired $22,599,123 back to PAC Funding. This sequence of events and Quan's acquiescence to the "roundtrip" transactions, which are classic indicia of a Ponzi scheme, demonstrate that Quan knew exactly what kind of investments (*i.e.*, fraudulent) he was engaged in when dealing with Petters or, at a minimum, should have had serious concerns with respect to the same.

142. On March 12, 2008, Coleman sent an email to Miele and Quan stating:

> I'll have about 6.5mm to 7MM on Friday that I can use to pay off a couple of notes Friday if you're able to put the money back to work on Monday or Tuesday. The funds are PCI's and needs to be used for a couple of deals, but if you're able to do the deals Monday or Tuesday I could use the funds to pay off a couple of old notes.

The 2 new deals are with Sam's for $3,281,595 and $3,639,593.75.

According to the Martens Aff., on March 14, 2008, PAC Funding wired $6,998,949.70 to Acorn and, the next business day, Acorn wired $6,921,188.75 million back to PAC Funding. The Martens Aff. reflects that Acorn entered into several other "roundtrip" transactions, whereby it received payments totaling $16.7 million on March 24, 2008, only to wire back $15.9 million over the next three days.

143. The 2007 Report was disseminated to Plaintiff and other members of the proposed Class on or after March 31, 2008. Although it notes certain events subsequent to year end, such as additional contributions and withdrawals to the Fund, it contains no mention of the February and March, 2008 "roundtrip" transactions noted above. Any audit at all of the Stewardship Fund would have uncovered these roundtrip transactions, which are classic "red flags" for a Ponzi scheme and a fraudulent enterprise. Again, the E&Y Defendants either confronted and ignored these red flags or, even worse, never even discovered the existence of the roundtrip transactions because they simply were signing off on the Fund's financials without engaging in any meaningful audit of the Fund and its investments of any kind.

144. As the forbearance period ended in or around June, 2008, Miele testified that Acorn was continually informed that the justification for PAC Funding's inability to make payments to Acorn was because the Retailers were delaying shipments following a sluggish holiday season. Miele further testified that Acorn confirmed the general state of the economy via the internet and *Bloomberg*, but also conceded that no attempt was made to verify this information with the Retailers. Quan testified that, between January and February, 2008, he had a conversation with Timothy Eng, the manager of FAM Global, a fund of hedge funds, who told

Quan that he had not heard of any other investors encountering difficulties in receiving payments because of retailing delays.

## VI. ADDITIONAL SCIENTER ALLEGATIONS

145. As more fully alleged above, during the Class Period, E&Y Bermuda and E&Y Bahamas, as members of the Financial Services Office, which is touted as uniquely "dedicated to the financial services marketplace," and the E&Y Global Asset Management practice, knew of and ignored "red flags" which should have caused the E&Y Defendants to, *inter alia*, withhold their unqualified audit opinions, including the following:

- The same individual controlled not only the Stewardship Fund and Advisors, its investment advisor, but also Acorn, the loan originator, from which the Fund was required to purchase every loan that made up its portfolio, and which also was supposedly servicing the loans going forward. The E&Y Auditors performed no additional tests to compensate for this obvious conflict of interest and obvious fraud risk.

- Escher lacked independence, was ineffectual and failed to fulfill his supposedly "independent" role as a buffer on Quan's unbridled discretion over the asserts within the Fund's portfolio. He was the only person employed by the Fund with the responsibility to determine the suitability of the promissory notes as investments for the Fund, but also to review the actual promissory notes purchased by the Fund from Acorn. Combined with the absence of a board of directors or any similar oversight body for the Fund, such a concentration of discretionary authority in Quan decreases the strength of his representations or responses to auditor inquiries and increases the need for, *inter alia*, effective and comprehensive internal controls.

