# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TERENCE ISAKOV, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 3:10cv1517 (MRK) |
| | : | |
| ERNST & YOUNG, LTD. (BERMUDA), and | : | |
| ERNST & YOUNG, LTD. (BAHAMAS), | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OF DECISION

Plaintiff Terence Isakov brings suit on his own behalf, and on behalf of all others who invested in the Stewardship Credit Arbitrage Fund, LLC (the "Fund") between March 15, 2006 and September 25, 2008, against Ernst & Young, Ltd. (Bermuda) & Ernst & Young, Ltd. (Bahamas) (collectively "E&Y"). Count I arises under § 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78j(b), and the rules and regulations promulgated thereunder by the United States Securities and Exchange Commission ("SEC"), including Rule 10b-5, 17 CFR § 240.10b-5(b).[1] Count II is a state law claim for professional negligence or malpractice.

Pending before the Court is E&Y's Motion to Dismiss, or in the alternative, to Enforce Arbitration and Forum Selection Provisions [doc. # 57], which the Court grants in part and denies in part. As discussed below, the Court finds that Dr. Isakov fails to state a § 10(b) claim because he does not adequately allege scienter and that his claims of negligence or professional

---

[1] Although the Third Amended Complaint states that the claims include a § 20(a) claim under the Exchange Act, *see* Third Am. Compl. [doc. # 56] ¶ 16, this appears to be a vestigial sentence from a previous draft. Only two claims for relief are formally listed, neither of which address potential § 20(a) liability.

malpractice are derivative and therefore are governed by the E&Y-Fund arbitration agreement. Dr. Isakov fails to establish the elements of a fraudulent inducement claim, but he does state a direct negligent inducement claim that survives this motion to dismiss.

## I.

The following facts are taken from Dr. Isakov's Third Amended Class Action Complaint [doc. # 56] unless otherwise noted. As this is a motion to dismiss, all facts are read in the light most favorable to Dr. Isakov. *See Matson v. Bd. of Educ. of City School Dist. of New York*, 631 F.3d 57, 63 (2d Cir. 2011).

## A.

Dr. Isakov's spouse originally invested in the Fund. Thereafter, in his role as the manager of the Isakov Family LLC, his family's investment vehicle, Dr. Isakov invested in the Fund in January 2005. On September 1, 2006, in reliance on a Private Placement Memorandum and on E&Y's audits, Dr. Isakov, as an individual, purchased $450,000 in Class A shares through his IRA. The required initial minimum contribution for an investor to become a member throughout the Class Period was $1 million, although subsequent contributions could be in lesser amounts.

The Fund's assets consisted primarily of promissory notes purchased from an affiliate, Acorn Capital Group, LLC ("Acorn"). Marlon Quan was the sole member and/or Managing Member of Acorn, and represented that he was Acorn's President and owner. Mr. Quan was also the sole member of Stewardship Investment Advisors, LLC ("Advisors"), an entity that made all of the Fund's investment and trading decisions. Mr. Quan exercised near complete control over Acorn, Advisors, and the Fund. Dr. Isakov also alleges that, for all intents and purposes, Acorn, Advisors, and the Fund operated as a single enterprise: they were housed in the same offices,

shared employees (whose number never exceeded twenty individuals), and no distinction was made between the businesses. Mr. Quan also dominated the Off-Shore Fund, which was essentially identical to the Fund insofar as Advisors was its investment advisor, E&Y were its auditors, and Acorn was the source of its loans.

Gustav E. Escher, III was the Fund's "Independent Manager." As such, he was responsible for evaluating the fairness of transactions between Acorn and the Fund. Dr. Isakov alleges that—as a friend and former co-worker of Mr. Quan's, as a director of the Off-Shore Fund, and as one of the Fund's subsidiaries—Mr. Escher was conflicted and his "independent" role was negated.

Both E&Y Bermuda and E&Y Bahamas are member firms of E&Y Global, one of the "big four" globally-respected accounting firms. Pursuant to annual engagement letters between E&Y and the Fund, the Fund was bound by an arbitration clause requiring that

> [a]ny dispute or claim arising out of or relating to services covered by this agreement or any other services hereafter provided by or on behalf of E&Y or any of its subcontractors or agents to the Fund or at its request (including any matter involving any third party for whose benefit any such services are provided), shall be submitted first to voluntary mediation, and if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures set forth in the attachment to this letter.

Defs.' Mot to Dismiss [doc. # 57-4] ¶ 22 (Engagement Letter of November 16, 2005); *see also* Defs.' Mot. to Dismiss [doc. # 57-5] ¶ 25 (Engagement Letter of December 7, 2006) (same). E&Y also served as the auditors for Acorn, and during the Class Period, E&Y had full access to the Fund's and Acorn's financial books and records and allegedly reviewed their financial statements.