- The majority of assets within the Stewardship Fund's portfolio consisted of promissory notes between Acorn and what was effectively one entity, PAC Funding or another Petters entity, all of which were concentrated in one niche area of lending (ABL collateralized by high-end consumer electronics inventory). This factor also necessitates effective internal controls which, as alleged above, the Fund lacked.

- Based on their claimed expertise in hedge fund audits, the E&Y Auditors recognized the critical importance of collateral for ABL investing strategies, but

yet the E&Y Auditors never verified the collateral underlying the vast majority of the Fund's investments. Moreover, the E&Y Auditors could not "obtain reasonable assurance that securities ... exist at the balance sheet date ...." At best, the only "competent evidential matter" of the existence of the notes comprising the majority of the Fund's assets were the notes themselves and otherwise second hand information (*i.e.*, a list of promissory notes and an opportunity to review (but not retain copies) of purchase order documents supplied by PAC Funding). Upon information and belief, based on the foregoing factual averments, the E&Y Auditors had no "competent evidential matter" of the existence of the collateral that secured the notes.

- Likewise, the E&Y Auditors had no basis to value the Fund's investments (*i.e.*, to opine that the value provided for the promissory notes, singularly or combined, was supported and justifiable), even though the E&Y Defendants' marketing materials emphasize their ability to master this "challenging area." Unlike marketable securities, valuation of the promissory notes must include, *inter alia*, the estimated value of the underlying collateral, but the E&Y Auditors had no basis to so value the promissory notes.

- At a minimum, to validate the existence and valuation of the Fund's assets, the E&Y Auditors were required to review: (i) documentation relating to the Initial Credit Agreement, such as Petters' personal financial statements to support the $50 million guarantee and audited financial statements for PAC Funding; (ii) the Acorn guarantees and Acorn's audited financial statements; (iii) the restructuring agreements between Acorn and PCI; (iv) documentation relating to the roundtrip loans between Acorn and PCI; (v) the source of note repayment and interest funds and testing of compliance with lockbox agreement; (vi) the collateral agreements and the absence of collateral inspections by Acorn (or the E&Y Auditors); and (vii) whether any rigorous testing of aging of notes payable had been conducted, which would have uncovered shuffling notes between agreements, restructuring, roundtrips used to disguise true aging and true nature of transactions as sham. As alleged herein, even assuming *arguendo* that such documentation even existed, it was never reviewed by the E&Y Auditors.

- The E&Y Auditors had no written documentary evidence (i) that the Retailers were actually purchasing merchandise from PAC Funding or any other Petters entity (either directly from the Retailers themselves or inferentially through their use of the Lockbox agreement); (ii) reflecting the manner in which the merchandise was shipped or otherwise transported from the manufacturers to the Retailers or where the merchandise was stored or warehoused at any point along the way; and (iii) regarding PAC Funding's financial condition, such as audited financial statements.

- As alleged herein, applicable auditing standards indicated the inherent risk with the Fund's investments, including (as outlined by the AAG) concentration of lending authority in one individual; significant nontraditional lending activities that involve a higher degree of risk; and significant concentrations of loans in a particular industry or geographic area.
- Furthermore, as identified by AU § 316, there were several opportunities for fraud risk, including "[a]ssets ... based on significant estimates that involve subjective judgments or uncertainties that are difficult to corroborate;" "[d]omination of management by a single person or small group ... without compensating controls," and an "[i]neffective board of directors or audit committee oversight over the financial reporting process and internal control."

146. The E&Y Auditors had significant obligations to verify the true carrying value of the Stewardship Fund's assets in order to justify their unqualified opinions as to the material conformity of the Fund's financial statements with GAAP. At a minimum, because there was no market for the promissory notes purchased from Acorn, the E&Y Auditors had to understand the Fund's methodology for valuing the assets, as well as independently determine that management had, in fact, accurately valued, in all material respects, the assets being carried in the Fund's portfolio.