Given Mr. Quan's various roles and Mr. Escher's conflict, Dr. Isakov alleges that E&Y were the only disinterested, wholly independent observers of the Fund's financial condition and

the validity of its transactions with other entities. Given this important role, E&Y's reputation, and the representations in Fund materials regarding E&Y, Dr. Isakov alleges that E&Y understood that Acorn and the Fund used their audits to establish financial credibility and that current and potential investors would place great weight on their audits in making investment decisions. Dr. Isakov specifically alleges that, as a Fund member on behalf of his family's investment vehicle, he received E&Y's audit reports and the annual audited financial statements since 2005 and relied on these documents when he made his personal investment in 2006.

B.

The Fund distributed Confidential Private Placement Memoranda ("PPMs") to prospective and existing Fund members, which identified E&Y as the Fund's auditor and outlined a series of practices Acorn would employ to ensure that all of its loans were well secured. The Fund's promotional materials also emphasized that E&Y was hired in part to examine the books of intermediaries—the companies to which Acorn would make loans—and Fund investors would be provided with audits of both the Fund and Acorn.

E&Y Bermuda issued clean audits of the Fund on March 31, 2003 for 2002; on March 5, 2004 for 2003; on March 7, 2005 for 2004 (with a disclaimer that E&Y had not been engaged to perform an audit of the Fund's internal control over financial reporting); on March 15, 2006 for 2005; and on March 27, 2007 for 2006. E&Y Bahamas issued a clean audit of the Fund on March 31, 2008 for 2007. In the statements issued in 2003, 2004, 2005, 2007 and 2008, E&Y stated that the audit was conducted in accordance with generally accepted accounting principles. According to Dr. Isakov, E&Y audits were addressed and provided to Dr. Isakov and other members of the proposed class. However, Dr. Isakov and other class members never received the Acorn audits, as promised in the PPMs.

As of April 30 2008, over 70% of the value of the Fund's assets (about $85 million) were tied up in loans Acorn made to a single borrower—PAC Funding, LLC ("PAC"), a company owned and controlled by Thomas J. Petters.[2] PAC claimed to be in the business of purchasing excess foreign high-end consumer electronics and reselling them to "big box" retailers, such as BJ's Wholesale Club, and it supposedly needed short-term loans to cover the acquisition of the goods and the time that elapsed before it was able to resell them. Each of the PAC loans was supposed to be secured by the underlying merchandise and a $50 million personal guarantee from Mr. Petters. The loans were also safeguarded by a lockbox agreement, according to which Acorn was supposed to receive payments directly from the retailers to whom PAC was selling its merchandise as sales were made.[3] Instead, PAC made monthly payments into the lockbox account. E&Y confirms that it did not audit Mr. Petters or his companies, contrary to the Fund's PPM statements. *See* Defs.' Mot. to Dismiss [doc. # 57-1] at 1 (Mem. in Support of Mot. to Dismiss).

PAC began falling behind in its payments in the spring of 2007. By February 2008, PAC

---

[2] In 2001, Acorn conducted approximately 33 successful note transactions with Redtag, another Petters corporation. In 2002, Acorn began entering into transactions with PCI, also a Petters company, which ultimately totaled approximately 149 note transactions worth over $585 million. In November 2004, Acorn began entering into note transactions with PAC, which ultimately totaled 491 note transactions worth over $1.9 billion. These, as well as other agreements with Petters companies, resulted in Acorn entering into over 670 separate loan transactions with an aggregate value of over $2.6 billion.

[3] The Complaint also notes that many of the Fund's other assets consisted of loans secured in reliance on Benjamin Zucker's appraisals of jewelry and other antiquities, which served as collateral for loans made to Ralph Esmerian, Inc. ("Esmerian"). Acorn began making these loans in December 2006 and required that Esmerian pledge as security collateral with an aggregate appraised value of at least three times the outstanding principal. In December 2007, Acorn made additional loans to Vassal Jewels LLC ("Vassal"), which represented that the funds would be used to purchase Esmerian stock. Again, Vassal was required to pledge collateral with an aggregate appraised value that met or exceeded the outstanding principal. Acorn, Esmerian, and Vassal agreed that Mr. Zucker—Mr. Esmerian's longtime friend—and another appraiser would evaluate the collateral.

and Acorn had entered into a Forbearance Agreement, in which Acorn agreed to postpone foreclosing on PAC's loans in return for a security interest in Polaroid Corp. ("Polaroid")— another Petters company—and proof that PAC was the legal owner of at least $112 million in accounts receivable from various retailers. In April 2008, PAC and Acorn restructured the credit facility of the Initial Credit Agreement from a revolving credit facility to a term facility. After further defaults, on May 14, 2008, PAC and Acorn further amended the Initial Credit Agreement to impose burdens on Polaroid and interest in Polaroid's intellectual capital—in effect, replacing the previous guarantees with Polaroid inventory, account receivables, and trademarks. PAC and Acorn also engaged in a number of "round-trip loans" in early 2008, whereby PAC would send Acorn money which Acorn would promptly re-loan to PAC.