147. The E&Y Auditors knew that the PAC Funding promissory notes had been originated by Acorn, which was dominated and controlled by Quan, and that they had been passed through to the Fund at the direction of Advisors, also dominated and controlled by Quan. Thus, the E&Y Auditors knew, or reasonably should have known, that Quan was responsible for placing a value on the promissory notes for financial reporting purposes. Based on the subjectivity inherent in the valuation of these loans, the related party relationship between Acorn, Advisors and the Fund, and the magnitude of the PAC Funding promissory notes in relation to the total value of the Fund's assets, the E&Y Auditors were obligated to examine the means by

which such assets had been valued and were being presented in the Fund's financial statements.

148. In this regard, AU 328, *Auditing Fair Value Measurements and Disclosures*, provides that, in the case of active markets for securities, quoted prices are the best available audit evidence to support a fair value, AU § 328.08, but when such prices are unavailable or otherwise inapplicable, the auditor must understand the underlying valuation method used by the entity. AU § 328.18. Similarly, with respect to estimating loan losses (*i.e.*, probability of impairment on a portfolio of loan products), the AAG provides as follows:

> [A]llowance for loan losses is evaluated on a regular basis by management and is based upon management's periodic review of the collectability of the loans in light of the historical experience, the nature and volume of the loan portfolio, adverse situations that may affect the borrower's ability to repay, estimated value of any underlying collateral, and prevailing economic conditions.

149. Because the Fund's primary assets were nothing more than loan notes, all of the AAG's foregoing criteria was applicable to the audits performed by the E&Y Auditors, even if used only to determine the potential for impairment to the value of the asset. Just as management is responsible for evaluating the assets for impairment, the auditors are obligated to ensure that such consideration has been made and that the assets are not improperly or over-valued. The underlying collateral value of such assets critical to such a determination.

150. AU 342, *Auditing Accounting Estimates*, provides that "when the underlying collateral of a security significantly contributes to its fair value and collectability of the security, evidence of the collateral also should be examined for existence, fair value, transferability, and the investor's right to the collateral." Similarly, the AAG provides that there are "certain common elements that should be include in any methodology (for evaluating, measuring, and/or estimating credit losses) for it to be effective," such as:

- including a detailed and regular analysis of the loan portfolio and off-balance-sheet instruments with credit risk.
- consideration of all known relevant internal and external factors that may affect collectability.
- consideration of the particular risks inherent in the different kinds of lending.
- consideration of current collateral fair values, where applicable.
- basing such a methodology on current and reliable data.
- requiring that the methodology be well documented, with clear explanations of the supporting analyses and rationale.

151. Consideration of credit losses often includes the classification of loans based on characteristics and collectability. As to the review of loans with unique characteristics, where they are significant in proportion to the total portfolio, an auditor should focus on determining whether loans are properly classified as to credit risk and whether the borrower is likely to perform in accordance with contractual terms and conditions. AAG-DEP 9.11. Such review would typically include an analysis of (a) loan performance since origination or the last renewal, (b) the current economic situation of a borrower or guarantor, and (c) estimates of current fair values of collateral. The AAG further provides that "[c]ollateral is reviewed to determine whether it is under the institution's control, whether security interests have been perfected, and whether the value is greater than the amount owed." AAG-DEP 9.11.

152. Such a review of collateral requires some means, method, and measure of accurately assessing and determining the value of the underlying collateral, including its inspection and appraisal. The E&Y Auditors never did this because the collateral did not exist. Moreover, AU 328 states that the auditor shall use both the understanding of management's

process for determining fair value measurements and her assessment of the risk of material misstatement to determine the nature, timing and extent of audit procedures. AU § 328.25. This standard further provides that the following considerations must be made when designing audit procedures to assess the fair market value of balance sheet amounts:

- Collateral often is assigned for certain types of investments in debt instruments that either are required to be measured at fair value or are evaluated for possible impairment. If the collateral is an important factor in measuring the fair value of the investment or evaluating its carrying amount, the auditor obtains sufficient competent audit evidence regarding the existence, value, rights, and access to or transferability of such collateral, including consideration of whether all appropriate liens have been filed, and considers whether appropriate disclosures about the collateral have been made.