In early 2007, the Off-Shore Fund began experiencing liquidity problems. E&Y did not include any reference to the Off-Shore Fund's problems in any Fund audit, despite the fact that Acorn's monies were comingled with those of the Off-Shore Fund. The Off-Shore Fund was found to be insolvent in the fall of 2008.

In early September 2008, it was discovered that Mr. Petters was a convicted felon who had not filed personal income tax returns since 2005. Mr. Petters had been running a large Ponzi scheme, and the vast majority of PAC's assets—and, therefore, the Fund's secured collateral— were illusory.[4]

On October 22, 2008, Dr. Isakov and other members of the proposed class received a memorandum from Advisors that E&Y Bahamas wished to notify them that the Acorn and Fund audit opinions issued on March 31, 2008 for the 2007 year could not be relied upon.

---

[4] Also in 2008, Esmerian and Vassal defaulted on their loans, and Acorn discovered that Mr. Zucker had vastly overvalued the collateral, which was actually worth barely 1% of the appraised value.

## II.

The Court must apply a familiar standard when ruling on any motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the *Federal Rules of Civil Procedure.* The Court must "accept as true all allegations in the complaint and draw all reasonable inferences in favor of the non-moving party." *Matson*, 631 F.3d at 63 (quotation marks omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).

## III.

Section 10(b) of the Exchange Act forbids the "use or employ, in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors."[5] 15 U.S.C. § 78j(b); *see also* 17 C.F.R. § 240.10b-5 (SEC Rule implementing § 10(b)).

A claim for securities fraud pursuant to § 10(b) of the Exchange Act and SEC Rule 10b-5 requires allegations of "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011) (citations and quotation marks omitted).

---

[5] The parties do not dispute that the interests in the Fund acquired by Dr. Isakov and other class members are "securities" pursuant to § 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10), in that they constitute investments in a common enterprise from which the interest owners were to receive profits solely from the efforts of the Fund's Managing Member. Nor do the parties contest that these interests are not "covered entities" as defined by 15 U.S.C. § 77r(b).

The only element of Dr. Isakov's § 10(b) claim E&Y disputes is whether he has adequately pled scienter. Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quotations omitted). The scienter element of a § 10(b) claim is subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4. *See ATSI Commc'ns v. Shaar Fund Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Neither *Iqbal, Twombly*, Rule 9(b), nor the PSLRA require detailed factual allegations. *See Iqbal*, 129 S. Ct. at 1949; *Twombly*, 550 U.S. at 555; *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d. Cir. 2001) (observing that neither Rule 9(b) nor the PSLRA "require the pleading of detailed evidentiary matter in securities litigation").

However, under both Rule 9(b) and PSLRA, allegations must be made "with particularity." *Telllabs, Inc.*, 551 U.S. at 314. To establish a strong inference of scienter under the PSLRA, the inference must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.*; *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008). In other words, plaintiffs must "'allege facts that give rise to a strong inference of fraudulent intent.'" *Stephenson v. PricewaterhouseCoopers, LLP*, 768 F. Supp. 2d 562, 571 (S.D.N.Y. 2011) (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)). A strong inference of scienter may be established by alleging either "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).

The standard for pleading scienter is demanding—and pleading auditor scienter even

more so by virtue of the relatively attenuated relationship between auditors and investors. *See, e.g.*, *In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 483 (S.D.N.Y. 2008); *In re J.P. Jeanneret Assoc., Inc.*, 769 F. Supp. 2d 340, 378 (S.D.N.Y. 2011) ("No Madoff-related case of which this Court is aware has sustained a federal securities claim against a feeder fund's outside auditors; courts confronted with such claims routinely dismiss them.").[6]

Given the high bar for pleading auditor scienter, "[a]llegations of [Generally Accepted Auditing Standards or other best practices] violations without corresponding fraudulent intent are insufficient to state a securities fraud claim against an independent accountant." *In re Tremont Sec. Law, State Law & Sec. Litig.*, 703 F. Supp. 2d 362, 370 (S.D.N.Y. 2010) (citing *Rothman v. Gregor*, 220 F.3d 81, 98 (2d Cir. 2000)). However, "[i]f there is evidence of corresponding fraudulent intent, [Generally Accepted Auditing Principles and other best practices] violations may themselves give rise to a strong inference of scienter." *In re Ambac Fin. Grp. Sec. Litig.*, 693 F. Supp. 2d 241, 273 n.38 (S.D.N.Y. 2010) (quotation marks and citations omitted).