- In some situations, additional procedures, such as the inspection of the asset by the auditor, may be necessary to obtain sufficient competent audit evidence about the appropriateness of a fair value measurement. For example, inspection of the asset may be necessary to obtain information about the current physical condition of the asset relevant to its fair value, or inspection of a security may reveal a restriction on its marketability that may affect its value.

153. As alleged above, the E&Y Auditors never obtained "competent audit evidence" regarding, *inter alia*, the existence or value of the collateral underlying the PAC Funding promissory notes. Accordingly, the E&Y Auditors had no basis upon which to opine as the "fair value" of the promissory notes or, more generally, regarding the presentation of the Fund's financial condition and, at best, conducted no audit at all with respect to the Stewardship Fund.

154. Furthermore, although GAAS would support the E&Y Auditors retention of a specialist, such as Foster, to value underlying collateral, *see*, *e.g.*, AA-DEP 9.62-.66, the E&Y Auditors failed to do so here. First, such a specialist could not have inspected the collateral because it did not exist. Second, if such a specialist had actually been engaged and had issued a favorable (albeit unsupportable) conclusion as to, *inter alia*, the value of the collateral, Acorn or

Quan unquestionably would have used this evidence offensively in the *Polaroid-Acorn* adversary proceeding or the *Sovereign Bank* (CT) action.

155. At a minimum, the auditing standards provide that an independent accountant's assessment of management assertions about the allowance for credit losses (or, more broadly, the carrying value of assets such as loans) may depend on the availability of certain documentation, including adequate collateral appraisals or current and complete financial statements of guarantors. AAG-DEP 9.74. As alleged above, the E&Y Auditors' audit reports issued during the Class Period entirely abdicated this baseline obligation.

156. The AAG, as it pertains to an auditor's consideration of the carrying value of a loan portfolio, provides as follows:

> For loans secured by collateral, a careful evaluation and valuation of that collateral is often necessary. In such circumstances, the independent accountant should evaluate the security interest in the collateral to determine how the institution knows that it has been perfected by execution and recording of the appropriate legal documents. The independent accountant should also review the reasonableness of the institution's collateral valuation by referring to quoted market prices or other pertinent sources, such as specialist's appraisals or engineering reports.
>
> The independent accountant may test the existence of the collateral by physical observation, independent confirmation, or other appropriate procedures, especially when the institution is involved in loans secured by marketable securities or in asset-based lending, which may include loans secured by inventory, equipment, or receivables. For … types of collateral [other than marketable securities], there should be determination that the institution has verified the existence of the collateral. In the absence of such documentation, the independent accountant should perform these or other collateral verification procedures, especially for significant loans for which collectability is otherwise questionable.

AAG-DEP 9.79; AAG-DEP 9.80.

157. The observation of inventory and confirmation of accounts receivable are

fundamental requirements for a properly conducted audit, and have been generally recognized as vital since at least 1939. In that year, the American Institute of Accountants (now, the AICPA) appointed its first standing committee on auditing procedures which thereafter promulgated its first standard, Statements on Auditing Procedure No. 1, "*Extensions of auditing procedure*," requiring, inter alia, the actual observation of inventory and confirmation of accounts receivable.