Recklessness may also give rise to a strong inference of scienter if such recklessness is "conduct that is highly unreasonable, representing an extreme departure from the standards of ordinary care. It must, in fact, *approximate an actual intent to aid in the fraud being perpetrated by the audited company*." *Rothman*, 220 F.3d at 98 (emphasis added) (quotation marks omitted);

---

[6] As an initial point, Dr. Isakov's argument that this case is factually distinguishable from the many Madoff cases involving § 10(b) claims against auditors is unconvincing. As evidence of the distinct facts, Dr. Isakov notes that most auditors in those cases were monitoring the feeder funds, not the Ponzi schemer. Here, however, E&Y was monitoring both the alleged feeder fund (the Fund) and the middleman (Acorn). This is a distinction without a difference—especially as Dr. Isakov also alleges that Acorn and the Fund essentially operated as a single enterprise. In both cases, the auditor defendant was not responsible for auditing the Ponzi schemer. *See In re Tremont Sec. Law, State Law & Sec. Litig.*, 703 F. Supp. 2d 362, 371 (S.D.N.Y. 2010) (finding critical the fact that the auditor of the feeder fund did not audit the third party Ponzi schemer). Rather, in both situations the defendant auditors reviewed the books of the businesses that—intentionally or unintentionally—fostered a Ponzi scheme. As a result, the Court is justified in looking to the many Madoff cases for guidance.

*see also South Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) ("This Court has also long held that the scienter element can be satisfied by a strong showing of reckless disregard for the truth."). As many courts have noted, recklessness in this context means that the

> accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.

*In re IMAX Sec. Litig.*, 587 F. Supp. 2d at 483 (quotation marks omitted); *see, e.g.*, *In re Priceline.com Inc. Sec. Litig.*, 342 F. Supp. 2d 33, 57 (D. Conn. 2004).

One way in which a complaint might allege that there was effectively no audit at all would be to claim that the auditors disregarded specific "red flags" that would alert a reasonable auditor to the likelihood that the audited company was engaged in wrongdoing. *See In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 204 n.51 (S.D.N.Y. 2004). "Merely labeling allegations as red flags, however, is insufficient to make those allegations relevant to a defendant's scienter." *In re Marsh & Mclennan Co. Sec. Litig.*, 501 F. Supp. 2d 452, 487 (S.D.N.Y. 2006). Similarly, "merely alleging that the auditor had access to the information by which it could have discovered the fraud is not sufficient." *In re Tremont*, 703 F. Supp. 2d at 370-71 (citing *Rothman*, 220 F.3d at 98). "In the accounting context, failure 'to identify problems with the defendant-company's internal controls and accounting practices *does not* constitute reckless conduct sufficient for Section 10(b) liability.'" *W. Va. Inv. Mgmt. Bd. v. Doral Fin. Corp.*, 344 F. App'x 717, 720 (2d Cir. 2009) (quoting *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000)) (emphasis in original). When a plaintiff alleges a series of red flags, but not that the auditor ever became aware of them, dismissal is warranted. *See Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 452-53 (S.D.N.Y. 2010).

Finally, in determining whether the plaintiff has alleged facts supporting a strong inference of scienter, a court must evaluate "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323 (emphasis in original); *see also id.* at 326 ("[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically.").

## IV.

In attempting to allege scienter, Dr. Isakov relies primarily on circumstantial evidence that E&Y acted recklessly. These allegations of recklessness are based on two overarching claims: that E&Y violated Generally Accepted Accounting Standards ("GAAS") and Generally Accepted Accounting Practices ("GAAP") and that E&Y ignored numerous red flags.

As GAAS and GAAP violations, taken alone, are not sufficient to support an inference of scienter, *see In re Tremont*, 703 F. Supp. 2d at 370, Dr. Isakov sensibly describes these alleged violations as related to alleged red flags, *see In re Ambac Fin. Grp. Sec. Litig.*, 693 F. Supp. 2d at 273 n.38. To establish scienter, Dr. Isakov must nonetheless allege with particularity facts evidencing E&Y's fraudulent intent. *See id.*

### A.

Dr. Isakov fails to adequately allege that E&Y knew of many of the alleged red flags, which impairs his ability to allege scienter. *See Stephenson v. Citco Grp. Ltd.*, 700 F. Supp. 2d 599, 623 (S.D.N.Y. 2010) ("[O]nly those red flags that [the auditor] is alleged to have known of, or that are so obvious that [the auditor] must have known of them, can support an inference of intent.").

11

Dr. Isakov maintains that E&Y should have known it was missing significant documentation—namely, the restructuring agreements and documents related to the round-trip loans—but he does not allege any specific facts supporting a conclusion that E&Y even knew this documentation existed, especially as these transactions occurred in early 2008 (after the end of the 2007 audit).

Dr. Isakov also alleges that Acorn should have known that it was missing documentation of the existence, shipping, storage, or sale of the collateral securing all of its transactions with PAC. However, as PAC fabricated documents including "purchase orders, bills of sale and other documents by 'cutting and pasting' from once-legitimate documents," Third Am. Compl. [doc. # 56] ¶ 42, Dr. Isakov has not supported his conclusion that E&Y had reason to know the falsified documents were inaccurate. Similarly, it is not clear how E&Y should have known that Acorn had not conducted sufficient due diligence regarding Mr. Petters's personal guarantee, given that Acorn had bank records demonstrating that Mr. Petters had sufficient funds to cover that guarantee.