158. These steps were in response to a massive fraud uncovered in 1938 involving McKesson & Robbins, Inc., which had financial statements (audited by Price Waterhouse) showing assets of $19 million for a non-existent drug company and $1.8 million gross profit on fake sales of $18 million. *In the Matter of McKesson & Robbins, Inc.*, S.E.C. Release No. AS-19, 1940 WL 977 (Dec. 5, 1940). The owner, which had purchased the legitimate company with bootlegging profits and who used an assumed name to conceal his criminal record, sought to inflate the company's reported assets to conceal his skimming. To accomplish this, he used one brother to operate a fictitious sales agency, which would create phony purchase orders and mail them to McKesson & Robbins. Another brother was in charge of McKesson & Robbins' shipping department, and he would forge shipping documents to make it appear that inventory had been delivered to legitimate companies. A third brother was appointed as McKesson & Robbins' assistant treasurer, and he would transfer funds between numerous company bank accounts to create the appearance of cash payments for purchases and cash receipts from customers. For each phony sale, the sales agency would be paid a commission (which would be divided among the brothers). The decade-long fraud was only uncovered when the Dun & Bradstreet credit reports that had been used to authenticate the phony sales agency were found to be forgeries themselves.

159. The foregoing cautionary tale (and historical analog to the Madoff and Petters scandals) is elemental to auditors such as the E&Y Defendants. Yet, they failed to fulfill even these fundamental obligations when issuing the false and misleading audit reports. If the E&Y Defendants had fulfilled this fundamental obligation, as opposed to issuing unqualified audit opinions after clearly conducting no audit at all, the fraudulent nature of the Stewardship Fund/Petters Ponzi scheme would have been uncovered before the commencement of the Class Period and none of the Class members would have suffered the damages complained of herein.

## VII. CLASS ACTION ALLEGATIONS

160. Plaintiff brings this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of himself and all other persons who invested or otherwise contributed to the Stewardship Fund during the Class Period (*i.e.*, between March 15, 2006 and September 25, 2008). Excluded from the Class are the E&Y Defendants, their officers, their subsidiaries and affiliates, any entities in which they have a controlling interest, the legal representatives, heirs, successors, predecessors in interest, affiliates or assigns of any of the Defendants, and the Judge(s) to whom this case is assigned.

161. This action may properly be maintained as a class action as a result of the following facts:

a. During the Class Period, at least 60 entities or individuals were members of the Fund, who are located throughout the United States, and are so numerous that joinder of all members of the putative Class is impracticable;

b. Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff and all members of the Class sustained damages as a result of the E&Y

Defendants' wrongful conduct complained of herein;

c. Plaintiff is a representative party who will fairly and adequately protect the interests of the other members of the Class, has retained counsel competent and experienced in class action securities litigation and has no interests antagonistic to, or in conflict with, the Class he seeks to represent;

d. A class action is superior to all other available methods for the fair and efficient adjudication of the claims asserted herein, because joinder of all members is impracticable. Furthermore, even though the damages suffered by the individual Class members may be significant, the expense and burden of individual litigation may make it difficult for the Class members to separately redress the wrongs done to them. Although some individual actions have been commenced by Class members, upon information and belief, none have asserted claims under the federal securities laws against the E&Y Defendants;

e. Plaintiff anticipates no unusual difficulties in the management of this action as a class action; and

f. The questions of law and fact common to the members of the Class predominate over any questions affecting any individual members of the Class.

162. The questions of law and fact which are common to the Class include, among others:

a. Whether federal securities laws were violated by the acts of the E&Y Defendants, as alleged in this Complaint;

b. Whether the audit reports disseminated to members of the Class by the E&Y Defendants during the Class Period omitted or misrepresented material facts about the

E&Y Defendants' audits, as well as the financial condition, business prospects, and internal controls of the Stewardship Fund;

c. Whether the E&Y Defendants failed to correct previously issued audit reports that they knew to be false or they recklessly disregarded the truth or falsity of such audit reports;

d. Whether the E&Y Defendants failed to disclose material, adverse information at a time when they were in possession of such information;

e. Whether the E&Y Defendants acted with knowledge or reckless disregard for the truth in misrepresenting and omitting material facts from the audit reports;

f. Whether the E&Y Defendants violated common law duties of care and diligence owed to members of the Class by disseminating the audit reports; and

g. Whether the members of the Class have sustained damages as a result of the E&Y Defendants' wrongful conduct complained of herein and, if so, what is the proper measure thereof.