Dr. Isakov also alleges that E&Y Bermuda neglected to correct audit reports when they learned they were false. The Second Circuit has held that

> an accountant violates the "duty to correct" and becomes primarily liable under § 10(b) and Rule 10b-5 when it (1) makes a statement in its certified opinion that is false or misleading when made; (2) subsequently learns or was reckless in not learning that the earlier statement was false or misleading; (3) knows or should know that potential investors are relying on the opinion and financial statements; yet (4) fails to take reasonable steps to correct or withdraw its opinion and/or the financial statements; and (5) all the other requirements for liability are satisfied.

*Overton v. Todman & Co., CPAs, P.C.*, 478 F.3d 479, 486-87 (2d Cir. 2007). Therefore, an accountant is only liable for a failure to correct when it "knows or should know that potential investors are relying on its opinion." *Id.* Given that E&Y Bermuda knew E&Y Bahamas had

drawn investors' attention to the possible faultiness of the 2008 report, and by extension to the potential problems in earlier reports, it was reasonable for E&Y Bermuda to assume that no one was relying on its earlier audits and to not bother to correct them.

Finally, the fact that other investors elected not to deal with Mr. Petters is utterly irrelevant in the absence of evidence that E&Y knew of their decisions, let alone the reasons for their decisions.

### B.

Even when Dr. Isakov does plead facts which might constitute warning signs of which E&Y was aware, these allegations do not constitute red flags supporting a strong inference of scienter.

First, while E&Y knew or should have known that the Fund was reporting consistently high returns as a result of their audits, this is not a sufficient red flag to support a finding of scienter. *See, e.g.*, *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269-70 (2d Cir. 1996) (finding that "unprecedented and dramatically increasing profitability" was not, by itself, a sign of fraud sufficient to plead scienter); *Stephenson v. Citco Grp. Ltd.*, 700 F. Supp. 2d at 624 (noting that while the defendant "had to be aware that [its client] consistently reported excellent results, . . . even in the present economic climate the Court is unwilling to hold that success in securities trading is a red flag").

Second, assuming E&Y knew or should have known from its audits that Acorn was engaged in asset-based lending or that it was not investing as diversely as the PPMs claimed, such facts do not compel a finding of scienter. Even though there are several opportunities for fraud risk in this type of investment, it would be going too far to claim that concentrated investment was itself a red flag.

13

Likewise, E&Y certainly knew or should have known of Mr. Quan's and Mr. Escher's respective roles. Mr. Quan's concentrated power and Mr. Quan's conflicts may constitute a red flag, but one which does not support an inference of recklessness. *See Stephenson v. Citco Grp. Ltd.*, 700 F. Supp. 2d at 624 (noting that a similar concentration of power was something of a red flag, but that it was nonetheless "far too mild to support an inference of recklessness on the part of [the auditor]").

C.

Dr. Isakov does plead certain facts which may support an inference of scienter, but ultimately the Court concludes that the more compelling explanation is simple negligence.

Dr. Isakov alleges that Acorn knew, and that E&Y should have known, that Acorn was not enforcing the lockbox safeguards; in other words, E&Y should have known that the monies were coming from PAC, rather than the merchandise buyers, and that the funds due were paid in one large sum every month, rather than at irregular intervals. If such information is not regularly an element of an audit, Dr. Isakov has not alleged that E&Y knew of the way in which the lockbox account was paid. Assuming, in Dr. Isakov's favor, that such information is an expected element of an audit, ignoring it might be evidence of scienter, but negligence seems to be the more likely explanation. *See Stephenson v. Citco Grp. Ltd.*, 700 F. Supp. 2d at 622 (finding that defendant auditor's failure to adequately investigate its client's internal safeguards did not satisfy the scienter requirement) (citing *W. Va. Inv. Mgmt. Bd.*, 344 F. App'x at 720 (quoting *Novak*, 216 F.3d at 309)).

As E&Y was the auditor for Acorn, the Fund, and the Off-Shore Fund, it would seem likely that they knew or should have known that the entities were co-mingling funds. Additionally, E&Y knew or should have known that they were not receiving documentation of

PAC's financial status, as required by the Acorn-PAC contract. While both of these allegations do provide some support for an inference of scienter, the Court concludes that they more strongly support an inference of negligence.

### D.

Dr. Isakov repeatedly, and correctly, reminds the Court that the facts must be examined collectively. *See Tellabs*, 551 U.S. at 323. After reviewing the totality of non-conclusory allegations, including both the alleged violations of GAAS, GAAP, and E&Y's internal best practices and alleged red flags, however, the Court concludes that the inference that E&Y were acting negligently is more likely than an inference that they were acting with an actual intent to perpetuate a fraud.