## VIII. EXISTENCE OF DUTIES OWED TO PLAINTIFF

163. E&Y Bermuda (from at least 2003 through 2007) and E&Y Bahamas (from 2007 through October, 2008) contracted with Advisors to perform auditing services of and for the Fund, the owners of which, as a limited liability company, included Plaintiff and other members of the proposed Class.

164. Accordingly, Plaintiff and other members of the proposed Class were clients, to whom the E&Y Auditors owed fiduciary duties, including the duties to disclose, correct and update.

165. Alternatively, the E&Y Auditors owed a duty of care to Plaintiff and other members of the proposed Class because the harm that ultimately was sustained by them – the value of their investments in the Fund rendered worthless because of the nonexistence of the collateral that was supposed to secure over 70% of the Fund's assets – was readily foreseeable.

166. The PPMs by which Plaintiff and other members of the proposed Class invested in the Fund all identified E&Y Bermuda as the Fund's auditor and uniformly stated, *inter alia*, that members of the Fund would receive "annual reports containing audited financial statements with respect to the prior year." Throughout the Class Period, Plaintiff and other members of the proposed Class received annual "Report[s] of Independent Auditors" from the E&Y Auditors, which were addressed "To The Members Of Stewardship Credit Arbitrage Fund, LLC."

167. The E&Y Auditors knew that their audit reports were being provided, as required by the PPM, to investors in the Stewardship Fund for the purpose of independently evaluating the financial condition of the Fund and informing those investors' decision to either continue holding those investments, contribute more or withdraw some or all of their investments in the Fund. Plaintiff and other members of the proposed Class were intended and expected recipients of the audit reports. Accordingly, harm to those investors resulting from misstatements or errors in the audit reports was reasonably foreseeable and was the direct and proximate cause of the E&Y Defendants' acts and omissions.

168. Plaintiff and other members of the proposed Class represent a finite universe of persons or entities to whom the foregoing duty of care is owed. The PPMs uniformly state Advisors' intention to limit the Stewardship Fund to no more than 100 members. Because the audit reports were addressed and intended for members of the Fund, the E&Y Auditors knew or

reasonably should have known the persons or entities to whom the audit reports were provided and that these persons or entities would be relying upon these audit reports.

**COUNT I**

**VIOLATION OF SECTION 10(b) OF THE**
**EXCHANGE ACT AND RULE 10b-5 THEREUNDER**
**(Against E&Y Bermuda and E&Y Bahamas)**

169. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if set forth herein at length.

170. E&Y Bermuda, with respect to the 2005 Report and 2006 Report, and E&Y Bahamas, with respect to the 2007 Report, issued audit opinions that constituted the presentation of false and misleading information as to the assets and financial condition of the Stewardship Fund. Instead of millions of dollars in assets, as represented, virtually no assets existed. These statements were made knowingly or, as explained above, with an extreme degree of recklessness, and constitute deceptive and untrue statements of material facts, as well as omissions of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. These statements induced Plaintiff and other members of the Class to make investments or contributions in the Stewardship Fund.

171. As alleged herein, E&Y Bermuda and E&Y Bahamas issued audit opinions with respect to the Fund's financial statements in which they (I) stated that they conducted the audits in accordance with GAAS and (ii) expressed their unqualified opinion that the Fund's financial statements "present[ed] fairly, in all material respects, the financial position of [the Stewardship Fund] ..." Those statements were false. Although E&Y Bermuda (and later, E&Y Bahamas) had full access to the financial books and records of Stewardship Fund and its affiliated companies,

including Acorn (and had such access since at least 2003), and had the responsibility to and, in fact, purportedly did review the financial statements of the Fund, in truth, neither E&Y Bermuda nor E&Y Bahamas confirmed, *inter alia*, the existence of the Fund's assets or the collateral underlying the promissory notes sold to the Fund by Acorn. While purporting to conduct an audit, E&Y Bermuda and E&Y Bahamas did not take the most fundamental and obvious step of confirming the existence of the Fund's assets or the collateral, and did not do so despite the express requirements of GAAS. For this reason and all of the reasons stated above, neither E&Y Bermuda nor E&Y Bahamas essentially conducted no audit at all of the Stewardship Fund.