Dr. Isakov makes many broad conclusory allegations, *see, e.g.*, Third Am. Compl. [doc. # 56] ¶ 3 (alleging that E&Y "either knew about the fraud at issue or were highly suspicious of the same and decided that they should 'bury their heads in the sand' rather than discover the obvious"), but he does not allege facts demonstrating that E&Y acted with fraudulent intent. Instead, taking the facts alleged in the record as true, the strongest inference is that E&Y was simply negligent in fulfilling its professional duties. *See Tellabs*, 551 U.S. at 314; *Teamsters Local 445*, 531 F.3d at 194; *Anwar*, 728 F. Supp. 2d at 453 ("Even if the [plaintiff] alleged facts sufficient to support a strong inference of conscious recklessness, Plaintiffs' federal securities law claims would still be subject to dismissal because a reasonable person would not deem the inference of scienter at least as compelling as opposing inferences one could draw from the facts alleged." (quotation marks and alterations omitted)).

The Court reiterates that pleading auditor scienter is difficult, and even more so when the auditor is responsible for monitoring an entity which may or may not know that it is transacting

with a Ponzi schemer. *See Anwar*, 728 F. Supp. 2d at 453 n.23 ("Plaintiffs cite no case, and the Court has found none, in which allegations that an auditor ignored red flags at a third party, non-client, as opposed to the audit client itself, established scienter."); *In re J.P. Jeanneret Assoc., Inc.*, 769 F. Supp. 2d at 378 (noting that courts "routinely" dismiss § 10(b) claims against a feeder fund's outside auditors). As Dr. Isakov has not adequately alleged that E&Y's actions "approximate[d] an actual intent to aid in the fraud being perpetuated by the audited company," *Rothman*, 220 F.3d at 98 (quotation marks omitted), his § 10(b) claim is dismissed.

## V.

The Court turns next to Dr. Isakov's state law claim for "professional negligence/malpractice." Third Am. Compl. [doc. # 56] at 96. E&Y argues that, to the extent that any of Dr. Isakov's claims are cognizable, they are derivative claims under both Delaware and Connecticut law, and Dr. Isakov is therefore bound by the terms of the engagement letters between the Fund and E&Y which require all claims to be subject to arbitration. Dr. Isakov counters that he is seeking individual, compensatory damages arising from his investments in the Fund based on E&Y's clean audits, and his claims are therefore direct under both Connecticut and Delaware law.

Keeping in mind that "a claim is not 'direct' simply because it is pleaded that way," *Dieterich v. Harrer*, 857 A.2d 1017, 1027 (Del. Ch. 2004), and that "the duty of the court is to look at the nature of the wrong alleged, not merely at the form of words used in the complaint," *In re Syncor Int'l Corp. Shareholders Litig.*, 857 A.2d 994, 997 (Del. Ch. 2004), the Court finds that Dr. Isakov's "pure" negligence and malpractice claims are derivative.

Under both Connecticut and Delaware law, "pure" negligence claims—as opposed to claims of negligent inducement—and professional malpractice claims require that plaintiffs

demonstrate injury. *See Retirement Program for Emps. of the Town of Fairfield v. NEPC, LLC*, 642 F. Supp. 2d 92, 96 (D. Conn. 2009) (noting that, under Connecticut law, a negligence claim requires a showing of damages); *Shawmut Bank Conn., N.A. v. Deloitte & Touche*, No. CV 94-0462508S, 1995 WL 283917, at *1 (Conn. Super. Ct. Apr. 25, 1995) (requiring, as one of the elements of a professional malpractice claim under Connecticut law, that "the plaintiff must suffer actual injury"); *Roache v. Charney*, --- A.3d ---, 2012 WL 603593, at *2 (Del. Supr. Ct. Feb. 24, 2012) (noting that, under Delaware law, a negligence claim requires a showing that plaintiff suffered an injury); *Nieves v. All Star Title, Inc.*, No. N10C-03-191 PLA, 2010 WL 2977966, at *6 (Del. Super. Ct. Jul. 27, 2010) (requiring, for a professional malpractice claim under Delaware law, that a plaintiff establish recoverable damages).

With regard to his "pure" negligence/professional malpractice claims, Dr. Isakov's injury can only be the diminution of the value of his shares. Under both Connecticut and Delaware law, a claim based on an injury sustained equally by all shareholders—such as that which Dr. Isakov alleges—is necessarily a derivative claim. *See May v. Coffey*, 291 Conn. 106, 115-16 (2009) (finding a diminution of value claim—in this case, due to stocks sold at a low price—derivative because the primary injury was to the corporation and shareholders suffered only an "indirect injury, a reduction in the value of their existing shares") (citing cases); *Feldman v. Cutaia*, 951 A.2d 727, 733 (Del. 2008) (denying plaintiff standing to bring a dilution of value claim directly because "to state a direct claim, the plaintiff must have suffered some individualized harm not suffered by all of the stockholders at large"). As Dr. Isakov's claims of negligence and professional malpractice are derivative, they are governed by the E&Y-Fund Arbitration Agreement.