172. E&Y Bermuda and E&Y Bahamas acted knowingly or recklessly and their conduct in performing the audits and issuing the false and misleading statements in the audit reports was highly unreasonable and represented an extreme departure from the standards of ordinary care. Moreover, when they made their false statements and/or committed their actionable omissions, E&Y Bermuda and E&Y Bahamas knew facts or had access to information suggesting that their public statements were not accurate or they failed to check information they had a duty to monitor and which would have demonstrated the falsity of their statements.

173. To issue clean audit opinions, supporting the conclusion that the Stewardship Fund had millions of dollars of assets, which were secured by collateral worth at least that much or more, without any independent confirmation that any of the assets or collateral existed, is a textbook definition of an audit so reckless as to essentially constitute no audit at all. Issuing clean audit opinions in the circumstances here, with the red flags set forth above, is even more reckless. The failure of E&Y Bermuda or E&Y Bahamas to acquire evidential matter from, *inter alia*, independent third parties such as the consumer electronic equipment manufacturers or the

Retailers, or to acquire direct personal knowledge of the existence of the collateral, such as by inspections and physical examination, or of evidence to support the value of personal guaranties, not only was a blatant violation of auditing standards, but violated the most fundamental and obvious purpose of an audit – to confirm that reported assets (and here, the collateral) in fact exist.

174. The facts alleged herein compel a strong inference that the E&Y Defendants made material false and misleading statements in the audit reports to Plaintiff and other members of the Class with scienter, in that the E&Y Defendants knew that the audit reports were materially false and misleading; knew or recklessly disregarded that such audit reports would be issued or disseminated to Plaintiff and other members of the Class; and/or knowingly and substantially participated or acquiesced in the issuance or dissemination of such audit reports as primary violators of the federal securities laws.

175. As a result of the foregoing, the value of interests in the Stewardship Fund were grossly inflated during the Class Period. In ignorance of the falsity of the audit reports and the statements and representations made therein, and the deceptive and manipulative devices and contrivances employed by E&Y Bermuda and E&Y Bahamas, Plaintiff and the other members of the Class reasonably relied, to their detriment, on the audit reports and statements described above in investing or otherwise continuing to contribute to the Stewardship Fund, the value of which was artificially inflated as a result of false and misleading audit reports and other statements.

176. Had Plaintiff and the other members of the Class known of the material adverse information which E&Y Bermuda and E&Y Bahamas failed to disclose and/or misrepresented,

they would not have invested or otherwise continue to invest in the Stewardship Fund, if at all, in the amounts that they did.

177. The dissemination of this false and misleading material information by E&Y Bermuda and E&Y Bahamas, and their failure to disclose material information that rendered their other statements false and misleading, served only to harm Plaintiff and the other members of the Class who invested or otherwise contributed to the Stewardship Fund, in ignorance of the financial risk to them as a result of such false and misleading information.

178. As a direct and proximate result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

179. By reason of the foregoing, E&Y Bermuda and E&Y Bahamas have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and the other members of the Class for the substantial damages which they suffered in connection with their investment or contribution in the Stewardship Fund during the Class Period.

## COUNT II

## PROFESSIONAL NEGLIGENCE/MALPRACTICE
**(Against E&Y Bermuda and E&Y Bahamas)**

180. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if set forth herein at length.

181. Plaintiff and other members of the Class were owed a duty of care by E&Y Bermuda, as to the 2005 Report and 2006 Report, and by E&Y Bahamas, as to the 2007 Report, because they were aware that the representations contained therein were to be used and relied on

by Plaintiff and other members of the Class in making decisions with regard to whether to start, continue or cease investing in the Stewardship Fund, which E&Y Bermuda and E&Y Bahamas understood and appreciated as evidenced by the fact that the 2005, 2006 and 2007 Reports were addressed and provided to Plaintiff and other members of the Class.