The parties do not challenge the validity of the E&Y-Fund Arbitration Agreement, nor

the provision which requires that "[a]ny dispute or claim arising out of or relating to services" provided to the Fund by E&Y "shall be submitted first to voluntary mediation, and if mediation is not successful, then to binding arbitration." Defs.' Mot to Dismiss [doc. # 57-4] ¶ 22 (Engagement Letter of November 16, 2005); *see also* Defs.' Mot. to Dismiss [doc. # 57-5] ¶ 25 (Engagement Letter of December 7, 2006) (same). The Court therefore stays Dr. Isakov's negligence and professional malpractice claims pending the conclusion of arbitration, in accordance with the arbitration agreement. *See Ernst & Young Ltd. v. Quinn*, No. 09-cv-1164 (JCH), 2009 WL 3571573, *8-9 (D. Conn. Oct. 26, 2009) (finding that the E&Y-Fund Arbitration Agreement satisfied the Second Circuit's requirements); *see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985) (discussing the strong federal policy favoring arbitration and choice-of-forum provisions in agreements involving international disputes); *David L. Threlkeld & Co. v. Metallgesellschaft Ltd. (London)*, 923 F.2d 245, 250 (2d Cir. 1991) ("The goal of the Convention [on the Recognition and Enforcement of Foreign Arbitral Awards] is to promote the enforcement of arbitral agreements in contracts involving international commerce so as to facilitate international business transactions on the whole.").

However, although he terms his state law claims as "professional negligence/malpractice," Third Am. Compl. [doc. # 56] at 96, in the text of his complaint Dr. Isakov argues an inducement claim, *see id.* ¶ 183 (incorporating previous paragraphs within the professional negligence/malpractice claim); *id.* ¶ 173 (stating that E&Y's statements "induced Plaintiff and other members of the Class to make investments or contributions in the Stewardship Fund."). Reading the Third Amended Complaint as a whole, as clarified by the briefing and oral argument, the Court finds that Dr. Isakov attempts to state a fraudulent or negligent inducement claim.

District courts in this Circuit—and elsewhere—are split on the question of whether inducement claims constitute direct or derivative actions. In *Ernst & Young Ltd. v. Quinn*, 2009 WL 3571573, investors brought numerous state law claims against Ernst & Young Ltd. Bermuda and Ernst & Young LLP based on substantially similar facts. The David B. Stenberg Inc. Employee Pension Trust brought a derivative suit on behalf of the Fund; Susan Quinn and Peter Pressman attempted to bring direct claims as a class action, on behalf of themselves and others similarly situated. Judge Hall found, *inter alia*, that (1) the district court had jurisdiction over the arbitration agreement between defendants and the Fund; and (2) all plaintiffs asserted derivative claims under both Connecticut and Delaware law because the nature of the plaintiffs' injury was necessarily linked to the nature of the injury to the Fund. Judge Hall specifically found that the plaintiffs' fraudulent inducement claims were derivative under both Connecticut and Delaware law because the injury was traceable to the diminution in value of the shares. *See id.* at *6, *8. Based on these conclusions, Judge Hall ordered a stay of the state court proceedings and compelled the parties to engage in arbitration.[7]

Contrary precedent is found in *Stephenson v. Citco Grp. Ltd.*, 700 F. Supp. 2d 599, in which a district court found, under Delaware law, that negligence and fraud claims against auditors were direct to the extent that plaintiffs alleged inducement. The *Stephenson* court reasoned that such claims "are direct because they allege a harm suffered by plaintiff independent of the partnership and a duty to plaintiff that is not merely derivative of [the auditor's] fiduciary duties to the partnership." *Id.* at 612; *see also Albert v. Alex. Brown Mgmt.*

---

[7] A Connecticut court also determined that, under Delaware state law, claims by Fund investors against Ernst & Young LLP were derivative. *See Quinn v. Stewardship Credit Arbitrage Fund, LLC*, No. X03-CV09-404647S, at *4 (Conn. Super. Ct. Aug. 6, 2010). Although fraud and negligent inducement were two of the many claims alleged in the plaintiffs' complaint, the Connecticut Superior Court did not clarify the reasons for its conclusion with regard to these claims.

*Serv., Inc.*, Nos. Civ. A. 762-N, Civ. A 763-N, 2005 WL 2130607, at *12 (Del. Ch. Aug. 26, 2005) (determining that a non-disclosure claim under state law was direct, in part because "[g]enerally, non-disclosure claims are direct claims").