182. Alternatively, Plaintiff and other members of the Class, as members of the Fund, were clients of E&Y Bermuda and E&Y Bahamas, and thus were obligated to apply to the audits of the Fund the degree of skill and learning possessed by reputable certified public accountants providing similar services to hedge funds and to use reasonable diligence and their best judgment in the exercise of their professional skill.

183. Alternatively, E&Y Bermuda and E&Y Bahamas, whose business, occupation and profession includes the dissemination of audit reports, owed Plaintiff and other members of the Class a duty to exercise reasonable or competence of care in communicating the results of those audits because Plaintiff and other members of the Class comprised a relatively finite and known group who reasonably and foreseeably relied on the 2005, 2006 and 2007 Reports to their detriment.

184. As more fully alleged herein, the 2005 Report and 2006 Report, as to E&Y Bermuda, and the 2007 Report, as to E&Y Bahamas, contained representations of fact as to, *inter alia*, the thoroughness of the audits and the financial condition of the Stewardship Fund.

185. As more fully alleged herein, E&Y Bermuda and E&Y Bahamas, individually or in concert, knew or reasonably should have known that the representations of fact contained in the 2005, 2006 and 2007 Reports were false.

186. In ignorance of the adequacy of the audits and the true state of the Fund's

financial condition, Plaintiff and other members of the Class reasonably relied on the misrepresentations contained in the 2005, 2006 and 2007 Reports and suffered economic harm as a result.

187. The wrongful acts committed by the E&Y Auditors as complained of herein were within the scope of the employment and duties of E&Y Bermuda and E&Y Bahamas and were committed in furtherance of the business of the E&Y Auditors.

WHEREFORE, Plaintiff, on behalf of himself and the other members of the Class, demands relief and judgment as to the E&Y Defendants, jointly and severally, as follows:

a. Determining that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b. Certifying Plaintiff as the Class Representative and his counsel as Class Counsel;

c. Declaring and determining that the E&Y Defendants violated the federal securities laws and committed professional malpractice/negligence by reason of their conduct as alleged herein;

d. Awarding monetary damages against the E&Y Defendants;

e. Awarding Plaintiff the costs, expenses, and disbursements incurred in prosecuting this action, including reasonable attorneys' fees and other recoverable expenses of litigation; and

f. Awarding Plaintiff and the other members of the Class such other and further relief as the Court may deem appropriate and just under all of the circumstances.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury in this action for all claims so triable against Defendants.

Respectfully submitted,

THE PLAINTIFF

/s/ Patrick A. Klingman

James E. Miller (ct21560)
Patrick A. Klingman (ct17813)
Karen Leser-Grenon (ct23587)
SHEPHERD, FINKELMAN, MILLER & SHAH, LLP
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (860) 526-1120
Email: jmiller@sfmslaw.com
pklingman@sfmslaw.com
kleser@sfmslaw.com

Scott R. Shepherd
Lawrence D. Berger
SHEPHERD, FINKELMAN, MILLER & SHAH, LLP
35 E. State Street
Media, PA 19063
Telephone: (610) 891-9880
Facsimile: (610) 891-9883
Email: sshepherd@sfmslaw.com
lberger@sfmslaw.com

Lesley E. Weaver
SHEPHERD, FINKELMAN, MILLER & SHAH, LLP
199 Fremont Street, 20th Floor
San Francisco, CA 94105
Telephone: (415) 992-7282
Facsimile: (415) 489-7701
E-mail: lweaver@sfmslaw.com

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on March 18, 2011, a copy of the foregoing Second Amended Class Action Complaint was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Patrick A. Klingman
Patrick A. Klingman (ct17813)