The Court finds *Stephenson*'s reasoning more persuasive, for reasons this Court discusses in more detail in a companion case. *See Poptech, L.P. v. Stewardship Investment Advisors, LLC*, No. 3:10cv967 (MRK). Under *Stephenson* and related cases, Dr. Isakov may bring a fraudulent or negligent inducement claim directly. *See Stephenson v. Citco Grp. Ltd.*, 700 F. Supp. 2d at 612 (finding that inducement claims "are direct to the extent (and only to the extent) that they allege (1) violation of a duty owed to potential investors at large and (2) that such violations induced plaintiff to invest in [the corporation]").

Under both Connecticut and Delaware law, a viable claim for negligent inducement or misrepresentation requires a misrepresentation of fact, reliance, and damages. *See, e.g., Barrow v. Walsh*, No. X02UWYCV095015180, 2012 WL 669841, *13 (Conn. Super. Ct. Feb. 2, 2012) (listing the elements as including a misrepresentation of fact that the defendant knew or should have known was false, reasonable reliance, and pecuniary harm); *Smith v. Peninsula Adjusting Co., Inc.*, No. 09C-03-024 (RBY), 2011 WL 2791252, at *3 (Del. Super. Ct. Jun. 16, 2011) (listing the elements as including a duty to provide accurate information, the supplying of false information, failure to exercise reasonable care in obtaining or communicating the information, and a pecuniary loss caused by justifiable reliance). Dr. Isakov alleges that E&Y had a duty to provide accurate audits; that, as a Fund Member, he knew of E&Y's audits; that the audits included false statements which E&Y should've known were false; and that he reasonably relied on E&Y's March 2006 audit when purchasing shares in September 2006. Necessarily, recovery on a claim based on such inducement would flow only to those individuals who were so induced.

*See Stephenson v. Citco Grp. Ltd.*, 700 F. Supp. 2d at 612 ("For example, damages from an inducement claim based solely on a fraudulent November 5th, 1955 report would only be available to that subset of limited partners who invested after that date."). Dr. Isakov has therefore stated a negligent inducement claim.

E&Y argues that Dr. Isakov was not a Fund Member at the time it issued the audits upon which he relied in making his investments, and therefore E&Y did not owe him any duty of care as a mere prospective investor. E&Y is correct that Dr. Isakov's family fund is not a named plaintiff and that Dr. Iskaov cannot assert claims in his personal capacity based on a corporate relationship. *See, e.g.*, *Chiulli v. Zola*, 905 A.2d 1236, 1242 (Conn. App. Ct. 2006). However, a question of fact remains as to whether Dr. Isakov was a Fund Member at the time he purchased shares in his individual capacity. Dr. Isakov purchased only $450,000 in shares on September 1, 2006, despite fact that the initial minimum contribution was $1 million. As this is a motion to dismiss and the Court must interpret all facts in Dr. Isakov's favor, the Court determines that, solely for the purposes of this motion, Mr. Isakov was or was considered to be a Fund Member in September 2006.

Under both Connecticut and Delaware law, a fraudulent inducement claim requires that a statement is made with the intent that the listener act upon it. *See, e.g.*, *Biro v. Matz*, 33 A.3d 742, 753 (Conn. App. Ct. 2011) (stating that one of the elements of fraudulent inducement under Connecticut law is that a statement "was made to induce the other party to act upon it"); *Duffield Assoc., Inc. v. Meridian Architects & Eng'rs, LLC*, No. S10C-03-004 RFS, 2010 WL 2802409, at *4 (Del. Super. Ct. Jul. 12, 2010) (same). Mr. Isakov repeatedly notes that E&Y knew or should have known that he would rely on their audits, but he provides no evidence to support a theory that they intended their audits to induce his investment. As a result, Dr. Isakov's fraudulent

inducement claim fails.

In summary, Dr. Isakov's "pure" negligence and malpractice claims are stayed pending arbitration, his fraudulent inducement claim is dismissed, and his negligent inducement claim may proceed.

## VI.

The Court GRANTS IN PART and DENIES IN PART E&Y's Motion to Dismiss, or in the alternative, to Enforce Arbitration and Forum Selection Provisions [doc. # 57]. Because Dr. Isakov failed to adequately plead scienter, his § 10(b) claim under the Exchange Act is DISMISSED. As the Court finds that Dr. Isakov's negligence and professional malpractice claims are derivative, they are governed by the arbitration agreement between the Fund and E&Y. The Court therefore STAYS consideration of Dr. Isakov's negligence and professional malpractice claims pending the conclusion of arbitration. Any fraudulent inducement claim is DISMISSED, but Dr. Isakov's negligent inducement claim survives. Dr. Isakov should submit a status report on or before April 20, 2012 to inform the Court as to whether he intends to submit the negligent inducement claim to arbitration along with his "pure" negligence and professional malpractice claims.

IT IS SO ORDERED.

/s/     Mark R. Kravitz_____
         United States District Judge

Dated at New Haven, Connecticut: March 19, 2012.